IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RICHARD M. SMITH, DONNA SMITH, DOUG SCHRIEBER, SUSAN SCHRIEBER, RODNEY A. HEISE, THOMAS J. WELSH, JAY LAKE, JULIE LAKE, KEITH BREHMER, and RON BRINKMAN, | ) ) ) ) ) ) | Case No. 4:07-cv-03101 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER |
| MITCH PARKER, In his official capacity as Chairman of the Omaha Tribal Council, BARRY WEBSTER, In his official capacity as Vice-Chairman of the Omaha Tribal Council, AMEN SHERIDAN, In his official capacity as Treasurer of the Omaha Tribal Council, RODNEY MORRIS, In his official capacity as Secretary of the Omaha Tribal Council, ORVILLE CAYOU, In his official capacity as Member of the Omaha Tribal Council, ELEANOR BAXTER, In her official capacity as Member of the Omaha Tribal Council, and ANSLEY GRIFFIN, In his official capacity as Member of the Omaha Tribal Council and as the Omaha Tribe's Director of Liquor Control. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## INTRODUCTION

This dispute arises from Defendants' attempts to tax and regulate alcohol sales in the village

of Pender, Nebraska. Pender lies outside the western edge of the Omaha Indian Reservation.

Although the land on which Pender sits was originally within the borders of the Reservation, this

area was never inhabited by members of the Omaha Tribe and, in 1882, Congress opened the area

for settlement and altered the western boundary of the Omaha Reservation. This alteration placed

Pender outside the Omaha Reservations' borders. Pender was quickly settled by non-Indian

homesteaders and has, for decades, been owned and controlled by nonmembers of the Omaha Tribe.

Defendants recently began attempts to impose a tribal liquor license and tax on nonmembers of the Omaha Tribe for alcohol sales that occur in Pender. Because Defendants cannot impose a tax beyond the Omaha Tribe's territorial limits, this Court should enter a temporary restraining order precluding Defendants from enforcing the tribal liquor license and tax on Plaintiffs, who are liquor retailers in Pender. See Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 653 (2001).

## FACTS

**Adoption of the New Licensing Scheme and Alcohol Tax**. On June 15, 2004, Defendants adopted an amendment to Title 8 of the Omaha Tribe's Beverage Control Ordinance in an effort to "regulate[] and control[] the possession, sale and consumption of liquor within the Omaha Tribe's Reservation." Amendment (Title 8 of the Tribal Code) to Omaha Tribe's Beverage Control Ordinance, 71 Fed. Reg. 10056 (Feb. 28, 2006), Pls.' Ex. 1,[1] (the ordinance, as amended, is hereinafter referred to as the "Beverage Control Ordinance.")[2] Prior to the adoption of this amendment, the Beverage Control Ordinance applied only to those portions of the Omaha Reservation located within the State of Iowa. By removing all references to "the State of Iowa" from the Beverage Control Ordinance, it became applicable to "any and all territory within the confines

---

[1] For the Court's convenience, Plaintiffs' Index of Evidence contains various authorities and documents which may be difficult to locate. In many cases, only excerpts are provided due to the voluminous nature of the authorities cited. At the Court's request, Plaintiffs will provide more extensive excerpts if possible.

[2] The prohibition on alcohol sales in Indian country can be conditionally suspended by enactment of a tribal ordinance and compliance with state law pursuant to 18 U.S.C. § 1161. Rice v. Rehner, 463 U.S. 713, 722 n.8 (1983). Omaha Tribal Council Resolution No. 85-89 (11-7-85) forbade the sale of alcohol within the boundaries of the Omaha Tribal Reservation. The Beverage Control Ordinance repealed Resolution No. 85-89 (11-7-85). See, Beverage Control Ordinance, 71 Fed. Reg. at 10061, Pls.' Ex. 1.

of the Omaha Indian Reservation, and to any and all future additions of land acquired within or without said boundary lines by the Secretary of the Interior for the Tribe or by the Tribe." <u>Id</u>.[3]

On February 22, 2006, the Beverage Control Ordinance was submitted for publication in the Federal Register. <u>Id</u>. On February 28, 2006, the Beverage Control Ordinance was published in the Federal Register and became effective. <u>Id</u>. However, Defendants made no attempt to enforce the Beverage Control Ordinance outside of the actual boundaries of the Omaha Reservation until December of 2006.

On December 10, 2006, each Plaintiff received a "Notice" from Defendants which threatened to "begin fining any unlicensed package dealers, on sale dealers, and wholesalers ***within*** the Omaha Indian Reservation beginning January 1, 2007." (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶ 11.) (emphasis added). None of the Plaintiffs took action in response to the Notice because none are located "within the Omaha Indian Reservation" and none are affiliated in any way with the Omaha Tribe or Defendants. (<u>Id</u>.)

---

[3] The licensing scheme contained within the Beverage Control Ordinance introduces three classes of liquor licenses–A, B, and C. Beverage Control Ordinance, 71 Fed. Reg. at 10059, Pls.' Ex. 1. Class A licenses are issued to "Package Dealers" and require a $1,000.00 application fee, Class B licenses are issued to "On-Sale Dealers" and require a $1,500.00 application fee, and Class C licenses are issued to "Wholesalers" and require a $500.00 application fee. (<u>Id</u>.) Each license is valid for one year, but may be extended for an additional thirty days provided that a new license application is pending at the time of expiration. (<u>Id</u>. at 5.) The Beverage Control Ordinance also institutes a 10% sales tax to be levied on the retail price of all sales of alcoholic beverages. (<u>Id</u>.) The 10% sales tax must be remitted to the Omaha Tribe. Any entity applying for a license must also grant unlimited access to its books and premises to the Omaha Tribe. (<u>Id</u>.) "[An applicant's] premises, for the purpose of search and seizure laws shall be considered public premises, and that such premises and all buildings, safes, cabinets, lockers, and store rooms thereon will at all times on demand of the Tribal Council or a duly appointed Tribal or Federal policeman, be open to inspection." (<u>Id</u>.) Non-tribal members who fail to comply with the licensing and taxing scheme are subject to administrative fines in the amount of $10,000.00 per violation. (<u>Id</u>.)

On December 19, 2006, Plaintiff Smith received a letter from the Omaha Tribe. (Aff. of R. Smith, Pls.' Ex. 2, ¶ 12; Ex. C.) The letter included an application to obtain a liquor license from the Omaha Tribe for Smitty City West and a request to remit the 10% alcohol tax imposed by the Beverage Control Ordinance on a monthly basis. (Id., Ex. C.) Again, Smith did not take any action in response to the December 19, 2006 letter because his business, Smitty City West, is not located within the Omaha Indian Reservation nor is he affiliated with the Omaha Tribe. (Aff. of R. Smith, Pls.' Ex. 2, ¶ 11.)

On or about January 31, 2007, Plaintiffs received a Second Notice from the Omaha Tribe via registered mail. (Aff. of R. Smith, Pls.' Ex. 2, ¶ 13; Aff. of D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 3-8, ¶ 12.) The Second Notice was addressed to "all manufacturers, importers, wholesalers, and retailers of alcoholic beverages **within the Omaha Indian Reservation**." (Id.) (emphasis added). Despite the fact that Plaintiffs are not located "within the Omaha Indian Reservation" and are not otherwise affiliated with the Omaha Tribe or Defendants, this notice informed them that "the Omaha Tribe's Director of Liquor Control has determined that [they] are subject to the requirements of the Alcoholic Beverage Control Title." (Id.) The Second Notice also stated that because Plaintiffs were not in compliance with the Beverage Control Ordinance, they were subject to fines of up to $10,000.00 per violation. Id. The Second Notice threatened "enforcement actions in Omaha Tribal Court." (Id.)

**The Plaintiffs**. Plaintiffs in this action consist of several similarly-situated individuals who operate businesses that sell alcoholic beverages in Pender, Nebraska. (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶¶ 2, 5) (collectively, Plaintiffs are hereinafter referred to as the "Liquor Retailers.") Each Plaintiff holds

a valid liquor license from the State of Nebraska and has fully complied with all of Nebraska's requirements to engage in the retail sale of alcohol. None of the Plaintiffs have applied for a license or remitted any taxes to the Omaha Tribe under the Beverage Control Ordinance. (Aff. of R. Smith, Pls.' Ex. 2, ¶¶ 6-8, 11-13; Aff. of D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 3-8, ¶¶ 6-8, 11-12.) Further, Plaintiffs' primary customers are not members of the Omaha Tribe, but rather nonmember residents of Pender and the surrounding areas. (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶ 9.)

Donna and Richard M. Smith own Smitty City West, a convenience store located at 701 South 4th Street in Pender, Nebraska. (Aff. of R. Smith, Pls.' Ex. 2, ¶ 2.) Smitty City West has sold alcoholic beverages for the last 38 years. (Id.) Doug and Susan Schreiber own Schreibs Bar, a bar serving food located at 202 Main Street in Pender, Nebraska. (Aff. of D. Schreiber, Pls.' Ex. 3, ¶ 2.) Schreibs Bar has sold alcoholic beverages for at least 11 years. (Id.) Rodney A. Heise owns the Other Side, a bar located at 219 Main Street in Pender, Nebraska. (Aff. of R. Heise, Pls.' Ex. 4, ¶ 2.) The Other Side has sold alcoholic beverages for at least 23 years. (Id.) Thomas J. Welsh owns Welsh's Bar, a bar located at 212 Main Street in Pender, Nebraska. (Aff. of T. Welsh, Pls.' Ex. 5, ¶ 2.) Welsh's Bar has sold alcoholic beverages for at least 27 years. (Id.) Jay and Julie Lake own Pender Lanes, a bowling alley located at 415 South 4th Street in Pender, Nebraska. (Aff. of J. Lake, Pls.' Ex. 6, ¶ 2.) Pender Lanes has sold alcoholic beverages for at least 23 years. (Id.) Keith Brehmer is Commander of the American Legion Post 55 and the Pender Veterans Club, a veterans club located at 610 Main Street in Pender, Nebraska. (Aff of K. Brehmer, Pls.' Ex. 7, ¶ 2.) Ron Brinkman is President of the Board of the Twin Creeks Golf Club, a golf course located at Highway

Nine North in Pender, Nebraska. (Aff. of R. Brinkman, Pls.' Ex. 8, ¶ 2.)  None of the Plaintiffs are members of the Omaha Tribe, parties to any contracts with the Omaha Tribe or involved in any other formal business relationship with the Tribe.  (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶ 10.)

**Establishment of the Omaha Indian Reservation**.  In 1854, the Omaha Tribe entered into a treaty with the United States government in which the Tribe ceded most of its aboriginal lands to the United States in exchange for money and other assistance.  Treaty with the Omaha, U.S.-Omaha Indian Tribe, 10 Stat. 1043 (1854), Pls.' Ex. 9; see also, Wilson v. Omaha Indian Tribe, 442 U.S. 653, 658-59 (1979) (discussing historical development of Omaha Reservation); United States v. Omaha Indians, 253 U.S. 275, 277-278 (1920) (same); Aff. of J. Fenner, Pls.' Ex. 10, Ex. A (Letter from Marcia M. Kimball, Office of the Solicitor, United States Department of Interior, to Jerry Jaeger, Area Director, Department of Indian Affairs (June 27, 1989)) (discussing effects of various treaties upon boundary of Omaha Indian Reservation).  The Omaha Reservation ultimately was created in the Blackbird Hills area of the Nebraska Territory.  Wilson, 442 U.S. at 658.  This land, as modified by subsequent treaties and statutes, is the current location of the Omaha Indian Reservation.

**Diminishment of the Western Boundary of the Omaha Reservation and the Village of Pender**.  The Village of Pender is the county seat of Thurston County and located in the northeastern corner of Nebraska.  (Aff. of T. Lamplot, Pls.' Ex. 11, ¶ 3.)  Pender is situated on land lying to the west of the Sioux City and Nebraska Railroad Company right of way.  (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶ 3-4.)  The right of way is now owned by the Chicago, St. Paul, Minneapolis & Omaha Railroad. (Neb. Att'y

Gen. Op. 07005 (Feb. 15, 2007), Pls.' Ex. 12, at 3.)   Although the site on which Pender sits was originally within the Omaha Reservation, all of the lands to the west of the Sioux City and Nebraska Railroad right of way were taken out of Indian control, removed from the Omaha Reservation, and opened for settlement pursuant to an Act of Congress in 1882.

On August 7, 1882, Congress approved an agreement between the Omaha Tribe and the Secretary of Interior.  Act of Aug. 7, 1882, ch. 434, 22 Stat. 341, Pls.' Ex. 13 (the "1882 Act").  The 1882 Act authorized the Secretary to survey and sell "all that portion of [the Omaha] reservation in the State of Nebraska lying west of the right of way granted by said Indians to the Sioux City and Nebraska Railroad Company."  Id.  The 1882 Act further authorized the Secretary to proclaim the unallotted lands "open for settlement."  Id.  The Act provided that "no portion of said land shall be sold at less than the appraised value thereof, and in no case for less than two dollars and fifty cents per acre."  Id.[4]  The property located to the west of the railroad right of way which was removed from the Omaha Reservation pursuant to the 1882 Act is hereinafter referred to as the "Disputed Territory."

The Disputed Territory was physically opened to settlers on April 30, 1884.  1884 Rep. of the Sec. of the Interior Vol. I, at 28, Pls.' Ex. 14.  "Upon opening the lands to settlement the major portion was quickly absorbed by settlers.  By September 1, 1884, 311 filings had been made, embracing about 43,000 acres."  Id.  Ultimately, the Disputed Territory was settled exclusively by

---

[4]  The 1882 Act also provided for the sale of the land located in township twenty-four, which is adjacent to the right of way to the east.  (Aff. of J. Fenner, Pls.' Ex. 10, Ex. A (Letter from Marcia M. Kimball, Office of the Solicitor, United States Department of Interior, to Jerry Jaeger, Area Director, Department of Indian Affairs (June 27, 1989)) at 3.)

non-Indians. (Aff. of T. Lamplot, Pls.' Ex. 11, ¶¶ 11-12.) None of the initial patents issued in the Disputed Territory were issued in trust to Omaha Tribe members. (Id. ¶ 12.)

On May 15, 1888, Congress passed an act which extended the time for homesteaders to pay for land purchased pursuant to the 1882 Act. Act of May 15, 1888, ch. 255, 25 Stat. 150, Pls.' Ex. 15 (the "1888 Act"). Under the terms of the 1888 Act, if a settler defaulted on payment for land within the Disputed Territory, the land was to be sold at public auction rather than revert back to the Omaha Tribe. Id.

Not only was the Disputed Territory settled exclusively by non-Indians, the Disputed Territory has never since been under Tribal control. A thorough search of the land patents issued pursuant to the 1882 Act shows that Omaha Tribe members were issued no land west of the railroad right of way after the 1882 Act. (Aff. of T. Lamplot, Pls.' Ex. 11, ¶¶ 4-12.) Indeed, except for a small portion of land gifted to the Omaha Tribe in 2005, no land in Pender is owned by a member of the Omaha Tribe. (Id. ¶¶ 13-14.)

In 1989, the Office of the Solicitor of the United States Department of the Interior was asked by the Bureau of Indian Affairs to locate the western boundary of the Omaha Indian Reservation. (Aff. of J. Fenner, Pls.' Ex. 10, Ex. A (Letter from Marcia M. Kimball, Office of the Solicitor, United States Department of Interior, to Jerry Jaeger, Area Director, Department of Indian Affairs (June 27, 1989)).) In order to provide the opinion, the Department of Interior reviewed "each of the treaties or legislative acts effecting [sic] the reservation" boundary. (Id., Ex. A at 1.) The Department of Interior concluded that the Disputed Territory "appears to have lost its Indian character long ago with the arrival of non-Indian homesteaders." (Id., Ex. A. at 5.) Thus, the Department of Interior concluded "the most logical demarcation line for the western boundary of the

Omaha Reservation is the centerline of the abandoned [Sioux City and Nebraska Railroad Company] right of way. . . . [U]nder the 1882 Act the land to the west of the right of way went out of Indian control when it was opened for settlement." (Id., Ex. A at 7-8.) Similarly, the Thurston County District Court and the Nebraska Attorney General's Office have previously issued opinions concluding that the Disputed Territory is not part of the Omaha Reservation. (State v. Picotte, Case No. CR 00-6, Docket 32 Page 363 (D. Ct. Thurston Co. Neb., Aug. 22, 2000), Pls.' Ex. 16; Neb. Att'y Gen. Op. 07005 (Feb. 15, 2007), Pls.' Ex. 12.)

**The Omaha Tribe's Exercise of Control Over Land West of the Railroad Right of Way**.

The Omaha Tribe owns only a small tract of land west of the railroad right of way and has owned that land only since 2005. (Aff. of T. Lamplot, Pls.' Ex. 11, ¶¶ 13-14.) The Omaha Tribe does not maintain offices or conduct tribal activities in Pender. (Id., ¶ 21.) In addition, the Omaha Tribe does not provide law enforcement, emergency services, social services, schools, or any other services in Pender. (Id. ¶¶ 17-21.) Rather, Thurston County and Village of Pender officials and employees provide such services. (Id. ¶¶ 17-18, 20.)

## ARGUMENT

A temporary restraining order enjoining Defendants' enforcement of the Beverage Control Ordinance against Plaintiffs should be issued if the Court finds that (a) Plaintiffs are likely to succeed on the merits of the litigation; (b) Plaintiffs suffer a threat of irreparable harm; (c) the balance between the harm to Plaintiffs and the harm created by granting the injunction weighs in favor of issuing an injunction; (d) the public interest supports the issuance of the injunction. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). See also Davis v. Francis Howell Sch. Dist., 104 F.3d 204 (8th Cir. 1997). "No single factor in itself is dispositive;

rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998). The Eighth Circuit applies the same standard to requests for preliminary injunctions and temporary restraining orders. S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir. 1989).

Because Plaintiffs satisfy each element of the Dataphase test, they are entitled to a temporary restraining order.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THIS LITIGATION BECAUSE DEFENDANTS' POWER TO TAX DOES NOT EXTEND BEYOND THE BOUNDARIES OF THE OMAHA RESERVATION.

"An Indian tribe's sovereign power to tax–whatever its derivation–reaches no further than tribal land." Atkinson Trading Company, Inc. v. Shirley, 532 U.S. 645, 653 (2001). This statement by the United States Supreme Court preordains the fate of Defendants' attempts to impose an alcohol tax and licensing scheme outside of the boundaries of the Omaha Reservation. Because Defendants lack sovereign authority over nonmembers outside of the boundaries of the Omaha Reservation, they may not compel Plaintiffs to submit to the Beverage Control Ordinance.

### A. Defendants Lack the Sovereign Authority to Impose a Tax or Regulatory Scheme on Nonmembers Outside the Omaha Reservation.

The Court fully explained the limits upon an Indian Tribe's power to impose taxes in Atkinson Trading Company, Inc. v. Shirley, 532 U.S. 645, 653 (2001). There, the Court rejected the authority of the Navajo Nation to impose a hotel occupancy tax on hotels located on non-Indian land located within the boundaries of the Navajo Reservation.[5] The Navajo Nation enacted a hotel

---

[5] There are several different labels applied to land that is affiliated with an Indian tribe. "Reservations" are lands formally reserved for Indians through treaties, federal statutes, or

occupancy tax which imposed an 8% tax on the cost of any hotel room located within the Reservation. Though the legal incidence of the tribal hotel tax fell on the hotel guests, the Navajo Nation sought to impose the duty to collect the tax on Atkinson, the non-Indian owner of a hotel.

The Supreme Court reaffirmed a narrow statement of the powers of Indian tribes over non-member activities on lands over which tribes have lost their "gate-keeping right." Strate v. A-1 Contractors, 520 U.S. 438, 456 (1997). The Court began its analysis with the now well-recognized statement that "[t]ribal jurisdiction is limited: For powers not expressly conferred upon them by federal statute or treaty, Indian tribes must rely upon their retained or inherent sovereignty." Atkinson, 532 U.S. at 649-50. Describing Montana v. Crow Tribe of Indians, 523 U.S. 696 (1998), as "the most exhaustively reasoned of our modern cases addressing" the scope of inherent tribal authority, the Court reiterated the view espoused in that case that tribal "power over nonmembers on non-Indian fee land is sharply circumscribed." Id. at 650. As explained in Montana, an Indian tribe's "inherent authority" is limited to "what is necessary to protect tribal self-government or to control internal relations," but does not extend to "external relations" as that would be "inconsistent with the dependent status of the tribes." Montana, 450 U.S. at 564.

---

executive orders. See Felix S. Cohen, Handbook of Federal Indian Law 473-81, 493 (1982 ed.). Lands within reservations are communal lands that are set apart for the benefit of all tribal members and held in trust. Id. at 34-38. "Dependent Indian communities" are areas largely populated by Indians on lands set apart for Indians outside of reservations. Id. at 38-39. "Allotments" are lands within or outside of reservations that are individually owned by Indians and that are either restricted against alienation or held in trust. Id. at 39-41. "Indian country" is defined in 18 U.S.C. § 1151 as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent [non-Indian fee land], and, including rights-of-way running through the reservation; (b) all dependent Indian communities. . .; and (c) all Indian allotments, the Indian titles to which have not been extinguished. . . ." Although the Indian country statute is codified under the criminal code, the United States Supreme Court has held that it applies to tribal civil jurisdiction as well. See DeCoteau v. District County Court for Tenth Judicial District, 420 U.S. 425, 427 n.2 (1975).

The Court in Atkinson then described Montana and the precedent on which that decision rested, and confirmed "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," unless one of two narrow exceptions apply. Id. at 651 (quoting Montana, 450 U.S. at 565). The exceptions, both of which were described within the context of tribal jurisdiction over non-Indians on reservation land, were articulated as follows:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations*, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands *within its reservation* when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

Montana, 450 U.S. at 565-66 (quoted, in part, by Atkinson, 532 U.S. at 651) (emphasis added).

Members of the Navajo Nation's Tax Commission argued that the Montana and Strate limitation of an Indian tribe's authority over nonmembers should "not restrict an Indian tribe's power to impose revenue-raising taxes." Atkinson, 532 U.S. at 652. The Court rejected that premise, stating that its prior opinion in Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982), "was careful to note that an Indian tribe's inherent power to tax only extended to 'transactions occurring on *trust lands* and significantly involving a tribe or its members.'" Atkinson, 532 U.S. at 653 (quoting Merrion, 455 U.S. at 137 (emphasis in Atkinson)). According to Justice Rehnquist, Merrion "is . . . easily reconcilable with the Montana-Strate line of authority, which we deem to be controlling . . . [A] tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." Atkinson, 532 U.S. at 653 (internal citations omitted). "An

12

Indian tribe's sovereign power to tax - whatever its derivation - reaches no further than tribal land."
Id.

In the present case, the tax and licensing scheme which Defendants seek to impose reaches even further than the tribal tax rejected in Atkinson. The Navajo Nation's hotel occupancy tax only extended to hotels located within the boundaries of the Navajo reservation. The Atkinson Court rejected the tribal officers' claim of sovereign authority to impose the tax on nonmembers on non-Indian fee land even though the hotel was located within the borders of the Navajo reservation. Atkinson, 532 U.S. at 654. If the Navajo Nation lacked the authority to impose a tax on nonmembers on non-Indian fee land located *within* its reservation boundaries, Defendants here certainly lack the authority to impose the Beverage Control Ordinance's tax and licensing scheme on nonmembers on non-Indian fee land *outside* the boundaries of the Omaha Reservation.

B.      Neither of Montana's Exceptions Apply to Defendants' Attempts to Impose the Beverage Control Ordinance on Plaintiffs.

In both Atkinson and Montana, the Court explained the "general rule that Indian tribes lack civil authority over nonmembers on non-Indian fee land." Atkinson, 532 U.S. at 654. The two exceptions to this rule identified by the Montana Court do not apply in this case because Defendants are attempting to enforce the Beverage Control Ordinance *outside* of the boundaries of the Omaha Reservation. Thus, even to the extent that Montana allows Indian tribes to exercise limited authority over nonmembers within the boundaries of a reservation, the Court has never extended tribal authority over nonmembers beyond the physical confines of Indian country.

The first Montana exception allows for a tribe to exercise civil jurisdiction over "non-Indians on their reservation" if the nonmembers enter into "consensual relationships with the tribe or its

members, through commercial dealing, contracts, leases, or other arrangements." Montana, 450 U.S. at 565.[6] None of the Plaintiffs in this case are involved in a consensual relationship with the Omaha Tribe or its members on the Omaha Reservation. As explained in the Plaintiffs' Affidavits, none of the Plaintiffs have a business or commercial relationship with the Omaha Tribe or its members within the Omaha Reservation. (Aff. of R. Smith, D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 2-8, ¶ 10.) Although a very small percentage of the Plaintiffs' alcohol sales are made to members of the Omaha Tribe, none of those sales take place within the Omaha Reservation. (Id., ¶ 9.) Rather, to the extent that any of the Plaintiffs engage in sales to Omaha Tribe members, those sales occur because Omaha Tribe members intentionally leave the confines of the Omaha Reservation to travel to Plaintiffs' places of business outside of the boundaries of the Reservation. Because the Plaintiffs are not involved in any consensual commercial or business relationship with the Omaha Tribe or its members within the boundaries of the Omaha Reservation, the "consensual relationship" exception does not authorize Defendants to impose the Beverage Control Ordinance on Plaintiffs.

---

[6] That the "consensual relationship" exception is limited to commercial dealings occurring on the reservation is made clear by the Court's introductory sentence to the exception: "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations*, even on non-Indian fee lands." Montana, 450 U.S. at 565. In addition, all of the cases cited by the Court in support of this exception involved transactions occurring within the confines of a reservation. See, e.g., Williams v. Lee, 358 U.S. 217 (1959) (collection action for credit extended by store located on Navajo Reservation); Morris v. Hitchcock, 194 U.S. 384 (1904) (upholding permit tax on non-Indian owned livestock grazed on Chickasaw Reservation); Buster v. Wright, 135 F. 947 (8th Cir. 1905) (permit tax for nonmembers to do business within the Creek Nation Reservation); Washington v. Confederated Tribes of Colville Indian Reservations, 447 U.S. 134 (1980) (challenge to various state taxes applied to transactions occurring on Indian reservations). Indeed, if the "consensual relationship" exception were applied to transactions taking place outside of the reservation, this exception would swallow the rule that tribes may only exercise limited civil authority over nonmembers.

The second <u>Montana</u> exception allows a tribe to "exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." <u>Montana</u>, 450 U.S. at 566. By its very terms, this exception is limited to a tribe's exercise of sovereignty over nonmembers for "conduct . . . within its reservation." <u>Id</u>. Although the sale of alcohol *within* a reservation's boundaries could be the type of activity that directly affects the "political integrity, economic security or health and welfare of the tribe," sales made outside of the Reservation to primarily non-Indians do not fit within this exception. To state the obvious, the Court expressly limited the reach of this exception to "lands within [the Tribe's] reservation." <u>Id</u>. Because the Plaintiffs are not located *within* the Omaha Reservation, Defendants cannot justify the imposition of the Beverage Control Ordinance on nonmembers based on either of the <u>Montana</u> exceptions.

The Supreme Court has made it clear that Indian Tribes, due to their dependent status, lack the sovereign authority to regulate the conduct of nonmembers outside of tribal boundaries. Even more than the Navajo Nation lacked the authority to impose a tax on nonmembers on non-Indian land *within* the Navajo Reservation, Defendants here lack the authority to impose a tax and licensing scheme on nonmembers *outside of* the Omaha Reservation. "An Indian tribe's sovereign power to tax–whatever its derivation–reaches no further than tribal land." <u>Atkinson</u>, 532 U.S. at 653.

**C.** **The Omaha Reservation Was Diminished by Congress in 1882 and the Land on Which the Plaintiffs' Businesses are Located is Not Within the Omaha Reservation.**

In <u>Solem v. Bartlett</u>, 465 U.S. 463, 466 (1984), the Supreme Court set forth the factors for determining whether an Indian Reservation was diminished when a portion of the reservation was opened for settlement by non-Indians. "The first and governing principle is that only Congress can

divest a reservation of its land and diminish its boundaries." Solem, 465 U.S. at 470. Congress must "clearly evince an 'intent to change boundaries' before diminishment will be found." Id. (internal citations omitted). "The most probative evidence of congressional intent is the statutory language used to open the Indian lands." Id. However, because many of the surplus land acts do not expressly specify whether Congress intended for the opened lands to "retain[] reservation status or [be] . . . divested of all Indian interests," when the act itself is unclear, the Court looks to "the events surrounding the passage of a surplus land act . . . . [the] events that occurred after the passage of a surplus land act . . . . [and] who actually moved onto opened reservation lands" to decide "whether a surplus land act diminished a reservation." Id. at 468-71.[7]

In Solem, the Court found that the 1908 Act authorizing the Secretary of Interior to "sell and dispose" of portions of the Cheyenne River Sioux Reservation in North and South Dakota opened the reservation for ownership by non-Indians, but did not diminish the reservation. Id. at 472-73. The Court found it particularly important that while the language of the 1908 Act allowed the Secretary to "sell and dispose" of portions of the reservation, "the Act strongly suggest[s] that the unalloted opened lands would . . . remain a integral part of the Cheyenne River Reservation." Id. at 474. For example, the Secretary was authorized to set aside portions of the opened land for the tribe's use for agency, school or religious purposes. Id. Further, the Act required that a geological survey be completed and that any portion of the opened lands "bearing coal" be exempted from

_____

[7] As explained by the Court in Solem, "the surplus land acts themselves seldom detail whether opened lands retained reservation status." Solem, 465 U.S. at 468. This is so because "the distinction seemed unimportant" at the time the acts were passed since "the turn-of-the-century assumption [was] that Indian reservations were a thing of the past. . . . Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parce of land off one reservation." Id.

allotment or disposal.  Id.  As the Court noted, "[i]t is difficult to imagine why Congress would have reserved land for such purposes if it did not anticipate that the opened area would remain part of the reservation."  Id.

The circumstances surrounding the 1908 Act also failed to demonstrate a clear Congressional intent to remove the opened lands from the reservation.  After introduction of the 1908 Act, the Cheyenne River Tribe never formally approved of the Act or agreed to its terms.  Id. at 476.  Thus, it was unclear that the Indians intended to "cede a portion of their territory to the Federal government."  Id.  During legislative debate, "no mention was made of the Act's effect on the reservation's boundaries or whether State or Federal officials would have jurisdiction over the opened areas."  Id. at 478.

> Without evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests in unallotted opened lands, and in the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish the Cheyenne River Sioux Reservation.

Id.

The events following the 1908 Act shed no light on Congress' intent regarding the opened land.  "The subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side."  Id.  In one subsequent Act of Congress, the opened land was referred to as being "in the Cheyenne River Indian Reservation," while a later act referred to the opened lands as "the former" Cheyenne River Sioux Reservation.  Id. at 479.  Both state courts and federal courts exerted criminal

jurisdiction over the opened lands, with "[n]either sovereign dominat[ing] the jurisdictional history of the opened lands." Id.

Finally, the actual settlement of the opened lands indicates that the land retained its Indian character and should be considered a part of the Cheyenne Reservation.

> Most of the members of the Tribe obtained individual allotments on the lands opened by the Act. Because most of the tribe lived on the opened territories, tribal authorities and Bureau of Indian Affairs personnel took primary responsibility for policing and supplying social services to the opened lands during the years following 1908. The strong Tribal presence in the opened area has continued until the present day. Now roughly two thirds of the Tribe's enrolled members live in the opened area. The seat of Tribal government is now located in a town in the opened area, where most important tribal activities take place.

Id. at 479-80. The Court noted that "few homesteaders perfected claims on the lands" though a "high percentage of Tribal members . . . continue to live in the area." Id. at 480.

Given the totality of the circumstances surrounding the passage of the 1908 Act and the settlement of the opened land, the Court was unable to overcome "[t]he presumption that Congress did not intend to diminish the Reservation." Id. at 481. With respect to the opening of the Omaha Reservation, however, an analysis of the factors identified by the Solem Court establishes that Congress did intend to diminish the Omaha Reservation when it opened the Disputed Territory west of the railroad right of way for settlement.

> 1. **Congress expressed a clear intent to diminish the Omaha Reservation in the 1882 Act**.

Congressional intent to diminish an Indian reservation "must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 586 (1977). "In all cases, the face of the Act, the surrounding circumstances, and the legislative history are to be examined with an eye toward determining what

18

congressional intent was." Id. at 587.  When Congress acted in 1882 to open the western portion of

the Omaha Reservation for settlement, Congress clearly expressed an intent to alter the boundaries

of the Omaha Reservation and remove the Disputed Territory from the Omaha Reservation.  In

section 1 of the 1882 Act, Congress authorized the Secretary of the Interior, with the consent of the

Omaha Tribe, to survey, appraise and sell "all that portion of the[] reservation . . . lying west of the

right of way."[8]  1882 Act, 22 Stat. at 341, Pls.' Ex. 13.  The Omaha Tribe consented to the sale on

May 5, 1883.  Indian Affairs: Laws and Treaties Vol. I, Ch. 434 n.b (Charles J. Kappler ed.,

Government Printing Office 1904) (available online at http://digital.library.okstate.edu/kappler).

Section 2 of the 1882 Act authorized the Secretary to proclaim the unallotted land west of the right

of way "open for settlement" by any citizen of the United States including anyone who declares an

intention to become a United States citizen.  1882 Act, 22 Stat. at 341, Pls.' Ex. 13.  Section 4

provides that after a settler complied with the payment and improvement provisions of the 1882 Act,

that "patents shall be issued as in the case of public lands offered for settlement under the homestead

and pre-emption acts."  1882 Act, 22 Stat. at 341, Pls.' Ex. 13.  Thus, non-Indian settlers who

complied with the terms of the 1882 Act received a fee simple interest in the land which they settled.

---

[8]  Admittedly, the 1882 Act does not contain the "clear language of express termination"
which the Supreme Court has previously found to be irrefutable evidence of an intent to
diminish.  Rosebud, 430 U.S. at 588 n.4.  However, "the notion that such express language in an
Act is the only method by which congressional action may result in disestablishment is quite
inconsistent" with the Court's prior decisions.  Id.  Instead, where the language of the Act does
not clearly establish Congressional intent to diminish a reservation, the Court will examine the
"surrounding circumstances and legislative history" to determine Congress' intent.  Id. at 586.
"Even in the absence of a clear expression of congressional purpose in the text of a surplus land
Act, unequivocal evidence derived from the surrounding circumstances may support the
conclusion that a reservation has been diminished."  South Dakota v. Yankton Sioux Tribe, 522
U.S. 329, 351 (1998).

Although the express language of the 1882 Act fails to incorporate terms which the Court has previously determined to be clear evidence of Congressional intent to diminish, the legislative history of the 1882 Act and Congress' subsequent treatment of the land do express a clear intent to diminish the reservation. During Senate debate of the bill, Senator Dawes made it clear that the sale of the 50,000 acres constituting the Disputed Territory would reduce the overall size of the Omaha Reservation.

> When this bill came in I was troubled lest ***the sale of 50,000 acres would leave the [Omaha] reservation too small.*** I went personally to the Indian Bureau to satisfy myself upon that point, and by the Commissioner of Indian Affairs ***I was assured that it would leave an ample reservation***, as much as, if all the Indians should take in severalty, would give each one a farm and have some left for such increase of numbers as might probably be expected in the next twenty-five years; that there was no apprehension on the part of the Department; they were satisfied.

13 Cong. Rec. S3032 (1882) (remarks of Senator Dawes), Pls.' Ex. 17 (emphasis added).

Similarly, the House debate expressed a similar conclusion that the sale of 50,000 acres would reduce the total size of the Omaha Reservation.

> Mr. Holman. May I inquire what portion is proposed to be sold?

> Mr. Haskell. The western portion or all that lying west of the Sioux City and Nebraska Railroad, which runs through the reservation.

> Mr. Holman. How many acres?

> Mr. Haskell. About 45,000. The total reservation is about 150,000 acres. ***It will leave some 100,000 acres to these Indians***.

13 Cong. Rec. H6538, Pls.' Ex. 17 (emphasis added).

Members of the Omaha Tribe also expressed their understanding that the land to the west of the railroad right of way would be separated from the remainder of the Omaha Reservation.

Therefore, the Indians say, "Do not sell the land under the present law, but pass a new law and sell it only to persons who will reside upon it and cultivate it. When it is sold upon these conditions, the white men will occupy up to the railroad on the west. They will build stations and towns; and the Indians will come up to the railroad from the east and get the benefit of these improvements."

13 Cong. Rec. H6541 (remarks of Mr. Valentine), Pls.' Ex. 17.

Under the terms of the 1882 Act, Congress evidenced its intent to diminish the Omaha Reservation by transferring the land to the west of the railroad right of way to settlers just as public lands were transferred to homesteaders under the Homestead Act. During debate, Congress clearly expressed their understanding that the sale of these 50,000 acres would diminish the total size of the Omaha Reservation from 150,000 acres to 100,000 acres. Unlike the 1908 Act addressed in <u>Solem</u>, the 1882 Act was approved of by the Omaha Tribe who consented to its provisions. <u>Indian Affairs: Laws and Treaties</u> Vol. I, Ch. 434 n.b (Charles J. Kappler ed., Government Printing Office 1904). In opening the land to the west of the railroad right of way, Congress did not reserve any portion of these lands for Indian use or carve out any mineral or other land rights from the opened area. Rather, all of the land west of the right of way was available for settlement and intended to be transferred just "as in the case of public lands offered for settlement under the homestead and pre-emption acts." Act of Aug. 7, 1882, ch. 434, 22 Stat. 341, Pls.' Ex. 13.

### 2. **The subsequent treatment of the Disputed Territory evidences Congress' intent to diminish the Omaha Reservation.**

The subsequent treatment of the Disputed Territory is evidence of Congress' intent to diminish the Omaha Reservation. In 1888, Congress passed the 1888 Act, which provided additional time for homesteaders to pay for land obtained from the Omaha Tribe under the 1882 Act. Act of May 15, 1888, 25 Stat. 150, Pls.' Ex. 15. Importantly, the 1888 Act provided that in the event a

settler defaulted on the required payment for a homestead claim in the Disputed Territory, the land under default would be sold at public auction rather than revert back to the Omaha Tribe. Act of May 15, 1888, 25 Stat. 150, Pls.' Ex. 15. Congress' instruction to sell defaulted land at public auction reflects their understanding that the Disputed Territory no longer belonged to the Omaha Tribe because the 1882 Act diminished the western boundary of the Omaha Reservation. Had Congress believed that the Disputed Territory remained within the Omaha Reservation, a default on a settler's claim would result in the land reverting back to the Omaha Tribe. See Drummond v. United States, 34 F.2d 755, 757-58 (8th Cir. 1929) (holding that where reservation land is alloted to a non-Indian who then defaults on payment, the land "revert[s] by foreclosure or otherwise . . . to be held by the Indians as originally."); Hooks v. Canadian Holding Co., 133 Okla. 275, 272 P. 366 (1928) (affirming that where land within reservation is purchased pursuant to act of Congress, "[i]f any such purchaser fails to make payment within the time prescribed by said rules and regulations, then such tract or parcel of land shall revert to the said Indian tribes and be sold as other surplus lands thereof.") If Congress did not intended to diminish the Omaha Reservation by the 1882 Act, a default in payment would result in the land reverting back to the Omaha Tribe. However, Congress clearly directed that in the event of a default by a homesteader, the land would not revert back to the Omaha Tribe, but would instead be sold at public auction. As a result, it is clear that Congress understood the 1882 Act to remove the Disputed Territory from the boundaries of the Omaha Reservation.

The treatment of the Disputed Territory by other governmental agencies also expresses an understanding that the 1882 Act diminished the Omaha Reservation. In a September 18, 1885 Report to the Secretary of the Interior by United States Indian Agent George W. Wilkinson, Agent

Wilkinson explained that "[t]he Omahas have ***reduced their reservation by selling 50,000 acres***, west of the Sioux City and Omaha Railroad, to actual settlers, and have taken allotments on the remainder." 1885 Rep. of the Sec. of Interior Vol. II, at 361, Pls.' Ex. 18 (emphasis added). The Department of the Interior apparently maintained its understanding that the 1882 Act diminished the Omaha Reservation for quite some time. In a Bureau of Indian Affairs Base Map of the Omaha Reservation dated October 8, 1964, the map explained that "[t]he land lying to the West of . . . the Sioux City and Nebraska Railroad Right-of-way . . . was 'Opened for Settlement' by the Act of August 7, 1882, 22 Stat. 341. ***This Office holds the opinion that the Act of Congress has Diminished the borders of the Omaha Reservation***." (Bureau of Indian Affairs Base Map, Omaha Indian Reservation (Oct. 8, 1964), Pls.' Ex. 19 (emphasis added).)

Similarly, when the Bureau of Indian Affairs asked the Field Solicitor's Office of the United States Department of the Interior to determine where the western boundary of the Omaha Reservation lay, the Department of Interior reviewed "each of the treaties or legislative acts effecting [sic] the reservation" and concluded:

> Regardless of where the fee interest currently rests, the most logical demarcation line for the western boundary of the Omaha Reservation is the centerline of the abandoned railroad right of way. Based upon the analysis explained above, under the 1882 Act the land to the west of the right of way went out of Indian control when it was opened for settlement.

(Aff. of J. Fenner, Pls.' Ex. 10, Ex. A at 7-8.)

Nebraska State courts and governmental officials have also concluded that the 1882 Act diminished the Omaha Reservation and that the village of Pender lies outside the boundaries of the Omaha Reservation. In State v. Picotte, Case No. CR 00-6, Docket 32 Page 363 (D. Ct. Thurston Co. Neb., Aug. 22, 2000), Pls.' Ex. 16, the District Court of Thurston County, Nebraska concluded

that Pender was not within the Omaha Reservation. In Picotte, the District Court addressed whether it had jurisdiction over a crime committed in Pender, Nebraska, or whether exclusive jurisdiction lay in the Federal Courts pursuant to the Major Crimes Act, 18 U.S.C. § 1153 (1988). (Id.) In concluding that the 1882 Act diminished the borders of the Omaha Reservation, the Picotte court explained:

> Evidence of Congressional intent to diminish the reservation in that Act is demonstrated by the fact that the lands lying east of the railroad right-of-way were treated differently from lands lying west of the right-of-way. That Native Americans consented to the sale of the land west of the right-of-way, and although the Act provided that the unallotted land east of right-of-way would be patented to the Omaha Tribe in common, no such provision was placed in effect for lands west of the right-of-way. The Omaha Tribe did not retain an interest in the lands opened for settlement west of the railroad right-of-way.

> . . .

> The history of the land west of the right-of-way since the passage of the Act further supports this court's conclusion that the reservation has been diminished. Congress declared in an 1888 Act, that any homestead defaults on land west of the right of way would not revert to the Omaha Tribe but would be sold at public auction. Although unallotted land east of the right of way would be held by the Omaha Tribe, the Act demonstrates that it did not retain any interest in lands west of the right of way. Further, both the Bureau of Indian Affairs in 1964 and the United States Department of Interior in 1989 have independently concluded that the Omaha Indian Reservation does not include the land west of the railroad right of way.

> Finally, the current demographics of the lands west of the right of way confirm that the reservation has in fact been diminished. The unallotted lands west of the railroad right of way were settled by non-Native Americans and are currently owned by non-Indians. There is no allotment land, tribally owned land, or Indian trust land west of the right of way. The land west of the right of way is routinely patrolled by State and Village of Pender officers; neither officers of the Tribe nor the Bureau of Indian Affairs have provided a law enforcement presence in the opened lands. The area west of the railroad right of way has lost its Indian character.

(Id., Pls.' Ex. 16 at 366-68.)

Finally, the Nebraska Attorney General's Office also expressed the opinion that Pender is no longer a part of the Omaha Reservation. In Neb. Att'y Gen. Op. 07005 (Feb. 15, 2007), Pls.' Ex. 12, the Attorney General's office expressly addressed the question of whether "the City of Pender and certain lands near Pender [are] part of the Omaha Indian Reservation." Id. at 2. The Attorney General concluded that the 1882 Act diminished the boundaries of the Omaha Reservation and that Pender was not within the Omaha Reservation. "[I]t is our opinion that the property west of the center of the right of way described in the 1882 Act went out of Indian control when it was opened for settlement, and should not be considered part of the Omaha Reservation." Id. at 5.

### 3. The land removed from the Omaha Reservation by the 1882 Act lost its Indian character long ago.

As explained by the Solem Court, the language of Congressional Acts and their historical context are key factors in determining Congress' intent to diminish an Indian reservation. In reviewing historical context, the Court also considers the subsequent treatment of the lands and the manner in which it was settled to determine whether a disputed area has "lost its Indian character" and whether a "de facto if not de jure diminishment may have occurred." Solem, 465 U.S. at 470-72; Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 603-05 (1977).

The Disputed Territory lost its "Indian character" long ago, assuming it ever even possessed any "Indian character." Prior to the passage of the 1882 Act, the land west of the right of way had not been settled by either Indians or non-Indians. As described by Agent Authur Edwards of the United States Indian Service, in December of 1881, "there are no Indians living on the western portion of the Omaha Reservation . . . no land has been allotted to any of them so far as I can ascertain; and furthermore. . ., there are no improvements, such as houses, fencing & e[tc]., upon the

50,000 acres of land alluded to in your letter."  13 Cong. Rec. S3029 (1882) (quoting, Letter from

Arthur Edwards, Agent, United States Indian Service, to Comm'r of Indian Affairs (Dec. 30, 1881)),

Pls.' Ex. 17.  Nor was the Disputed Territory inhabited by non-Indians.  "This land has no settlers

upon it, as we are able to show from the papers and from the agent himself, and is yielding nothing

to the Indians, nothing to the Government, and nothing to the country."  13 Cong. Rec. S3027

(Statement of Sen. Saunders), Pls.' Ex. 17.

Following the survey and appraisal of the Disputed Territory, the land was opened for

settlement on April 30, 1884.  1884 Rep. of the Sec. of Interior Vol. I, at 28, Pls.' Ex. 14.  "Upon

opening the lands to settlement the major portion thereof was quickly absorbed by settlers.  By

September 1, 1884, 311 filings had been made, embracing about 43,000 acres."  Id.

As reported in the Omaha Bee:

Perhaps at no time in the history of Nebraska can there be recalled an hour of more
intense excitement than that which prevailed in this immediate vicinity at 12 o'clock
on [April 30, 1884], there being hundreds upon hundreds of anxious home-seekers
struggling to secure at least a garden spot in this, the now recognized paradise of the
poor, where all who are willing to exert an effort to prosper, are amply rewarded with
health, peace and plenty.

. . .

[T]he almost endless procession of teams and humanity is said to have resembled a
vast city of cabins on wheels, as the eager land seekers hurriedly rushed to the front
to make selections of home sites, carrying with them their temporary dwellings
already to be put together as rapidly as locations could be secured, and in many
instances, completed and ready for occupancy as unloaded.  As the law opening the
lands to settlement forbade the entrance hereon until noon of that day, the signal of
the arrival of the hour was given by the firing of a gun, which was a warning for all
to "go!"  Within an hour thereafter hundreds of men and women were working like
bees, plowing up a few furrows and also erecting shanties on their respective
homesteads, while others were hurrying madly to Bancroft to file on their claims.

Land Seekers in Wild Dash to Claim Farms on April 30, 1884, Omaha Bee, (reprinted in The Pender Times (Golden Jubilee Edition), May 24, 1935, at 1, Pls.' Ex. 20.

By 1890, the Village of Pender had been incorporated on the west side of the railroad right of way and held a population of more than 470 settlers.  Nebraska State Gazetteer, Business Directory and Farmers List for 1890-91  445 (J.M. Wolfe & Co.) (1890) (available online at: http://www.rootsweb.com/~nethurst/thurgazb.htm) (hereinafter cited as Nebraska State Gazetteer). Methodist, Episcopal and Presbyterian churches had been established in Pender as well as a school, two banks, two newspapers, a Wells Fargo & Company express station, and a Western Union Telegraph office.  Nebraska State Gazetteer at 445.  Businesses in Pender included three attorneys, a tailor, two barbers, a jeweler, a meat market and grocery store, a saloon, a restaurant, a hotel and several blacksmiths.  Id.  More than 140 families were identified as farming in the area around Pender.  Nebraska State Gazetteer at 1324-25.

The Disputed Territory was settled and homesteaded exclusively by non-Indians.  In the years immediately following the opening of the land, all of the deeds to the land were issued in fee simple patent to non-Indians.  (Aff. of T. Lamplot, Pls.' Ex. 11, ¶¶ 5-12.)  Currently, the Disputed Territory remains almost exclusively populated by non-Indians, with the Omaha Tribe owning a small tract of land since 2005.  (Id., ¶¶ 13-14.)  Tribal authorities and the Bureau of Indian Affairs do not exercise jurisdiction over the Disputed Territory.  (Id. ¶¶ 17-21.)  Rather, the Nebraska State Patrol, the Village of Pender Police, and the Thurston County Sheriff's Office provide police protection, and local governmental entities provide fire and all other social services to the residents west of the right of way.  (Id., ¶¶ 17-21.)  Similarly, there are no tribal government offices located west of the right of way and the Omaha Tribe does not conduct tribal activities on the Disputed Territory.  (Id.,

¶ 21.)  The Disputed Territory is, for all purposes, just like other non-Indian, non-reservation lands located within the State of Nebraska.  It is neither owned by Tribe members, populated by Tribe members, maintained by Tribe members, patrolled by the Bureau of Indian Affairs, or utilized for Tribal activities.  In short, the Disputed Territory has no Indian character.

As explained by the Court in <u>Hagen v. Utah</u>, 510 U.S. 399 (1994), "when an area is predominately populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains Indian country seriously burdens the administration of state and local governments." <u>Id</u>. at 420-21.  Thus, in <u>Hagen</u>, where the current population of the disputed land was 85 percent non-Indian, the Court found that concluding that the area had not been diminished would "seriously disrupt the justifiable expectations of the people living in the area." <u>Id</u>. at 421.  The same is true of the Disputed Territory in this case.  The current population is almost exclusively non-Indian and all government services are being provided by state and local governmental entities.  A determination that the Disputed Territory is, in fact, a part of the Omaha Reservation would require jarring changes to the manner in which governmental services are provided and unsettle "the justifiable expectations" of the nonmembers living in the Disputed Territory.

Although the land on which Pender is located was originally a part of the Omaha Reservation, Congress relocated the western border of the Reservation by removing all of the land west of the Sioux City and Nebraska Railroad Company right of way from the Reservation and opening that land up for settlement by non-Indians.  Thereafter, Congress no longer treated the Disputed Territory as part of the Omaha Reservation and the Disputed Territory lost its Indian character.  The Disputed Territory was settled by non-Indians and is currently owned by non-Indians.  The Omaha Tribe does not exercise jurisdiction over the Disputed Territory nor does it conduct

Tribal activities or maintain Tribal offices in the Disputed Territory. Rather, the Disputed Territory possesses no Indian character and is just like any other land in Nebraska that is unrelated to an Indian reservation.

**D.     The Omaha Tribe's Sovereign Immunity Does Not Bar the Plaintiffs' Claims.**

Although the Omaha Tribe enjoys sovereign immunity so long as it acts within its sovereign powers, its officials can nonetheless be sued in their official capacities for prospective injunctive relief. See Garcia v. Akwesasne Housing Authority, 268 F.3d 76, 84 (2d Cir. 2001) ("As a matter of federal common law, an Indian tribe enjoys sovereign immunity from suit except where 'Congress has authorized the suit or the tribe has waived its immunity.'") (quoting Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998); see also Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 356-357 (2d Cir. 2000)).

However, a plaintiff "can still obtain injunctive relief against [a tribal agency] by suing an agency officer in his official capacity." Garcia, 268 F.3d at 87 (citations omitted). "[U]nder the doctrine of Ex parte Young, prospective injunctive or declaratory relief is available against tribal officials when a plaintiff claims an ongoing violation of federal law or claims that a tribal law or ordinance was beyond the authority of the Tribe to enact." Bassett, 221 F. Supp. 2d at 278. This is because "[t]ribal officials alleged to be acting outside the scope of their lawful authority are not immune from suit." Atkinson Trading Co. v. Navajo Nation, 866 F.Supp. 506, 508 (D. N.M. 1994) (citing Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Oklahoma, 725 F.2d 572, 574 (10th Cir.1984)).

In this case, the Liquor Retailers are suing the Omaha Tribal Council in their official capacities only for prospective injunctive and declaratory relief. The Liquor Retailers are alleging

an ongoing violation of federal law and also that the Tribe has no sovereign authority to impose their

liquor licensing and taxation scheme in Pender.  Thus, sovereign immunity is not a barrier to the

Liquor Retailers' claims.

**E.    The Omaha Tribe's Attempt to Enforce the Liquor Tax Also Violates 18 U.S.C. § 1161.**

In addition to acting beyond its sovereign authority, Defendants actions also violate 18 U.S.C.

§ 1161.  Congress passed 18 U.S.C. § 1161 to allow tribes to regulate sales and importation of

alcohol within the boundaries of their reservations:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, *shall not apply within any area that is not Indian country*, nor to any act or transaction *within any area of Indian country* provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register. 18 U.S.C. § 1161 (emphasis added).

Section 1161, passed in 1953, is a suspension of the 1832 Congressional prohibition of liquor

sales to Indians. Rice v. Rehner, 463 U.S 713, 722 (1983) ("Congress imposed complete prohibition

by 1832, and these prohibitions are still in effect subject to suspension conditioned on compliance

with state law and tribal ordinance.").  "The prohibition on liquor sales to Indians 'is still in the code

as part of 18 U.S.C. § 1854, but is confined to Indian country by 18 U.S.C. § 1161 and can be

*conditionally suspended* by enactment of a tribal ordinance pursuant to the latter section.'" Rice, 463

U.S. at 722 n.8 (quoting Cohen, Federal Indian Law, 306-307) (emphasis added).

Thus, Congress has expressed a clear intent that the suspension of prohibition in 18 U.S.C.

§ 1161 only applies to Indian country, and tribes can only regulate alcohol within Indian country.

Because Pender in not within the Omaha Reservation, Defendants' attempts to enforce its liquor tax

and licensing scheme on Plaintiffs–or anywhere west of the railroad right-of-way–is a violation of 18 U.S.C. § 1161.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF IMMEDIATE INJUNCTIVE RELIEF IS NOT GRANTED BECAUSE THEY WILL ENDURE UNRECOVERABLE AND PERMANENT LOSS OF CUSTOMERS AND GOODWILL.

Generally, "[i]n order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996) (citations omitted). "The threat of unrecoverable economic loss . . . does qualify as irreparable harm." Iowa Utilities Bd., 109 F.3d at 426 (citations omitted). Also, the "potential loss of consumer goodwill qualifies as irreparable harm." Id. (citing Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.")).

In Iowa Utilities, the Eighth Circuit granted an injunction to prevent the FCC from enforcing new proxy rates on local exchange carriers ("LECs"). Iowa Utilities, 109 F.3d at 426-427. The proxy rates were part of a vast Congressional scheme to "alter the monopolistic structure of local telephone service markets." Id. at 421. The rates set the price for allowing new and competing companies to connect to the current LEC systems in order to provide consumers with options for telephone services at the local level. Id. at 422. The LECs argued that the proxy rates were artificially low and would not cover the costs of allowing their competitors to establish the new connections. Id. The court reasoned that if the FCC enforced its proxy rates, there was a real

possibility for permanent and unrecoverable economic loss, because competitors could force the existing telephone companies to offer connectivity at a rate which was much lower than the actual cost. Id. at 426.

In this case, the Plaintiffs face a very similar situation as the LECs in Iowa Utilities. If Plaintiffs were forced to comply with the Beverage Control Ordinance, they would be required to: 1) pay a yearly licensing fee, Beverage Control Ordinance, 71 Fed. Reg. at 10059, Pls.' Ex. 1; and 2) impose a 10% retail sales tax on alcohol sales. Beverage Control Ordinance, 71 Fed. Reg. at 10059, Pls.' Ex. 1. The license fee and sales tax are *in addition to* the current Nebraska license fee and sales tax. As a result, the Plaintiffs must charge a double sales tax and pay a double license fee. (Aff. of R. Smith, Pls.' Ex. 2, ¶¶ 6–8, 14, 17; Aff. of D. Schreiber, R. Heise, T. Welsh, J. Lake, K. Brehmer, and R. Brinkman, Pls.' Exs. 3-8, ¶¶ 6-8, 13, 16.) Just like the LECs in Iowa Utilities, Plaintiffs here will be placed at a competitive disadvantage because they will be forced to charge artificially high prices. (Id.)

More specifically, because other liquor retailers located further from the Omaha Reservation will offer the same goods without charging the extra 10% Tribal tax, the Plaintiffs will immediately lose customers, and thus profit and goodwill. Moreover, the loss of customers would likely be permanent, because customers are unlikely to return to pay higher prices for the same goods. This could eventually force the Liquor Retailers out of business altogether. Plaintiffs' potential for permanent loss of customers is precisely the kind of permanent and unrecoverable economic loss which amounts to irreparable harm. Iowa Utilities, 109 F.3d at 426.

Additionally, Defendants' violation of federal law allows this Court to presume irreparable harm to the Plaintiffs and the public. See Sikeston Prod. Credit Ass'n v. Farm Credit Admin., 647

F. Supp. 1155, 1163 (E.D. Mo. 1986) ("[I]rreparable harm to the public and to the movants is presumed in this case because equitable requirements are satisfied per se when a violation of Federal law . . . is shown.") (citation omitted). "[W]hen federal statutes have been violated, it has long been the rule that a court need not inquire into the traditional requirements for equitable relief." Community Nutrition Inst. v. Butz, 420 F. Supp. 751, 754 (D.C. Cir. 1976).

In Sikeston, the court presumed irreparable harm where federal regulations denied farmers due process by taking their property without compensation. 647 F. Supp. at 1163. In this case, this Court can presume irreparable harm because Defendants are violating federal law in two ways: 1) taxing beyond its sovereign power; and 2) regulating alcohol in violation of 18 U.S.C. § 1161. Because Defendants are attempting to impose a tax outside the boundaries of the Omaha Reservation, Defendants are in violation of 18 U.S.C. § 1161. See Longie v. Spirit Lake Tribe, 400 F.3d 586, 590 (8th Cir. 2005) ("The interpretation of federal law is central, however, to the resolution of cases that involve the question whether a tribal court has exceeded its jurisdiction."); see also Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 851 (1985) (holding that "federal common law establishes the limits of tribal sovereignty"). Since Defendants' actions are in violation of federal law, this Court can presume that Plaintiffs and the public are irreparably harmed.

## III. THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER PREVENTS IRREPARABLE HARM TO PLAINTIFFS AND OUTWEIGHS THE LACK OF HARM TO DEFENDANTS.

Because Defendants have no power to enforce the liquor tax and licensing scheme in Pender, an injunction preventing them from doing so would do nothing more than enforce the status quo. There is no harm to Defendants whatsoever if this Court grants an injunction.

On the other hand, if this Court does not grant an injunction, the Liquor Retailers will suffer unrecoverable and permanent economic losses. The Liquor Retailers will lose customers and goodwill to the point that they will be forced to close their businesses altogether. Thus, the balance of the harms heavily favors the Plaintiffs, because their harm is great compared to the complete lack of harm to Defendants.

## IV.     THE PUBLIC HAS A STRONG INTEREST IN UPHOLDING FEDERAL LAW AND ENSURING SOVEREIGNS DO NOT TAX BEYOND THEIR POWER.

An injunction would serve the public interest in at least two ways: 1) by ensuring that tribal councils cannot tax beyond their boundaries; and 2) by upholding federal statutes. Congress expresses a public interest every time it passes a law. See Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 553 (1937). Thus, violations of federal law are against the public interest. An injunction in this case would serve the public interest because it would stop Defendants from violating both federal common law (taxing beyond its boundaries) and 18 U.S.C. § 1161 (regulating alcohol beyond its boundaries). Moreover, this Court can presume irreparable harm to the public when federal law is violated (Sikeston, 647 F. Supp. at 1163), and an injunction would serve to protect the public from that irreparable harm.

The public interest in keeping Defendants from enforcing the liquor tax and licensing scheme in Pender is the same public interest in keeping any other nation from enforcing any other tax Pender. For example, the same public interest would be at stake if France were to attempt to tax liquor sales in Pender. Thus, an injunction would strongly serve the public interests in this case.

## <u>CONCLUSION</u>

Because the Plaintiffs are highly likely to succeed on the merits, because the balance of harms heavily favors them, and because the public has a strong interest in seeing that courts enforce the laws of Congress, this Court should enjoin Defendants from enforcing its liquor tax in Pender as well as anywhere west of the railroad right-of-way.

RICHARD M. SMITH, DONNA SMITH, DOUG SCHRIEBER, SUSAN SCHRIEBER, RODNEY A. HEISE, THOMAS J. WELSH, JAY LAKE, JULIE LAKE, KEITH BREHMER, and RON BRINKMAN, Plaintiffs.

BY:    OGBORN SUMMERLIN & OGBORN, P.C.
V. GENE SUMMERLIN - 19611
MARNIE A. JENSEN - 22380
610 J Street, Suite 200
Lincoln, NE 68508
(402) 434-8040
gene@osolaw.com
marnie@osolaw.com

BY:____/s/ Marnie A Jensen_____
Marnie A. Jensen - 22380