## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

RICHARD M. SMITH, et al.,

          Plaintiffs,

    and

STATE OF NEBRASKA,

          Plaintiff-Intervenor

v.

MITCH PARKER, et al.,

          Defendants,

    and

THE UNITED STATES,

          Defendant-Intervenor.

C.A. NO. 4:07-CV-3101

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

MITCH PARKER, et al., Defendants

By: /s/ **Nora M. Kane**

    Nora M. Kane – 21562
    Patricia A. Zieg – 14662
    Mark J. Peterson – 18850
    Stinson Morrison Hecker LLP
    1299 Farnam St., Suite 1500
    Omaha, NE 68102
    Phone: (402) 342-1700
    Fax: (402) 930-1701
    nkane@stinson.com
    pzieg@stinson.com
    mpeterson@stinson.com

ATTORNEYS FOR DEFENDANTS

June 24, 2013

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................................... 1

ARGUMENT ........................................................................................................................... 3

STANDARD OF REVIEW ...................................................................................................... 3

I.      Parties and Background of Lawsuit ....................................................................... 4

II.     The Tribal Court based its decision upon the tenet that the original
        boundaries of a reservation remain the same until Congress acts to
        change them ........................................................................................................ 6

III.    The First Prong:  the 1882 Act did not diminish the Omaha Indian
        Reservation .......................................................................................................... 7

        A.      The Act of 1882 Does Not Include the Hallmark Language of
                Diminishment ....................................................................................... 7

                1.      *Seymour v. Superintendent of Wash. State Pen.*, 368 U.S.
                        351 (1962) ................................................................................. 9

                2.      *Mattz v. Arnett*, 412 U.S. 481 (1973) .................................... 11

                3.      *DeCoteau v. District County Court for the Tenth Judicial
                        Dist.*, 420 U.S. 425 (1975) ...................................................... 13

                4.      *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977) ............ 15

                5.      *Solem v. Bartlett*, 465 U.S. 463 (1984) ................................. 16

                6.      *Hagen v. Utah*, 510 U.S. 399 (1994) ..................................... 19

                7.      *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) ......... 19

IV.     The Second Prong:  There is no clear-cut evidence of a widely-held
        contemporaneous understanding that Congress intended to alter the
        boundaries of a reservation ............................................................................ 23

        A.      There is no clear and unambiguous evidence of an intent to
                diminish the Omaha Reservation which is inconsistent with the

implications of non-diminishment found in the language of the
1882 Act....................................................................................23

    1.    The 1854 Treaty...........................................................24

    2.    The 1865 Treaty...........................................................25

    3.    The 1872 Act................................................................25

    4.    Legislative history of the 1882 Act.............................27

**V.**    **The Third Prong:  Subsequent Jurisdiction and Demographics**.................... **29**

    A.    The Court Need Not Address this Prong ....................................29

    B.    Subsequent Jurisdictional and Demographic History do not
Support Diminishment................................................................29

    1.    Establishment and Population of the Village of Pender ...............32

    2.    Thurston County Boundaries ........................................33

    3.    Historical Summary ......................................................34

    4.    Retrocession .................................................................34

    5.    Recent Opinions of the Office of the Solicitor, U.S.
Department of the Interior ............................................35

    6.    Other Significant Activity Evidences that the Omaha
Reservation Borders Remain Unchanged since 1865 ...................35

**CONCLUSION** .......................................................................................... **38**

# TABLE OF AUTHORITIES

**Page(s)**

Cases, Statutes, Other Authorities, Rules, Treatises
From Tribal Court TOA:

## Cases

*DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U.S. 425 (1975) ............................................................................................................. *passim*

*Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294 (8th Cir. 1994) ........................... 3, 4

*Enlow v. Moore,* 134 F.3d 993 (10th Cir. 1998)............................................................................ 4

*Hagen v. Utah*, 510 U.S. 399 (1994) ...................................................... i, 6, 7, 8, 19, 21, 28

*Hallowell v. United States*, 221 U.S. 317 (1911)........................................................................ 32

*Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9 (1987) .................................................................. 4

*Mattz v. Arnett*, 412 U.S. 481 (1973).............................................................................. *passim*

*Petrogulf Corp. v. Arco Oil & Gas Co.,* 92 F.Supp.2d 1111 (D. Colo. 2000)............................... 4

*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977) ........................................ i, 15, 16, 17, 21, 23

*Seymour v. Superintendent of Wash. State Pen.*, 368 U.S. 351 (1962)................................. *passim*

*Solem v. Bartlett*, 465 U.S. 463 (1984)........................................................................... *passim*

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) .............. i, 7, 8, 19, 20, 21, 23, 28, 29

*United States v. Celestine*, 215 U.S. 278 (1909)........................................................................... 7

*United States v. Dion*, 476 U.S. 734 (1986).................................................................................. 7

## Statutes

Neb. Rev. Stat. § 17-201 ................................................................................................................ 4

Neb. Rev. Stat. § 22-187 .............................................................................................................. 33

## Other Authorities

Act of Aug. 7, 1882, ch. 434, 22 Stat. 341............................................................................ *passim*

Act of June 10, 1872 ............................................................................................................. 25, 26

Indian Entities Recognized and Eligible to Receive Services from U.S. Bureau of Indian Fairs Notice, 75 Fed. Reg. 60810 (Oct. 1, 2010) ..................................................... 5

Indian Reorganization Act of 1934................................................................................................ 5

## Rules

Fed. R. Civ. P. 56.......................................................................................................................... 1

Fed. R. Civ. P. 56(c) ..................................................................................................................... 2

Fed. R. Civ. P. 56(e) ..................................................................................................................... 2

Fed. R. Civ. P. 56(e)(2)................................................................................................................. 2

NECivR56.1(b)(1) ......................................................................................................................... 2

Omaha Tribal Code Rules of Civil Procedure, Ch. 1, R. 1(d) ...................................................... 2

## Treatises

Treaty with the Omaha, 1854, 10 Stat. 1043, Mar. 16, 1854................................................. 24, 25

Treaty with the Omaha, 1865, 14 Stat. 667, Mar. 6, 1865.......................................................... 25

## INTRODUCTION

United States Supreme Court precedent mandates that the question of whether an Act of Congress diminished the boundaries of an Indian reservation must appear clearly in the statutory language, and the intent to diminish must be plain and unambiguous. Secondary consideration is given to events surrounding the passage of an allotment-era land Act for clear-cut evidence of a widely-held contemporaneous understanding that Congress intended to alter the boundaries of a reservation. Finally, the subsequent jurisdictional and demographic history of the region opened for settlement may be considered. The Tribal Court applied this three-part test and concluded that the Omaha Reservation was not diminished by Congressional ratification of certain land sales. The Omaha Tribe respectfully submits that this Court should adopt the Tribal Court Opinion and enter its Order of Summary judgment for the Omaha Tribe.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The parties filed a Joint Stipulation of Facts to be considered as undisputed by this Court. (ECF 100, Nos. 1-67). However, there is a dispute about whether certain additional facts are subject to re-litigation in this Court. As the Court is aware, the Plaintiffs and the Omaha Tribe disagree whether certain statements the Omaha Tribe presented to the Tribal Court as undisputed material facts were controverted by Plaintiffs in the Tribal Court proceeding. The items at issue deal primarily with undisputed statutory language, and appear in ECF 100 at 26-28 and are individually numbered as 1-16.

The Omaha Tribe submits that Plaintiffs failed to respond to any of the Tribe's 124 Statements of Fact submitted to the Tribal Court and thus waived the right to controvert them in this proceeding. Plaintiffs dispute whether they were required to follow the dictates of Fed. R. Civ. P. 56 and this Court's Local Rules. The parties stipulated to address their disagreement in their summary judgment submissions.

The Tribal Code does not have specific provisions governing procedure on summary judgment. Thus, summary judgment is to be handled in accordance with the Federal Rules of Civil Procedure. Tribal Code Rules of Civil Procedure, Chapter 1, Rule 1(d). Federal Rule of Civil Procedure 56(c) provides that a party "must" support an assertion that a fact is genuinely disputed, which the Plaintiffs failed to do for any of the Omaha Tribe's statements of undisputed fact. Likewise, our Local Rules require a party opposing summary judgment to include a "concise response" with appropriate citations to the record. "Properly referenced material fact in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR56.1(b)(1) (emphasis in original).

Rule 56(e) also addresses an opposing party's failure to properly respond to another party's assertion of fact as required by 56(c) and was raised at the summary judgment hearing. Judge Scarmon agreed that the rules applicable in this Court would be adhered to in the tribal court. (Ex. 1, Transcript at 15:2-16:11). Therefore, Judge Scarmon properly ruled the way that he did, *i.e.,* he considered the facts undisputed, in accordance with 56(e)(2) and NECivR56.1(b)(1):

> The undisputed facts of the case, stated by the parties in their briefs, have been considered together with the other facts raised in the lengthy discovery by each side. Material facts are not in dispute. The only disputed matters are the legal interpretations to be accorded to the facts, as analyzed by the United States Supreme Court.

(ECF 82-1, Memorandum Opinion & Order on Summary Judgment at 41-42; *see also id.* at 16 ("Plaintiffs concede that the 1882 Act lacks the determinative language of diminishment applied by the Supreme Court.") (citing Plaintiffs' Summary Judgment Briefs).

Plaintiffs did not seek additional time to controvert the undisputed facts in Defendants' moving papers and did not seek relief from Judge Scarmon's Order in the nature of an amendment or otherwise.

2

Based upon the foregoing, the Omaha Tribe submits that the items in ECF 100 at 26-28 and are individually numbered as 1-16 should not be subject to further litigation in this Court. Exhaustion at the tribal court would be a meaningless exercise if the record and the determination thereon by the tribal court were simply ignored by the parties or this Court.

## ARGUMENT

## STANDARD OF REVIEW

This Court requested the parties give particular attention to the standard of review to be applied in this proceeding. The first issue before the Court is one of statutory construction: whether the Act of 1882 diminished the boundaries of the Omaha Indian Reservation. Any ambiguity in the language of the Act must be construed broadly in favor of the Omaha Tribe. *DeCoteau v. District Court for the Tenth Judicial Dist.,* 420 U.S. 425, 447 (1975). The parties are filing cross-motions for summary judgment on a primarily stipulated factual record. (ECF 100). Material facts are not in dispute.

While the standard of review is important in any case, it may be especially so when a federal court reviews a decision from a Tribal Court because of the Federal Government's long-standing policy of encouraging tribal self-government. *Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294, 1299 (8th Cir. 1994) (citations omitted).

> Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. *See Montana v. United States,* 450 U.S. 544, 565-66 (1981); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152-53 (1980); *Fisher v. District Court,* 424 U.S. 382 at 387-89 (1976). Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute. "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact." *Merion v. Jicarilla Apache Tribe,* 455 U.S. 130, 149 n.14 (1982). *See also Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 60 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent.").

\*\*\*

Unless a federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised . . . and resolved in the Tribal Courts.

*Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 18, 19 (1987); *accord Duncan Energy:*

Therefore, on review, the district court must first examine the Tribal Court's determination of its own jurisdiction. This determination is a question of federal law that must be reviewed *de novo. See FMC v. Shoshone-Bannock Tribes,* 905 F.2d 1311, 1313 (9th Cir. 1990). However, in making its analysis, the district court should review the Tribal Court's findings of fact under a deferential, clearly erroneous standard. *Id.* The Tribal Court's determinations of federal law should be reviewed *de novo* while determinations of Tribal law should be accorded more deference. *Id.*

27 F.3d at 1300. Deferential review is especially important to tribal sovereignty in reviewing a Tribal Court's decision on a boundary dispute. *See Petrogulf Corp. v. Arco Oil & Gas Co.,* 92 F.Supp.2d 1111, 1115 (D. Colo. 2000) ("*Enlow* . . . teaches that . . . comity concerns . . . counsel against a federal court addressing boundary disputes involving Indian land before a tribal court has had an opportunity to do so.") (citing *Enlow v. Moore,* 134 F.3d 993, 996 (10th Cir. 1998)).

Accordingly, the Tribal Court found certain facts as stipulated; any independent factual findings are to be reviewed under the deferential, clearly erroneous standard. The tribal court's conclusions of law are reviewed *de novo*.

## I.    Parties and Background of Lawsuit

Plaintiffs include the Village of Pender, Nebraska, a village as defined by Neb. Rev. Stat. § 17-201 with a population of approximately 1,300 residents in northeastern Nebraska. Pender is a political subdivision of the State of Nebraska, the County Seat of Thurston County and is governed by a Village Board of Trustees. The remaining Plaintiffs are residents of Thurston County Nebraska and owners of or agents for establishments engaged in the sale of alcoholic beverages in or near Pender, Nebraska. (ECF 100 at ¶¶1-10).

The Omaha Tribe of Nebraska is a federally recognized Indian Tribe organized and chartered under the Indian Reorganization Act of 1934. (*Id.* at ¶15) (citing the Indian Entities Recognized and Eligible to Receive Services from U.S. Bureau of Indian Fairs Notice, 75 Fed. Reg. 60810 (Oct. 1, 2010)). All named Defendants are or were at all relevant times members or officials of the Omaha Tribal Council. (ECF 100 at ¶¶15-16). The Defendants are collectively referred to as the Omaha Tribe.

The dispute in this case stems from the Omaha Tribe's attempts to enforce its Beverage Control Ordinance relating to the Plaintiffs' sale of alcohol in and upon Omaha Reservation land. (*Id.* at ¶¶17-26). On April 17, 2007, the United States District Court for the District of Nebraska granted Plaintiffs a temporary restraining order prohibiting the enforcement of the Beverage Control Ordinance in Pender, Nebraska, which was later extended by a stipulation of the parties. (ECF 16, 29).

On October 4, 2007, this Court stayed the original proceeding in order for the Plaintiffs to exhaust any potential remedies available in the Omaha Tribal Court. (ECF 53). On January 7, 2008, Plaintiffs filed an action in the Omaha Tribal Court, seeking a judgment declaring that Pender is not within the boundaries of the Omaha Reservation, and an injunction prohibiting the enforcement of the Beverage Control Ordinance in Pender. (ECF 100 at ¶29).

Recognizing that an intensive historical analysis was required to determine the ultimate issue of whether an Act of Congress diminished the original boundaries of the Omaha Indian reservation, Plaintiffs retained Emily Greenwald, Ph.D. as their expert witness and the Omaha Tribe retained R. David Edmunds, Ph.D., Watson Professor of American History for the University of Texas at Dallas, as its expert witness. (ECF 100 at ¶¶31-32).

On February 4, 2013, the Omaha Tribal Court held that the 1882 Act did not diminish the boundaries of the Omaha Indian Reservation."  (ECF 82-1, Tribal Court Memorandum Opinion & Order & ECF 86, Tribal Court Judgment).  Stipulating that tribal court exhaustion was complete, the parties returned to this Court for resolution of this matter.

The United States Department of Justice participated as *amicus curiae* in the Tribal Court proceeding.  Both the DOJ and the State of Nebraska were invited to submit *amicus* briefs in the proceeding, and both were since granted Intervenor status.  Pursuant to the Court's scheduling Order, the Omaha Tribe hereby submits its Brief in Support of Summary Judgment.

## II.   The Tribal Court based its decision upon the tenet that the original boundaries of a reservation remain the same until Congress acts to change them.

The Tribal Court correctly articulated the question presented by the parties as whether the United States Congressional enactment of an 1882 statute (the "1882 Act") ratifying the sale of Omaha tribal lands evinced an intent to diminish the boundaries of the Omaha Reservation in Nebraska.  (ECF 82-1 at 1):

> If Congress intended to diminish the Omaha Reservation by enacting the 1882 statute, the area involved would no longer constitute "Indian country" as defined by 18 U.S.C. 1151[a] and would deny the Omaha Tribe the right to seek regulation and taxation of alcohol sales in Pender.  If Congress did not intend diminishment of the Omaha Reservation, then the issue of regulation and taxation of non Indian fee owners of bars on the Reservation would conform to rules governing such actions within recognized reservation boundaries.

(*Id.* at 1-2).

The Tribal Court recognized that the issue must be resolved by applying United States Supreme Court precedent on the issue of diminishment, which has developed into a three-prong "fairly clean analytical structure."  (*Id.* at 10) (quoting *Hagen v. Utah,* 510 U.S. 399, 411 (1994)). It is "settled law that some surplus land acts diminished reservations . . . and other surplus land

acts did not."  (*Id.*) (quoting *Hagen,* 510 U.S. at 410; *Solem v. Bartlett,* 465 U.S. 463, 469 (1984)).

Under the United States Supreme Court diminishment test, the first prong mandates that an intent to diminish the boundaries of an Indian reservation must appear clearly in the statutory language, and such intent must be plain and unambiguous.  Secondary consideration is given to events surrounding the passage of an allotment-era land Act for clear-cut evidence of a widely-held contemporaneous understanding that Congress intended to alter the boundaries of a reservation.  Third, the subsequent jurisdictional and demographic history of the region opened for settlement may be considered.

## III.   The First Prong:  the 1882 Act did not diminish the Omaha Indian Reservation

### A.   *The Act of 1882 Does Not Include the Hallmark Language of Diminishment*

The first prong begins with an absolute:  Only Congress can diminish an Indian reservation.  (*Id.*) (citing *South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 343 (1998); *United States v. Celestine,* 215 U.S. 278, 285 (1909)).  "The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries.  The most probative evidence of the intent of the intent of Congress is the statutory language employed by the Congress in opening Indian lands for non-Indian settlement."  (*Id.* at 10-11) (quoting *Hagen,* 510 U.S. at 411).  Congressional intent to diminish a reservation must be "clear and plain."  *Yankton Sioux,* 522 U.S. at 343 (quoting *United States v. Dion,* 476 U.S. 734, 738-39 (1986)).

The Tribal Court acknowledged the Supreme Court's imposition of certain canons of statutory construction to the analysis under the first prong.  First, the Act must "clearly evince" the intent of Congress to change the reservation boundaries.  (*Id.* at 11) (citing *Solem,* 465 U.S. at 470).  Second, any ambiguity in the language of the Act must be construed broadly in favor of the Omaha Tribe, due to vast inequities in the bargaining power of the government over the

tribes and of the trust responsibility of the United States over the tribes. (*Id.*) (citing *DeCoteau,* 420 U.S. at 447; *Hagen,* 510 U.S. at 422 (Blackmun, J. dissenting)). Third, operative terms such as "cession" and the inclusion of a fixed "sum certain" in the granting clause of an Act creates a "nearly conclusive" or "almost insurmountable" presumption of diminishment of a reservation through the sale of tribal lands. (*Id.*) (citing *Yankton Sioux,* 522 U.S. at 792; *Solem,* 465 U.S. at 470). Likewise, if the Act "restores" or "vacates" the land sold to the "public domain," such evidences a Congressional intent to terminate the reservation status of land sold to non-Indians. (*Id.*) (citing *Hagen,* 510 U.S. at 414; *Seymour v. Superintendent of Wash. State Penitentiary.,* 368 U.S. 351, 354-55 (1962)).

The 1882 Act, reproduced here in pertinent part, provided as follows:

CHAP. 434.-An act to provide for the sale of a part of the reservation of the Omaha tribe of Indians in the State of Nebraska, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That with the consent of the Omaha tribe of Indians, expressed in open council, the Secretary of the Interior be, and he hereby is, authorized to cause to be surveyed, if necessary, and sold, all that portion of their reservation in the State of Nebraska lying west of the right of way granted by said Indians to the Sioux City and Nebraska Railroad Company[.] under the agreement of April nineteenth, eighteen hundred and eighty, approved by the Acting Secretary of the Interior, July twenty-seventh eighteen hundred and eighty. The said lands shall be appraised, in tracts of forty acres each, *by three competent commissioners, one of whom shall* be selected by the Omaha tribe of Indians, and the other two shall be appointed by the Secretary of the Interior. * * *
SEC. 8. That the residue of lands lying east of the said right of way of the Sioux City and Nebraska Railroad, after all allotments have been made, as in the fifth section of this act provided, shall be patented to the said Omaha tribe of Indians, which patent shall be of the legal effect and declare that the United States does and will hold the land thus patented for the period of twenty-five years in trust for the sole use and benefit of the said Omaha tribe of Indians, and that at the expiration of said period the United States will convey the same by patent to said Omaha tribe of Indians, in fee discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That from the residue of lands thus patented to the tribe in common, allotments shall be made and patented to each Omaha child who may be born prior to the expiration of the time during which it is provided that said lands shall be held in trust by the United States, in quantity and upon the same conditions, restrictions, and limitations as are provided in section six of this act,

8

> touching patents to allottees therein mentioned.  But such conditions, restrictions, and limitations shall not extend beyond the expiration of the time expressed in the patent herein authorized to be issued to the tribe in common:  *And provided further*, That these patents, when issued shall override the patent authorized to be issued to the tribe as aforesaid, and shall separate the individual allotment from the lands held in common, which proviso shall be incorporated in the patent issued to the tribe:  *Provided*, That said Indians or any part of them may, if they shall so elect, select the land which shall be allotted to them in severalty in any part of said reservation either east or west of said right of way mentioned in the first section of this act.

(ECF 100 at 31-34, 1882 Act at §§ 1 & 8) (italics in original).

To undertake the Supreme Court analysis, the Tribal Court necessarily considered each of the applicable cases addressing diminishment.  The basic tenet of the law of diminishment remains unchanged—only Congress can diminish a reservation through clear and plain edict.  This Court's review of the Tribal Court's resolution of the first prong should be considered under a *de novo* standard.

1.  <u>*Seymour v. Superintendent of Wash. State Penitentiary,* 368 U.S. 351 (1962)</u>

Seymour sought habeas corpus relief to challenge his state court conviction as void for want of jurisdiction.  Seymour was a member of the Colville Indian Tribe, charged with a crime on the Colville Indian Reservation (thus, he argued, negating state jurisdiction).  The state court ruled that the crime was committed on a portion of the reservation that was restored to the public domain by a 1906 Congressional Act.  On certiorari, the Supreme Court reiterated the tenet that the boundaries of a reservation remain the same until Congress acts to change them.  *Id.* at 359.  The Court also provided guidance as to when actions of Congress can be construed as diminishing a reservation.  According to the Court, for diminishment to occur, the Congressional action must effect a complete cession of sovereignty and the return of the land to the public domain.

9

The Court's analysis began with the explicit language of the 1906 Act, which provided for the sale of mineral lands and opened up certain lands to homesteading.  Significant to the analysis was the conspicuous absence of any language "vacating" the land at issue or "restoring" it to the "public domain."  *Id.* at 355.  The 1882 Act at issue in this matter is also bereft of such language.

The distribution of the proceeds from the sale of the pertinent land (the South Half of the reservation) was also important to the Court.  When the North Half of the reservation was diminished, Congress was given power to "appropriate the net proceeds from the sale and disposition of lands in the North Half of the original reservation for the general public use."  *Id.* at 355-56.

 In contrast, the Act pertaining to the South Half provided that the funds were to be "deposited in the Treasury of the United States to the credit of the Colville and confederated tribes of Indians belonging and having tribal rights on the Colville Indian Reservation in the State of Washington."  *Id.*  The proceeds from the sale of the Omaha lands were similarly deposited in the Treasury for the benefit of the Omaha Tribe.  (ECF 100 at 31-34, 1882 Act at § 3).

The State of Washington argued that because "the particular parcel of land upon which the underlying crime committed is held under a patent in fee by a non-Indian," the reservation would be "diminished by the actual purchase of land within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians."  *Id.* at 357.  In response, the Court ruled:

> This contention is not entirely implausible on its face, and, indeed, at one time had the support of distinguished commentators on Indian Law.  But the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include "all land within the limits of any Indian reservation

10

under the jurisdiction of the United States government, notwithstanding the issuance of any patent . . . ."

[The State's argument] rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid.

*Id.* at 357-58.

The Court concluded that "[t]he Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner in which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Id.* at 356. The Omaha Tribe respectfully submits this same conclusion could and should be reached in this case as the 1882 Act did nothing more than open the way for non-Indian settlers to own land on the reservation in a manner in which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards.

> 2. *Mattz v. Arnett,* 412 U.S. 481 (1973)

The Court's diminishment jurisprudence continued in *Mattz v. Arnett*, 412 U.S. 481 (1973), a case in which a California game warden confiscated five gill fishing nets (illegal under California state law), and then instituted a state court forfeiture action. The owner of the nets intervened, claiming that the state law prohibiting the nets did not apply to him because he used the nets on his reservation as a member of the Yurok, or Klamath River, Indian Tribe.

The question before the Court on certiorari was whether the Klamath River Indian Reservation was diminished by an 1892 Act of Congress. The Supreme Court held that the 1892 Act did *not* alter the boundaries of the reservation. The 1892 Act in question in *Mattz* and its

11

effect on the Klamath River Indian Reservation is very similar to the 1882 Act and its effect on the Omaha Indian Reservation.

> The Klamath River Act provided:
>
> That all of the lands embraced in what was Klamath River Reservation in the State of California, as set apart and reserved under authority of law by an Executive order dated November sixteenth, eighteen hundred and fifty-five, are hereby declared to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands:  Provided, That any Indian now located upon said reservation may, at any time within one year from the passage of this act, apply to the Secretary of the Interior for an allotment . . . .  And the Secretary of the Interior may reserve from settlement, entry, or purchase any tract or tracts of land upon which any village or settlement of Indians is now located, and may set apart the same for the permanent use and occupation of said village or settlement of Indians. . . .  Provided further, That the proceeds arising from the sale of said lands shall constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands and their children.'

*Mattz*, 412 U.S. at 494-95.

As in *Seymour*, the 1892 Act in *Mattz* did not provide for a sum certain payment. Instead, the proceeds were to be collected by the Government to be distributed to the benefit of its wards.  The absence of the "sum certain" language weighed in favor of a finding of non-diminishment.  Again, there was no language in the Act requiring the Indians to vacate the land, no language returning the land to the public domain, and no language terminating the reservation.

In addition, the provisions for allotments to tribal members caused the *Mattz* Court to specifically note that "allotment under the 1892 Act is completely consistent with continued reservation status."  *Id.* at 497.   In fact, the inclusion of allotments was of monumental importance to the Court:   "The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated."  *Id.* at 504.

The foregoing factors, together with the subsequent treatment of the land as reservation by the Department of the Interior and Congress, led the Court to conclude that Congress did not intend to change the boundaries of the reservation. The *Mattz* Court reiterated the rule that "[a] congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Id.* at 505.

The Court further noted that if Congress wanted to terminate the reservation, it "was fully aware of the means by which termination could be effected." *Id.* at 504. The Court buttressed this statement by the inclusion of specific examples of explicit diminishment:

> Congress has used clear language of express termination when that result is desired. See, for example, 15 Stat. 221 (1868) ("the Smith River reservation is hereby discontinued"); 27 Stat. 63 (1892) (adopted just two weeks after the 1892 Act with which this case is concerned, providing that the North Half of the Colville Indian Reservation, "the same being a portion of the Colville Indian Reservation. . . be, and is hereby, vacated and restored to the public domain"), and *Seymour v. Superintendent,* 368 U.S., at 354; 33 Stat. 218 (1904) ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished").

*Id.* at n.22. In light of the absence of such language in the Act at issue, the Court held, "[c]lear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate the reservation." *Id.* at 504.

Likewise, in this case, the 1882 Act contained no language requiring the Omaha Tribe to vacate the land, no language returning the land to the public domain, and no language terminating the reservation. There is no payment for a sum certain, and the presence of allotment provisions in the 1882 Act "cannot be interpreted to mean that the reservation was to be terminated." *Mattz*, 412 U.S. at 504.

3.     <u>*DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U.S. 425 (1975)</u>

The next significant diminishment case is *DeCoteau,* addressing whether the boundaries of the South Dakota Lake Traverse Reservation were altered by an 1891 Act of Congress, which

ratified an agreement between the Government and the tribe.  The Court concluded that the reservation was terminated and restored to the public domain, because of the explicit language of the Agreement preceding the Act, and facts and circumstances not present in this case.

*DeCoteau* held that it was outcome determinative that the 1891 Act included a straightforward cession of lands to the United States government for a sum certain.  Specifically, in *DeCoteau,* the tribe agreed to "**hereby cede, sell, relinquish, and convey** to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made **for a sum certain.**"  *Id.* at 445 (emphasis added).  The "sum certain" language is important (*id.*) and distinct from the collection of proceeds (uncertain in amount) for future disbursement for the benefit of the tribe by the government, present in both *Seymour* and *Mattz*.  Further, the legislative history in the 1891 Act at issue in *DeCoteau* was clear—the "sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.'"  *Id.* at 446.

Finally, the *DeCoteau* Court held that the language of diminishment was nearly indistinguishable from that used in the other "sum-certain, cession agreements ratified by Congress in the same 1891 Act."  *Id.*, providing examples:

> "—cede, relinquish, and forever and absolutely surrender to the United States all their claim, title and interest of every kind and character in and to the following described tract of country . . . ." 26 Stat. 1016 (Citizen Band of Pottawatomie Indians).
>
> "—cede, relinquish, and surrender, forever and absolutely, to the United States, all their claim, title and interest of every kind and character in and to the following described tract of country . . . ." 26 Stat. 1019 (Absentee Shawnee Indians).
>
> "—cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind

14

and character, in and to the lands embraced in the following described tract of country . . . ." 26 Stat. 1022 (Cheyenne and Arapahoe Tribes).

"—cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had, to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho . . . ." 26 Stat. 1027 (Coeur d'Alene Indians (I)).

"—cede, grant, relinquish, and quitclaim to the United States, all the right, title, and claim which they now have, or ever had, to the following-described portion of their reservation . . . ." 26 Stat. 1030 (Coeur d'Alene Indians (II)).

"—cede, sell, and relinquish to the United States all their right, title, and interest in and to all that portion of the Fort Berthold Reservation [as herein described] . . . ." 26 Stat. 1032 (Gros Ventres, Mandans, and Arickarees).

"—agree to dispose of and sell to the Government of the United States, for certain considerations hereinafter mentioned, all that portion of the Crow Indian Reservation [as herein described] . . . ." 26 Stat. 1040 (Crow Indians).

*Id.* at n.22.

The examples set forth by *DeCoteau* of sum certain cession agreements ratified by Congress in the 1891 Act provide distinct and concrete examples of language employed by Congress when it intended to diminish a reservation. Not one of the key terms or phrases evidencing an intent to diminish appears anywhere in the 1882 Act involving the Omaha Indian Reservation. On the contrary, the terms and phrases that Congress employed in the 1882 Act are similar, if not identical, to the language found in the <u>non-diminishment</u> cases. *See Seymour, Mattz, supra*, and *Solem, infra*.

4. *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584 (1977)

The next significant case is *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977)  The Supreme Court held that certain Acts of Congress clearly demonstrated intent to diminish the boundaries of the Rosebud Sioux Reservation:

The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud

15

> Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County . . . .  33 Stat. 256.
>
> As in *DeCoteau v. District County Court,* 420 U.S. at 445, this language is "precisely suited" to disestablishment.

*Rosebud Sioux*, 430 U.S. at 597.

The Court also relied upon a presidential proclamation which reflected Congressional intent to diminish in no uncertain terms:

> Whereas by an agreement between the Sioux tribe of Indians on the Rosebud Reservation, in the State of South Dakota, on the one part, and James McLaughlin, a United States Indian Inspector, on the other part, amended and ratified by act of Congress . . . the said Indian tribe ceded, conveyed, transferred, relinquished, and surrendered, forever and absolutely, without any reservation whatsoever, expressed or implied, unto the United States of America, all their claim, title, and interest of every kind and character in and to the unallotted lands embraced in the following described tract of country now in the State of South Dakota[.]

*Id.* at 602.

Again, the pivotal language of cession appears nowhere within the 1882 Act at issue in this case.  Thus, there is no support in *Rosebud Sioux* for a finding of diminishment of the reservation.  On the contrary, as noted above, the language in the 1882 Act mirrors that of the *Seymour, Mattz, supra,* and *Solem, infra*.

         5.    *Solem v. Bartlett,* 465 U.S. 463 (1984)

Whether another South Dakota reservation was diminished was the issue in *Solem v. Bartlett*, 465 U.S. 463 (1984).  Bartlett sought federal habeas corpus relief on the grounds that he was a Native American convicted of a crime committed on the Cheyenne River Sioux Reservation and thus should have been prosecuted in the federal courts.  The Supreme Court agreed, holding that the Cheyenne River Reservation was not diminished by the Cheyenne River Act.

*Solem* is a unanimous opinion which discusses *Seymour, Mattz, DeCoteau,* and *Rosebud,* identifies the guidelines relied upon in each case, and assigns hierarchal weight to each of them. *Solem* provides a useful framework "for distinguishing those surplus land acts that diminished reservations from those that simply offered non-Indians the opportunity to purchase land within established reservation boundaries."  465 U.S. at 470.

As always, the analysis begins with the recognition that only Congress can diminish a reservation and, no matter what happens to the title of individual plots of land, if Congress intends to diminish a reservation it must do so explicitly and clearly evince such intent.  *Id.*  The Court emphasized that "[d]iminishment, moreover, will not be lightly inferred.  Our analysis of surplus land Acts requires that Congress clearly evince an "intent . . . to change . . . boundaries" before diminishment will be found.  The most probative evidence of congressional intent is the statutory language used to open the Indian lands."  *Id.* (citation omitted).  When there is a combination of explicit language of cession coupled with an unconditional commitment for compensation, as in *DeCoteau,* "there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished."  *Id.* at 470-71.

The Cheyenne River Act at issue in *Solem* provided:

[T]he Secretary of the Interior . . . is hereby . . . authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations in the States of South Dakota and North Dakota lying and being within the following described boundaries . . . .

* * *

[F]rom the proceeds arising from the sale and disposition of the lands aforesaid, exclusive of the customary fees and commissions, there shall be deposited in the Treasury of the United States, to the credit of the Indians belonging and having tribal rights on the reservation aforesaid in the States of South Dakota and North Dakota the sums to which the respective tribes may be entitled. . . ."

465 U.S. at 472-73.

Examining the "most probative evidence," the *Solem* Court found a sharp, and outcome determinative, difference between the "cede, sell, relinquish and convey" language of *DeCoteau* and the "sell and dispose" language of the Cheyenne River Act.  Also important was the contrast between the sales of land for a "sum certain" as in *DeCoteau* versus the Cheyenne River Act's creation of an account where sale proceeds are deposited for the benefit of the Indians:

> Rather than reciting an Indian agreement to "cede, sell, relinquish and convey" the opened lands, the Cheyenne River Act simply authorizes the Secretary to "sell and dispose" of certain lands. This reference to the sale of Indian lands, coupled with the creation of Indian accounts for proceeds, suggests that the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent.  Indeed, when faced with precisely the same language in Seymour v. Superintendent, supra, at 356, we concluded that such provisions "did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards."

*Solem*, 465 U.S. at 473.

Even though the language of the Act alone was sufficient according to the Court to find non-diminishment, *Solem* addresses the remaining factors of the Court's diminishment construction framework.  A number of passages in the legislative history commented upon the legislation's effect of reducing the reservation and whether the Indians would have sufficient land remaining after implementation of the Act for the present and future needs of the tribes.  The *Solem* Court explains that such sundry congressional debate and discussion were not convincing stating:

> However, it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate. *Without evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests in unallotted opened lands, and in the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish the Cheyenne River Sioux Reservation.*

465 U.S. at 478 (emphasis added).

The subsequent treatment of the land by the Indians and non-Indians was of little value to the analysis according to the Court. The land was so poor that few homesteaders settled there, leaving the opened lands evenly divided between Indian and non-Indian residents.

As in *Seymour* and *Mattz, supra*, the key language at issue in the *Solem* case is similar if not identical to the language in the 1882 Act. Accordingly, the same conclusion should be reached with regard to the 1882 Act—the Omaha Reservation was not diminished by its enactment.

6.       *Hagen v. Utah*, 510 U.S. 399 (1994)

Ten years later, in *Hagen v. Utah*, 510 U.S. 399 (1994), the Court held that Congress intended to diminish the Uintah Indian Reservation. Reliance was placed on the hierarchical framework of *Solem*, with a renewed emphasis that statutes should be liberally construed, in the broadest possible scope, in favor of Indians, with ambiguous provisions interpreted in their favor. 510 U.S. at 411. Essential to the finding of diminishment was the Act's provision that the land in question would be "restored to the public domain." *Id.* at 412. Such language, as used in the context of the passage of the particular act, the contemporaneous events surrounding its passage, and the subsequent demographic results unambiguously evinced a congressional intent to diminish the Uintah reservation.

The 1882 Act involving the Omaha Reservation did not restore land to the public domain and is thus distinct from *Hagen*. Moreover, the context of the passage of the 1882 Act, as well as the contemporaneous events surrounding its enactment, and the subsequent demographic results as discussed, *infra*, evinced a Congressional intent *not* to diminish the Omaha Reservation.

7.       *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998)

*South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998), is the Supreme Court's most recent foray into the analysis of reservation diminishment. The issue was whether an 1894

surplus land act (the "Surplus Land Act") diminished the Yankton Sioux Reservation.  The Court concluded that the Surplus Land Act's language and the circumstances surrounding its passage evinced a congressional intent to diminish the reservation.

*Yankton Sioux* clearly follows the hierarchical framework set forth in *Solem, supra*, for the analysis of diminishment cases.  The Court states that the "touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose."  522 U.S. at 343.  The "most probative evidence" of that purpose is still to be gleaned in the statutory language itself.  The historical context surrounding the passage of the act is also a consideration.  To "a lesser extent" a court may turn to the subsequent treatment of the area in question and the pattern of settlement.  *Id.* at 343-44.

The statutory language in *Yankton Sioux* mirrored that of *DeCoteau* with cession language as well as a fixed payment component.  The Court thus easily concluded in favor of diminishment.  Neither *Yankton Sioux* nor *DeCoteau* control the outcome in this case, because the 1882 Act is devoid of either cession language or a fixed payment component.

Following is a case-by-case chart, quoting the language that the Supreme Court has found to be outcome determinative of diminishment, (*i.e.*, language of absolute cession, return of the land to the public domain, and payment of a sum certain).

| CASES FINDING DIMINISHMENT | | |
| --- | --- | --- |
| Case | Language of Diminishment | Payment Provisions |
| *DeCoteau* | "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest[.]"<br><br>Congressional supporters repeatedly stated the land would be restored to the "public domain" | Sum certain |

20

| CASES FINDING DIMINISHMENT | | |
|---|---|---|
| <u>Case</u> | <u>Language of Diminishment</u> | <u>Payment Provisions</u> |
| *Rosebud Sioux* | "hereby cede, surrender, grant and convey to the United States all their claim, right, title and interest." | |
| *Hagen* | Restoration of land to the public domain. | |
| *Yankton Sioux* | "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" | fixed payment of $600,000 |

There is no dispute between the parties that the Act of 1882 does not include the hallmark language of cession. There are absolutely no similarities between the cases finding diminishment and the Act of 1882.

However, there are overarching similarities between the Supreme Court cases finding *no* diminishment and the 1882 Act, as illustrated below:

| CASES CONCLUDING NO DIMINISHMENT | | |
|---|---|---|
| <u>Case</u> | <u>Absence of Language of Diminishment</u> | <u>Payment Provisions</u> |
| *Seymour* | Absence of language expressly vacating land and absence of language restoring land to public domain | Payment to the Dep't of Treasury for the credit of the tribe |
| *Mattz* | Absence of language of vacating or returning land; absence of language requiring termination<br><br>*granting of allotments key to finding of non-diminishment | Collected and distributed by the Government for the benefit of its wards |
| *Solem* | No language of cession, merely permission to "sell and dispose" | Proceeds to be paid into accounts to be created for tribal members |

In sum, this case is aligned with the teachings of *Seymour, Mattz,* and *Solem* under the first prong based upon the following:

21

- The 1882 Act did not provide for a relinquishment of title to the land in exchange for a specific sum of money.

- The 1882 Act did not provide for the total surrender of all tribal rights on the opened lands.

- The 1882 Act did not require that the Omaha tribal members vacate any part of the reservation.

- The 1882 Act did not restore the opened lands to the public domain.

- The 1882 Act did not prohibit access by the Omaha Tribe to the opened lands following its passage.

- The proceeds of the sales made pursuant to the 1882 Act were to be "placed on the credit of said Indians in the Treasury of the United States, and shall bear interest[.]"  (ECF 100 at 31-34, 1882 Act at § 3).

Additional crucial evidence of non-diminishment is the 1882 Act, Article 8 provision for allotments to be given to the Omaha Indians east and west of the railroad right of way:

> That said Indians or any part of them may, if they shall so elect, select the land which shall be allotted to them in severalty in any part of said reservation either east or west of said right of way mentioned in the first section of this act.

(ECF 100 at 31-34, 1882 Act at § 8).

First and foremost, "allotments," by definition, could only be made on Indian land, that is, reservation land.  Obviously, an Indian could not be given an allotment on public land.  The provision in the 1882 Act allowing allotments on land west of the right of way mandates a conclusion that the land west was Indian Country.

Per the Supreme Court, allotment under an Act "is completely consistent with continued reservation status" and the "presence of allotment provisions" in the 1892 Act reviewed in *Mattz*

22

"cannot be interpreted to mean that the reservation was to be terminated." *Mattz*, 412 U.S. at 497 & 504. In 1882, allotments to Indians were granted only on reservation land. The fact that the 1882 Act included allotments west of the railroad right of way is clear evidence of Congressional intent that the land west of the railroad right of way was to remain reservation country.

Under well-established and controlling diminishment caselaw, the Plaintiffs' claim for relief fails as a matter of law.

## IV. <u>The Second Prong:    There is no clear-cut evidence of a widely-held contemporaneous understanding that Congress intended to alter the boundaries of a reservation</u>

### A. *There is no clear and unambiguous evidence of an intent to diminish the Omaha Reservation which is inconsistent with the implications of non-diminishment found in the language of the 1882 Act.*

The second prong of the Supreme Court analysis is focused upon the events surrounding the passage of an allotment-era land Act for clear-cut evidence of a "widely-held contemporaneous understanding" that Congress intended to alter the boundaries of a reservation. (ECF 82-1, Tribal Court Memorandum Opinion & Order at 11) (citing *Solem,* 465 U.S. at 471)). These factors include the legislative history of the Act, reports on the negotiations surrounding the land sale, executive and presidential declarations, including reports from executive agencies overseeing Indian matters, and other congressional enactments surrounding the passage of the 1882 Act. (*Id.*) (citing *Rosebud Sioux,* 430 U.S. at 602; *Seymour,* 368 U.S. at 356-57). Finally, in the absence of a "clear expression" in the statutory language relating to Congressional intent, only "*unequivocal*" evidence gleaned from the surrounding circumstances will permit a finding of diminishment of a reservation. (*Id.* at 11-12) (citing *Yankton Sioux,* 522 U.S. at 351) (emphasis added).

This Court's review of the Tribal Court's Opinion under the second prong involves mixed questions of fact and law. Obviously, the Tribal Court's interpretations of Treaties and Statutes

23

are subject to *de novo* review.  On the other hand, the Tribal Court's factual findings regarding events surrounding the passage of an allotment-era land Act and the contemporaneous understanding of the Omaha Indians, government officials (including agents charged with overseeing Indian affairs), congressional floor debates, and other contemporaneous statements are reviewed under the deferential clearly erroneous standard.

The Tribal Court began its analysis of the second prong by noting that the language of the 1882 Act differs "substantially" from language of cession and sum certain payment contained in other federal legislation pertaining to the Omaha Reservation, referring to the 1854 Treaty and the 1865 sale of tribal land to the Winnebago Indian Tribe.  (ECF 82-1 at 17).

        1.    <u>The 1854 Treaty</u>

The Omaha Indian Reservation was established by a treaty between the Omaha Tribe and the United States of America executed March 16, 1854, with the actual boundaries of the reservation established in May of 1855.  Within the 1854 treaty, the Omaha Tribe ceded to the United States "all their lands west of the Missouri River, and south of a line drawn due west from a point in the center of the main channel of said Missouri River due east of where the Ayoway River disembogues out of the bluffs, to the western boundary of the Omaha County, and forever relinquish all right and title to the country south of said line[.]"  (Ex. 2, 1854 Treaty at Article 1). In consideration of and payment for the land ceded by the Omaha Tribe, the United States agreed to pay the Omaha Tribe a sum certain paid over a certain number of years.  (*Id.* at Article 4).

The Tribal Court concluded that the 1854 Treaty contained the language found by the Supreme Court to support a diminishment of tribal lands and undeniably effected a cession of Omaha Tribal lands and established the Omaha Reservation.  (ECF 82-1, Tribal Court Memorandum Opinion & Order at 22).

2. The 1865 Treaty

The Tribal Court next examined the 1865 Treaty, which effectuated the sale of part of the Omaha Reservation for the benefit of the Winnebago Tribe. (Ex. 3, 1865 Treaty) On March 6, 1865, the Omaha Tribe sold to the United States Government a tract of land encompassing approximately 98,000 acres within the northern tier of the Omaha Indian Reservation to be used as a separate reservation for the Winnebago Indians. (ECF 100, Stipulated Facts at 39). This sale was for a sum certain ($50,000). (Ex. 3, 1865 Treaty at Article 2).

The 1865 Treaty sale to the United States for the benefit of the Winnebago Tribe employed language of cession (the Omaha Tribe agreed to "cede, sell, and convey to the United States a tract of land from the north side of their present reservation[.]"). (*Id.* at Article 1). Additional cession language provided that the Omaha Tribe was to "vacate and give possession of the lands ceded by this treaty immediately after its ratification." (*Id.*).

The 1854 and 1865 Treaties provided individual allotments within the Omaha Indian Reservation to Omaha Tribe members. (ECF 100, Stipulation of Facts at ¶47). While allotments were made to individual Omaha Tribal members under the provisions of the 1854 and 1865 Treaties, those allotments did not grant fee-simple title. (*Id.*). The Omaha Tribe members later learned that the certificates for the allotments provided in the 1854 and 1865 Treaties were legally infirm, causing the Omaha Tribe to request allotments that would guarantee fee-simple title to the reservation land so allotted. (*Id.* at ¶46).

3. The 1872 Act

In August 1871, the Omaha chiefs appealed to Congress "to provide for the enactment of a law authorizing the sale of 50,000 acres of the most western portion of their reservation . . ." to raise funds for farming and housing. (ECF 100 at ¶48). Congress did not enact the requested legislation.

25

In October 1871, the Omaha chiefs sent a letter to Congress and "earnestly renew[ed] the petition presented to Congress at its last session" calling for "the sale of near 50,000 acres from the most western portion of our reservation as can be separated from the remainder by a line running along the section-lines from north to south." (*Id.* at 49).

On January 22, 1872, Commissioner of Indian Affairs F.A. Walker recommended the proposed legislation to Congress and stated, "I believe that the general idea of diminishing these reservations for the purpose of securing higher cultivation of the remaining lands, is consonant with sound policy." (*Id.* at 50).

On June 10, 1872, Congress enacted legislation that authorized the Secretary of the Interior, with the consent and concurrence of the Omaha Tribe, to "cause to be surveyed, if necessary, a portion of their reservation in the State of Nebraska, not exceeding fifty thousand acres, to be taken from the western part thereof, and to be separated from the remaining portion of said reservation by a line running along the section lines from north to south. The said lands so separated shall be appraised [and] the Secretary of the Interior shall be, and hereby is, authorized to offer the same for sale for cash in hand." (*Id.* at 51).

A minimum price of two dollars and fifty cents per acre was set and the proceeds of the sale were to be placed in the United States Treasury to the credit of the Indians. (ECF 82-1, Tribal Court Memorandum & Order at 24). Only 300.72 acres of the Omaha Reservation were actually sold under the terms of the 1872 Act. The Commissioner reported: "By the provision of the act of June 10, 1872, 49,762 acres have been appraised for sale [and are held] in trust for said Indians, leaving 143,225 acres as their diminished reserve." (*Id.* at 53).

In examining the legislation discussed above, *i.e.,* the Treaties and the 1872 Act, the Tribal Court correctly concluded:

26

> [T]he language utilized in the failed 1872 Act is ambiguous as to the intent of Congress when authorizing the sale of lands on the Omaha Reservation.  In contrast, the 1854 Treaty and 1865 Act clearly evince the intent of Congress to diminish the Omaha Reservation.  During the period in question, "Congress was fully aware of the means by which termination (of reservation status) could be effected."  *Mattz,* 412 U.S. at 504.  As a whole, the facts and circumstances surrounding the enactments leading up to the 1882 Act do not reveal an unequivocal statement of a Congressional purpose to diminish the Omaha Reservation.

(ECF 82-1, Tribal Court Memorandum Opinion & Order at 24).

### 4.    Legislative history of the 1882 Act

Next, the Tribal Court turned its attention to the circumstances surrounding the passage of the 1882 Act, including its legislative history.[1]  After a thorough analysis, the Tribal Court concluded:

- Neither party can point to a definitive statement regarding the effect of the land sale on the boundaries of the Omaha Reservation, nor could the Tribal Court independently find any reference to specific boundaries in any of the debates or discussions.  (ECF 82-1 at 26).

- The "statements contained in the legislative history of the 1882 Act do not clear up the uncertainty about the key issue of diminishment." (*Id.*).

The Tribal Court also considered the contemporaneous understanding of the Indians involved in the sale as a relevant aspect of the surrounding circumstances related to the opening of a reservation for white settlement.  (*Id.* at 27).  The Tribal Court found that the overwhelming sentiment in the "memorials" of Omaha ancestors expressed a desire to gain title or permanency to their resident lands and a fear of removal from their homeland.  (*Id.*).

Notably absent, the Tribal Court pointed out, were any statements by or to the Indians, evincing an understanding of diminishment.  Such statements in other Supreme Court cases were

---

[1] The parties' stipulated facts pertaining to the legislative history are found at ECF 100, at ¶¶59-85.

pertinent in determining whether all parties understood the sale of land would involve a dissolution of reservation boundaries.  (*Id.*) (citing examples from *DeCoteau,* 420 U.S. at 432 ("We never thought to keep this reservation for our lifetime."); *Yankton Sioux,* 522 U.S. at 352 ("This reservation alone proclaims the old time and old conditions."); Hagen, *510 U.S. at 417* ("[c]ongress has provided legislation which will pull up the nails which hold down that line and after next year there will be no outside boundary line to this reservation.") (emphasis original).

The Tribal Court examined Supreme Court precedent to determine what import the surrounding circumstances had on the ultimate decision of whether an Indian Reservation was diminished, and it became clear in cases where the Supreme Court concluded that the language of the Act at issue itself did not evince an intent to diminish a reservation, it also found a lack of support in contemporaneous history.  *See, e.g., Solem*:

> Without evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests in unallotted opened lands, and in the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish the Cheyenne River Sioux Reservation.

465 U.S. at 478.

The Tribal Court's ultimate conclusion was that there is "no clear and unambiguous evidence of the intent to diminish the Omaha Reservation which is inconsistent with the implications of non-diminishment found in the language of the 1882 Act."  (ECF 82-1, Tribal Court Memorandum Opinion & Order at 28).  Instead, the Tribal Court concluded that the circumstances were uncertain as to the key issue of diminishment, and devoid of any definitive statements regarding the effect of the land sale on the boundaries of the Omaha Reservation.  (*Id.* at 26).

## V.   The Third Prong:  Subsequent Jurisdiction and Demographics

### A.   The Court Need Not Address this Prong.

The third and "least compelling" prong of the Supreme Court analysis involves the examination of the subsequent jurisdictional and demographic history of the region opened for settlement under the 1882 Act.  (ECF 82-1, Tribal Court Memorandum Opinion & Order at 12) (citing *Solem,* 465 U.S. at 472).  While this analysis may provide an "additional clue," as to what Congress foresaw in enacting the 1882 Act, it constitutes an "unorthodox and potentially unreliable method of statutory interpretation."  (*Id.*).  In *Yankton Sioux,* the Court held that the mere sale of reservation land to non-Indians does not change the character or the definition of land as reservation.  522 U.S. at 356 (citations omitted).

Arguably, the Tribal Court was not required to address the third prong, in light of its foregoing conclusions of non-diminishment:

> There are, of course, limits to how far we will go to decipher Congress's intention in any particular surplus land act.  When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.

*DeCoteau,* 420 U.S. at 470-71.  If this Court agrees with the Tribal Court's holdings on the first and second prongs, it likewise need not consider the third prong.

The Tribal Court's opinion under the third prong is purely factual, and as such, is subject to deferential clearly erroneous standard of review, if this Court chooses to consider the third prong of the diminishment test.

### B.   Subsequent Jurisdictional and Demographic History do not Support Diminishment.

In April 1883, the Secretary of the Interior appointed Alice Fletcher as a special agent to oversee the allotment process.  Fletcher urged the Omahas to select land near the railroad right of

29

way because she considered this the best agricultural land and it also afforded rail access to markets.  While some of the Omahas accepted Fletcher's advice, most preferred the eastern part of the reservation for its access to water and timber.  (ECF 100 Stipulation of Facts at 86-88).

In April 1883, Commissioner Price wrote to Fletcher directing her to "please ascertain whether any of the Indians desire to make their selections <u>west</u> of the right-of-way of the Sioux City and Nebraska Railroad Company.  It is important that their wishes in that respect be made known at once in order that the appraisement of the lands lying west of the railroad may be proceeded with, if deemed desirable, without waiting for the completion of the allotments. . . ." (*Id.* at ¶89).

Section 8 of the 1882 Act allowed the Omaha Tribe members to take their allotments anywhere on the reservation, including west of the railroad right of way.  At the end of 1883, Commissioner of Indian Affairs, Hiram Price, reported that 10-15 Indians had taken allotments west of the railroad right of way.  Upon completion of the initial allotment process, the land west of the railroad right-of-way was opened to settlers on April 30, 1884.  A total of 50,157 acres west of the railroad right-of-way were opened for settlement by non-Indians.  (*Id.* at ¶¶90-93).

In 1885, Omaha and Winnebago Agent George Wilson described the results of the 1882 Act as follows: "The Omahas have reduced their reservation by selling 50,000 acres, west of the Sioux City and Omaha Railroad, to actual settlers, and have taken allotments on the remainder." In 1885, the Commissioner of Indian Affairs reported that "Omaha Reservation lands lying west of the Sioux City and Nebraska Railroad" had recently been sold to settlers, but that many of the latter had failed to pay for the acreages.  In 1887, the Secretary of the Department of the Interior referred to land west of the railroad right of way as "within the limits of the former Omaha Indian Reservation."  (*Id.* at ¶¶94-96).

Congress authorized extensions of payment under the 1882 Act in 1885, 1886, 1888, 1890, and 1894.  The extension of payment in 1894 acknowledged that the Omahas retained an interest in these lands by adding a provision that "this Act shall be of no force and effect until the consent thereto of the Omaha Indians shall be obtained[.]"  Further, non-Indian settlers on the reservation lands west of the railroad also acknowledged the Omaha Tribe's retained interest in the lands by requesting the Omaha Tribe's acquiescence in the payment extensions. Federal officials agreed to the request and on December 23, 1895, the Omaha met in council with Indian Agent William Beck and gave their permission for payment schedules for reservation lands west of the railroad to be extended.  (*Id.* at ¶97).

Under the terms of the 1888 extension, if a settler defaulted on payment for land west of the right-of-way, the land was to be sold at public auction rather than revert back to the Omaha Tribe.  However, the proceeds from any sale of the land continued to inure for the benefit of the Omaha Tribe.  Congressional reports focusing upon this extension also refer to the land as being "on the Omaha Reservation" or individuals buying lands west of the railroad as "purchasers of land of the Omaha tribe."  (*Id.* at ¶98-99).

In 1900, Secretary of Interior Ethan Allen Hitchcock ruled that settlers who purchased land west of the railroad right of way were not subject to homestead legislation because they were settled on lands "in the Omaha reservation."  All of the land west of the railroad right-of-way, apart from the 10-15 Indian allotments, was conveyed from the United States to non-Indians, with the final remaining parcel selling in 1913.  The land allotted to Indians west of the right-of-way was patented in fee simple by 1919, with no trust land remaining west of the railroad.  (*Id.* at ¶¶100-02).

31

    1.    <u>Establishment and Population of the Village of Pender</u>

Upon the opening of the area west of the right-of-way, W.E. Peebles purchased a tract of 160 acres, on which he platted the townsite for Pender. He conveyed a portion of the land to the railroad for a depot site. Lots within the town went on sale in April 1885. Many Omahas regularly visited Pender, resided in the village, and conducted business there. Excerpts from the correspondence and diary of Rosalie Farley, whose allotments were located west of the railroad, indicate that her family resided on her allotment, and that she and other Omahas regularly visited Pender, conducted business at that location and even attended concerts in the village. (ECF 100, Stipulation of Facts at ¶¶114, 116).

Between 1890 and 1895, Thomas Sloan, an attorney and member of the Omaha Tribe, maintained both a residence and a law office in The Village of Pender where he employed an Omaha as a clerical assistant. Sloan also served as Mayor of the Village of Pender, Thurston County Surveyor, and Justice of the Peace. Hiram Chase, another attorney and enrolled member of the Omaha tribe, resided and practiced law in Pender, where his children attended public schools. Chase also served as Thurston County Attorney for eight years, before being elected as County Judge. (*Id.* at ¶¶117-121).

In *Hallowell v. United States*, the United States Supreme Court restated the parties' stipulation of facts relied upon by the district court as follows:

> That the Omaha Indians exercise the rights of citizenship, and participate in the County and State Government extending over said Omaha Indian Reservation, and over and upon the allotments herein referred to. That the defendant, Simeon Hallowell, has been on frequent occasions a Judge and Clerk of election, a Justice of the Peace, an Assessor, and a Director of the public school district in which he lives. That Omaha Indians have taken part in the State and County government, extending over the reservation, and have held the following offices in said county of Thurston, State of Nebraska: County Coroner, County Attorney, County Judge, Justice of the Peace, Constable, Road Overseer, Election Officers, and have also served as jurors in the county and district Courts. Defendant is self-supporting, as are most of said Indians. Some of them are engaged in business and most of them engaged in farming.

221 U.S. 317, 319-20 (1911).

### 2. Thurston County Boundaries

In 1889, the Nebraska Legislature enacted legislation defining the geographical boundaries of Thurston County—now codified as Neb. Rev. Stat. § 22-187.  In 1922, the legislature changed the boundaries of Thurston County as reflected below.  New language as of 1922 is highlighted in bold font:

> **The territory bounded as follows shall constitute the county of Thurston:**
>
> Commencing at **a point where the west boundary of the Omaha Indian reservation intersects the south line of section thirty-three (33),** the southeast corner of section thirty-four (34), township twenty-five, (25), north, of range five, (5) east, sixth P.M. **6th principal meridian**; thence east to the northeast corner of township twenty-four, (24), north, of range seven (7), east sixth P.M; thence south to the south line of the Omaha Indian reservation, as originally surveyed; thence east along said line to the **line between sections thirty-two and thirty-three,** southwest corner of section twenty-eight (28), township twenty-four (24), north, of range ten (10), east sixth P.M.; thence north to the northwest corner of section twenty-one (21), township twenty-four, (24) north, of range ten (10) east sixth P.M.; thence east to the eastern boundary of the State of Nebraska; thence in a north-westerly direction along said boundary line to its intersection with the section **north** line **of the Winnebago Indian reservation,** dividing sections twenty-five (25) and thirty-six (36), township twenty-seven (27), north, of range nine**,** (9), east sixth P.M.; thence west **along the north line of said reservation to the intersection of the line between sections thirty-three and** to the northwest corner section thirty-four (34), township twenty-seven (27), north, range six (6), east sixth P.M; thence south to the south-west corner of section thirty-four**,** (34), township twenty-seven**,** (27), north, range six (6), east sixth P.M.; thence west to **an intersection with the west boundary of said Winnebago Indian reservation;** the northwest corner of section two (2), township twenty-six (26), north, of range five (5), east sixth principal meridian; thence south **along the Winnebago and Omaha Indian reservation line** to the place of beginning.

*Compare* Compiled Statutes of Nebraska 1889, chapter 17, § 75b with Compiled Statutes of Nebraska 1922, chapter 13, § 804.  The addition of language incorporating the original boundaries of the Omaha Reservation into Thurston County's legal definition clearly demonstrates that the State of Nebraska in the three decades following the enactment of the 1882 Act considered the Omaha Indian Reservation boundaries to have remained unchanged.

From 2007 until sometime immediately prior to expert depositions in this case (August 7-8, 2012), the Thurston County website declared that:

> The two reservations [the Omaha Indian and Winnebago] are still in existence today and cover the entire Thurston County area.

(ECF 100 Stipulated Fact ¶128).

### 3.    Historical Summary

In November 1961, the Winnebago Agency issued a "Historical Summary for Omaha Reservation," stating that boundaries of the Omaha Reservation were delineated in the original survey of 1855, and were only diminished by two sales of land to the United States for the benefit of the Winnebagos.  According to the "Summary," these "two statutory cessions . . . are the only changes effected in the boundaries of the Omaha Reservation since its inception.  The later enactments authorizing sale of various lands included within these boundaries are not considered to have had the effect of terminating Federal jurisdiction over them."  (ECF 100 Stipulation ¶¶123-24).

### 4.    Retrocession

On April 16, 1969, the Nebraska State Legislature voted to retrocede to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, except for offenses involving operation of motor vehicles on public roads or highways.  The United States Government, through the Secretary of the Interior, accepted the retrocession of jurisdiction on October 16, 1970.  See 35 Fed. Reg. 16598 (1970).  The legal description of the land in the Notice of Acceptance of Retrocession of Jurisdiction delineates the Omaha Indian Reservation as originally surveyed.  (ECF 100 Stipulation ¶¶125-27).

5.      Recent Opinions of the Office of the Solicitor, U.S. Department of the
         Interior

In 1989, the Office of the Solicitor of the United States Department of the Interior was asked by the Bureau of Indian Affairs to locate the western boundary of the Omaha Indian Reservation. The Department of Interior reviewed "each of the treaties or legislative acts effecting [sic] the reservation" boundary and stated that the land west of the railroad right of way "appears to have lost its Indian character long ago with the arrival of non-Indian homesteaders."

Marcia M. Kimball, an employee in the Field Solicitor's office in the Department of the Interior's Minnesota Office issued an opinion (the "Kimball Opinion") that the railroad right of way was the western boundary of the Omaha reservation; however, in the rationale supporting her discussion, she incorrectly stated that no "Indian trust allotments were made on lands lying west of the Sioux City and Nebraska Railroad right-of-way," a circumstance which is clearly incorrect, because the allotment map shows that there were at least 15 allotments taken west of the railroad right of way following the passage of the 1882 Act. (ECF 100 Stipulation ¶¶129-33).

The 1989 Kimball Opinion was officially withdrawn on April 16, 2012 by Patrice H. Kunesh, Deputy Solicitor for Indian Affairs in the United States' Solicitor's Office in Washington, and were instructed to rely upon an April 24, 2008 opinion, the Wilfahrt Letter, which concluded that the reservation borders were not diminished. (ECF 100 Stipulation ¶¶134-36). The current and controlling opinion mirrors the Wilfahrt opinion in its conclusion that the Omaha Indian Reservation borders are not diminished (the "Berrigan Opinion"). (ECF 106-3).

6.      Other Significant Activity Evidences that the Omaha Reservation Borders
         Remain Unchanged since 1865

In 2007, Ms. Teri Lamplot, while she was Chair of the County Board of Supervisors for Thurston County, asked the U.S. Census Bureau to revise the boundaries of the Omaha Indian

Reservation to place Pender outside of the Omaha Indian Reservation.  In response to Ms. Lamplot, Robert LaMacchia, the Chief of the Geography Division of the U. S. Census Bureau informed Ms. Lamplot that the Census Bureau was "unable to make the changes to our database" and would continue to rely upon the 1999 BIA map which indicated that Pender fell within the western boundary of the Omaha Indian reservation and stated "While land ownership may change on reservation lands, the reservation boundaries are clear and, as far as we are aware, no new legal opinion, federal court decision, Act of Congress, etc., has altered these boundaries." (ECF 100, Stipulation ¶¶160-61).

On March 6, 1992, the Nebraska State Tax Commissioner issued a Revenue Ruling stating that the Village of Pender, among others, is located within the boundaries of the Omaha Indian Reservation.  (*Id.* at ¶148).

In 2002 and 2003, the Omaha Tribe contacted the Nebraska Department of Roads (NDOR) requesting replacement of signs delineating the location of the boundaries of the Omaha Indian Reservation.  The signs had been removed at the direction of State officials due to a dispute over the location of the western boundary of the Omaha Indian Reservation.  (*Id.* at 149).

Beginning on October 1, 2005, the Omaha Tribe and the State of Nebraska entered into an Agreement for the Collection and Dissemination of Motor Fuel Taxes between those parties on sales of motor fuel made on the Omaha Reservation.  (*Id.* at 150).

Former Omaha Tribal attorney, Maurice Johnson, testified regarding various efforts made by the Omaha Tribe throughout his tenure as counsel relating to its presence in the western region of the Omaha Tribe of Nebraska Reservation and, in particular, near or within the Village of Pender.  Mr. Johnson testified that in his opinion, for the most part, the Tribe's efforts were met with anger and hostility and at least once instance of overt racism**.**  For example, in

approximately 2003, the Tribe received a federal grant relating to roads. A requirement of the grant was the exercise of traffic safety checks in order to determine whether people were wearing seatbelts. There was opposition from the Pender community and, specifically, the Pender police, who challenged the Tribe's authority to administer the safety checks. (*Id.* at 151-53).

Also, in or around the summer of 2007, officials from the Environmental Protection Agency, Region 7 in Kansas City ("EPA"), visited Pender to publicly discuss the Omaha Tribe administering federal regulations on pesticide and fungicide control on the Omaha Tribe reservation, including Pender. The meeting, which was of a "town hall" variety, was very heated. Two statements made by persons in opposition to the EPA's involvement were anti-Native American, such as "We're not going to have Indians telling us how to farm," and "How about if I change my name to 'Spotted Eagle,' can I then tell white people how to farm their land?" (*Id.* at 159).

Efforts were made to cross-deputize police officers among the Tribe, Thurston County Sheriff, and the Nebraska State Patrol to facilitate law enforcement on the reservation by defining policing relationships, delineating powers, and encouraging cooperation. Thurston County refused to join any cross-deputization efforts, despite the willingness of the Nebraska State Patrol to participate in such an agreement. Although cross-deputization did occur with the State Highway Patrol and with the Walthill Police Department, Thurston County did not participate. (*Id.* at 162-163).

In approximately October of 2011, Tribal member Thomas Saunsoci was arrested and charged with a probation violation in the County Court of Thurston County, Nebraska. Mr. Saunsoci was held in custody in the Thurston County jail in Pender with the condition that he could not be released until he paid a bond. A close personal friend of Mr. Saunsoci came to the

Thurston County jail in Pender with a sufficient amount of money to bail him out.  The jailer said that she / Thurston County could not accept the money without Mr. Saunsoci's signature appearing on a document called a "Waiver of Extradition."  (*Id.* at ¶¶164-167).  Although not artfully drawn, the "Waiver of Extradition," is tacit acknowledgment by Thurston County that venue for Mr. Saunsoci's violation was properly in the Omaha Tribal Court.

## CONCLUSION

Based upon the foregoing, the Defendants respectfully request this Court enter its Order of summary judgment in favor of the Defendants and for such other, further, and different relief as this Court deems just and equitable.

Respectfully submitted this 24th day of June, 2013.

MITCH PARKER, et al., Defendants

By: /s/ *Nora M. Kane*
    Nora M. Kane – 21562
    Patricia A. Zieg – 14662
    Mark J. Peterson – 18850
    Stinson Morrison Hecker LLP
    1299 Farnam St., Suite 1500
    Omaha, NE 68102
    Phone: (402) 342-1700
    Fax: (402) 930-1701
    nkane@stinson.com
    pzieg@stinson.com
    mpeterson@stinson.com

    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

    This is to certify that on this 24th day of June, 2013, a true and correct copy of Defendants' Brief in Support of Motion for Summary Judgment was electronically filed with the Clerk of Court using the CM/ECF System, which sent electronic notice of such filing to all CM/ECF-registered Participants of record.

/s/ *Nora M. Kane*
Nora M. Kane

DB03/0580031.0031/9986535.2  DD02