**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| RICHARD M. SMITH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| and | ) |
| | ) |
| STATE OF NEBRASKA, | ) |
| | ) |
| Plaintiff-Intervenor | ) |
| v. | )   Case No. 4:07-cv-3101 |
| | ) |
| MITCH PARKER, in his official capacity as | ) |
| Chairman of the Omaha Tribal Council, et al., | ) |
| | ) |
| Defendants, | ) |
| and | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant-Intervenor | ) |
| | ) |

**BRIEF OF THE UNITED STATES**
**IN SUPPORT OF SUMMARY JUDGMENT**

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division

DARON T. CARREIRO, Trial Attorney
Indian Resources Section
Of Counsel:                                          Environment and Natural Resources Division
                                                     United States Department of Justice
Rebecca Ross, Attorney-Advisor                       P.O. Box 7611
U.S. Department of the Interior                      Ben Franklin Station
Office of the Solicitor                              Washington, D.C. 20044-7611
1849 C Street N.W.                                   Phone: (202) 305-1117
Washington, D.C. 20240                               Fax: (202) 305-0275
Phone: (202) 208-4218                                daron.carreiro@usdoj.gov
rebecca.ross@sol.doi.gov

Attorneys for the United States

## INTRODUCTION

This case concerns the reservation boundaries of the Omaha Tribe of Nebraska (the "Tribe") and requires the Court to decide whether an 1882 Congressional Act authorizing the sale of land in the western part of the Tribe's Reservation (the "Disputed Area") diminished the Reservation's boundaries. After five years of extensive litigation, the Omaha Tribal Court recently held that the 1882 Act did not result in diminishment. ECF No. 82-1 (Tribal Court Memorandum Opinion & Order).

The Supreme Court has repeatedly construed statutes such as the 1882 Act as preserving reservation boundaries and merely opening the lands at issue to non-Indian purchase and settlement. On the other hand, every statute that the Supreme Court has held to result in diminishment has unambiguously reflected Congress's clear intent to diminish the reservation's boundaries, an intent which is not reflected in the 1882 Act. Furthermore, statements and actions surrounding the passage of the 1882 Act are inconsistent and contradictory – far from unequivocally revealing any widely held, contemporaneous understanding of Congress's intent to diminish the Reservation, which is required in the absence of clear statutory language.

In addition, in the 130 years following the 1882 Act, federal and state authorities generally have recognized the continued existence of the original Omaha Reservation boundaries, undiminished by the 1882 Act. Opinions and actions by the U.S. Department of the Interior ("Interior"), the U.S. Environmental Protection Agency, the U.S. Census Bureau, the Nebraska State Legislature, the Nebraska Department of Revenue, and state taxing authorities, all generally demonstrate that the Tribe's Reservation boundaries remain intact, and have not been diminished. To be sure, there have been exceptions and temporary inconsistencies in the treatment of the Disputed Area by both the United States and the State of Nebraska, but under

- 1 -

Supreme Court legal principles such inconsistencies do not tip the scale in favor of finding that Congress intended to diminish the Reservation.

Finally, Plaintiffs' fears of sudden and unexpected alterations to the land status of the Disputed Area are unfounded.  As described below, confirming the validity of the Omaha Reservation boundaries will not disrupt settled expectations, nor cause any significant changes in the Disputed Area.

## FACTUAL BACKGROUND

The Tribe's present reservation was guaranteed by its 1854 Treaty, 10 Stat. 1043, ECF No. 115-2.  The 1854 Treaty reserved specific lands for the Tribe while allowing the Tribe, should the reserved lands prove unsatisfactory, to exchange them for other lands.  Id. at Art. 1. The lands initially reserved proved unsatisfactory, and the Tribe selected land comprising the current Reservation bounds and the United States administratively approved such selection in 1855.  ECF No. 120-4 at 12, 14-15.  In 1865, the Tribe agreed to "cede, sell, and convey" additional land, not at issue here, to the United States for a fixed sum of money.  ECF No. 115-3 (1865 Treaty, 14 Stat. 667).  The 1865 Treaty required the Tribe to "vacate and give possession of the lands ceded" so that land could be made available to the Winnebago Tribe.  Id. at Arts. 1, 5.

The present dispute stems from the Congressional Act of August 7, 1882, 22 Stat. 341, ECF No. 100 at 32-34, which provides in pertinent part:

> [T]he Secretary of the Interior be, and he hereby is, authorized to cause to be surveyed, if necessary, and sold, all that portion of [the Omaha] reservation in the State of Nebraska lying west of the right of way granted by said Indians to the Sioux City and Nebraska Railroad Company . . . .

* * *

- 2 -

[A]fter the survey and appraisement of said lands the Secretary of the Interior shall be, and he hereby is authorized to issue proclamation to the effect that unallotted lands are open for settlement . . . .

\* \* \*

[T]he proceeds of such sale . . . shall be placed to the credit of said Indians in the Treasury of the United States . . . .

\* \* \*

[S]aid Indians or any part of them, if they shall so elect, [may] select the land which shall be allotted to them in severalty in any part of said reservation either east or west of said right of way mentioned in the first section of this act.

As described in more detail below, for 130 years following the 1882 Act, the western boundary of the Omaha Reservation has been the subject of federal and state legislation, agency opinions, environmental permitting decisions, revenue rulings, and contracts, almost all of which treated the Reservation as undiminished. This case deals specifically with an alcoholic beverage control ordinance adopted by the Tribe on June 15, 2004 (the "Ordinance"). Amendment (Title 8 of the Tribal Code) to Omaha Tribe's Beverage Control Ordinance, 71 Fed. Reg. 10056 (Feb. 28, 2006). Interior certified the Tribe's Ordinance and published it in the Federal Register on February 28, 2006. Id. Within a year, the Tribe began notifying Reservation liquor retailers, including the Plaintiffs, of the Ordinance and its requirements. ECF No. 2-2. This lawsuit followed.

## **PROCEDURAL BACKGROUND**

The Village of Pender, Nebraska and Pender business owners that sell alcoholic beverages sued tribal officials to enjoin the Tribe from enforcing the Ordinance in Pender. Plaintiffs contend that the 1882 Act diminished the Tribe's Reservation boundaries. The Court, at the urging of Plaintiffs, and eventually upon agreement of Defendants, issued an order temporarily restraining the Tribe from enforcing the Ordinance pending resolution of the litigation. ECF

Nos. 16 and 24.  While keeping the temporary restraining order in place, the Court also held that Plaintiffs first had to exhaust their remedies in Omaha Tribal Court.  ECF No. 53.

Following that ruling, litigation over the Reservation boundaries commenced in Omaha Tribal Court.  There, the parties served and responded to interrogatories, document requests, and requests for admission; served third-party subpoenas; conducted depositions; prepared and served expert reports; and filed and argued dispositive motions.[1]  In a Memorandum Opinion and Order dated February 4, 2013, the Tribal Court denied Plaintiffs' motion for summary judgment, granted Defendants' cross motion, and held that the boundaries of the Omaha Reservation were preserved following the 1882 Act.  ECF No. 82-1, Mem. Op. and Order, Village of Pender v. Parker, CV No. 08-2 (Omaha Tribal Court Feb. 4, 2013).

This Court thereafter ordered the parties to file a copy of the final judgment issued by the Tribal Court, and set a summary judgment briefing schedule.  ECF No. 85.  After granting the State of Nebraska and the United States leave to intervene (ECF Nos. 102 and 108), the Court set a revised briefing schedule, and ordered that the case would be resolved solely on the evidentiary record established before the Tribal Court, with the following exceptions to be added as part of the record: Plaintiffs' and Defendants' joint stipulation of facts (ECF No. 100); the exhibits attached the State of Nebraska's complaint (ECF No. 107); and the opinion letter from Michael Berrigan, Associate Solicitor, Division of Indian Affairs, to Priscilla Wilfahrt, Twin Cities Field Solicitor, dated September 5, 2012 (ECF No. 106-3).

---

[1] These proceedings before the Omaha Tribal Court were described in Joint Status Reports filed in this Court (ECF No. 58 at ¶¶ 9-13; ECF No. 65 at ¶1; ECF No. 67 at ¶¶ 1-4; ECF No. 68 at ¶2-3; ECF No. 70 at ¶ 2; ECF No. 73 at ¶¶ 1-3; ECF No. 74 at ¶¶ 1-6; ECF No. 81 at ¶¶ 1-3; ECF No. 82 at ¶¶ 1-2) and in the Omaha Tribal Court's Memorandum Opinion and Order docketed in this Court (ECF No. 82-1).

Defendant-Intervenor, the United States, adopts the Defendants' motion for summary judgment (ECF No. 113) and respectfully requests that summary judgment be entered in its favor, and in favor of the Defendants, for the reasons stated herein.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 mandates entry of summary judgment "against a party who fails . . . to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the moving party shows that there are no genuine issues of material fact, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations and quotations marks omitted).

 A motion for summary judgment may be supported by "depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, "[t]he court need not consider only the cited materials, but may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party, and gives the nonmoving party the benefit of all reasonable inferences to be drawn from the evidence. Russell v. Men's Wearhouse, Inc., 170 F.3d 1156, 1157 (8th Cir. 1999). But the role of the Court is not to weigh the evidence, but rather to determine whether there is any genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Such issues are not raised by mere allegations of the nonmoving

- 5 -

party; rather, the non-moving party must bring forth sufficient evidence for a jury to return a

verdict for that party.  Id.  "If the evidence is merely colorable, or if not significantly probative,

summary judgment may be granted."  Id. at 249-50.

In this case, the parties have raised the additional question of whether and to what extent

the Tribal Court's ruling on the Reservation boundary issue is entitled to some degree of respect

or deference in the federal district court.  The Eighth Circuit has suggested that, in general, when

a district court requires exhaustion of remedies in a tribal court, the district court relies on the

record compiled by the tribal court, reviewing de novo any questions of federal law relating to

tribal jurisdiction, reviewing under a "clear error" or "clearly erroneous" standard any findings of

fact, and deferring to the tribal court's interpretations of tribal law.  See Attorney's Process and

Investigation Servs., Inc. v. Sac & Fox Tribe of Mississippi in Iowa, 609 F.3d 927, 937, 942 (8th

Cir. 2010); Duncan Energy Co. v. Three Affiliated Tribes of the Ft. Berthold Reservation, 27

F.3d 1294, 1300 (8th Cir.1994); cf. Water Wheel Camp Recreational Area v. LaRance, 642 F.3d

802, 808 (9th Cir. 2011) ("A decision regarding tribal court jurisdiction is reviewed de novo, and

factual findings are reviewed for clear error.  We have also recognized that because tribal courts

are competent law-applying bodies, the tribal court's determination of its own jurisdiction is

entitled to 'some deference.'").  The Eighth Circuit has further suggested, without deciding, that

some level of deference may apply "to tribal court decisions of nonjurisdictional issues of federal

law."  Attorney's Process, 609 F.3d at 943.[2]

---

[2] See also id. at 942 n.9 ("A de novo standard of review for all questions of federal law decided by tribal
courts would also appear to take inadequate account of the fact that 'the tribes remain quasi-sovereign
nations which … are in many ways foreign to the constitutional institutions of the Federal and State
Governments.'") (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 71 (1978)).

Here, the issue of whether the Reservation boundary was diminished is purely a matter of federal law, turning on the interpretation of Congress's intent behind an 1882 federal statute. Moreover, that issue arguably constitutes a question of federal law relating to tribal jurisdiction (and hence subject to de novo review), because a tribal court's jurisdiction over non-members is generally determined by the scope of its regulatory jurisdiction over non-member conduct. See Strate v. A-1 Contractors, 520 U.S. 438, 453 (1997) ("where tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'") (quoting Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987). There is no need, however, for this Court to resolve definitively whether the Reservation boundary issue is a "jurisdictional" or "non-jurisdictional" issue of federal law under the Eighth Circuit's standard of review analysis, because for the reasons set forth below, even if a de novo standard of review applies here, the Tribal Court and Interior have both reached the correct legal conclusion that the Reservation boundaries remain intact. That legal conclusion should be upheld regardless of the applicable standard of review.[3]

---

[3] To the extent Plaintiffs argue that the Omaha Tribal Court did not have jurisdiction to issue a ruling in the first instance on their lawsuit against tribal officials, in which Plaintiffs challenge the tribal officials' authority to enforce the terms of a tribal liquor ordinance, that argument was rejected by the Eighth Circuit in a similar case. See City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 559 (8th Cir. 1993) (tribal court had jurisdiction to hear non-Indians' challenge to tribal authority enforce liquor ordinance).

## ARGUMENT

**I.      The Reservation Boundaries Were Not Diminished By the 1882 Act**

   **A.      United States Supreme Court Standards For Diminishment**

   Only Congress can diminish reservation boundaries.  Solem v. Bartlett, 465 U.S. 463, 470 (1984).  "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."  Id.

   The sole issue in this case is whether the 1882 Act diminished the Omaha Tribe's Reservation boundaries, or simply offered non-Indians the opportunity to purchase land within the Reservation.  The Supreme Court has dealt with this issue seven times in the modern era, and has repeatedly construed statutes such as the 1882 Act as merely opening the lands at issue to non-Indian purchase and settlement while preserving reservation boundaries.  On the other hand, every statute that the Supreme Court has found to result in diminishment has clearly reflected Congress's intent to diminish the reservation, an intent not reflected in the 1882 Act.

   The Supreme Court has established "a fairly clean analytical structure" consisting of a three-part inquiry for determining whether Congress intended to diminish a reservation.  Solem, 465 U.S at 470.  The first and most important factor is whether the statute explicitly evidences a clear intent by Congress to diminish the reservation boundaries: "**Congress [must] clearly evince an 'intent to change boundaries' before diminishment will be found**."  Id. at 470 (emphasis added) (quoting Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 615 (1977)); Hagen v. Utah, 510 U.S. 399, 411 (1994) ("the statutory language must establis[h] an express congressional purpose to diminish") (internal quotations omitted).

- 8 -

Second, the Court may resort to legislative history and circumstances surrounding the passage of the relevant statute. **But absent explicit statutory language, the Court may find diminishment only "[w]hen events surrounding the passage of [the statute] unequivocally reveal a widely-held, contemporaneous understanding" of Congress's intent to diminish the reservation**. Solem, 465 U.S. at 471 (emphasis added).

Third, the Court looks, "[t]o a lesser extent," at subsequent events that occurred after the passage of a surplus land act. Id. Subsequent events should not by themselves lead to a diminishment finding. Duncan Energy, 27 F.3d at 1298 ("We find this exclusive reliance on the third *Solem* factor to create a quasi-diminishment totally inappropriate."). Thus, **"[w]hen both an act and its legislative history fail to provide substantial and compelling evidence of congressional intention to diminish Indian lands, [courts] are bound . . . to rule that diminishment did not take place and that the old reservation boundaries survived the opening**." Solem, 465 U.S. at 472 (emphasis added).

Inconsistencies in the subsequent treatment of reservation lands opened for settlement provide evidence that there was no clear Congressional intent to diminish a reservation. Solem, 465 U.S. at 478 (holding that diminishment did not occur where "[t]he subsequent treatment of the [reservation] by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side"); City of New Town v. United States, 454 F.2d 121, 125-26 (8th Cir. 1972) (inconsistent subsequent events do not impute congressional intent to diminish and "[w]e do not deem it necessary to examine these later acts in detail").

The Court must also "resolve any ambiguities in favor of the Indians." Hagen, 510 U.S. at 411 (1994). The general rule that "legal ambiguities are resolved to the benefit of the Indians"

is given "the broadest possible scope" in diminishment cases.  <u>DeCoteau v. District Court</u>, 420

U.S. 425, 447 (1975).

Plaintiffs fail to address the first and most important part of the <u>Solem</u> test because the

1882 Act lacks a plain and unambiguous statement of congressional intent to diminish the

Reservation boundaries.  Furthermore, the statements and actions surrounding the passage of the

1882 Act are inconsistent and contradictory – far from "unequivocally reveal[ing]" any widely

held, contemporaneous understanding of Congress's intent to diminish.  Finally, in the 130 years

following the 1882 Act, federal and state authorities have recognized the continued existence of

the original Reservation boundaries, undiminished by the 1882 Act, with a few short-lived

exceptions and inconsistencies that cannot support a diminishment finding.

**B.   <u>Solem Factor 1:</u>**
**<u>The Statutory Language of the 1882 Act Shows There Is No Diminishment</u>**

The "most probative evidence of congressional intent is the statutory language used to

open the Indian lands."  <u>Solem</u>, 465 U.S. at 470.  Here, the 1882 Act provided that "the Secretary

of the Interior [is] authorized to cause to be surveyed, if necessary, and sold, all that portion of

[the Omaha] reservation in the State of Nebraska lying west of the right of way" with the

"proceeds of such sale . . . placed to the credit of said Indians in the Treasury of the United

States").  ECF No. 100 at 32.  As described below, this language lacks what the Supreme Court

has interpreted as explicit diminishment language.

"At one extreme," the Court stated in <u>Solem</u>, is the situation in which the statutory

language both explicitly cedes and relinquishes all tribal interests and provides in exchange for

the cession an unconditional, "fixed-sum" payment from the United States, creating an almost

insurmountable presumption of diminishment.  <u>Solem</u>, 465 at 469 n. 10 and 470-71; <u>South</u>

- 10 -

Dakota v. Yankton, 522 U.S. 329, 344 (1998).  Statutory language that restores reservation land

to the public domain also indicates intent to diminish.  Hagen, 510 U.S. at 412.[4]

 "At the other extreme," the Supreme Court classified statutes that merely authorize the

Secretary of the Interior to sell and dispose of unallotted lands within a reservation.  Solem, 465

U.S. at 469 n. 10.  Such statutes do not demonstrate Congressional intent to diminish the

reservation.  Id.; Yankton, 522 U.S. at 345 ( "Acts declaring surplus land 'subject to settlement,

entry, and purchase,' without more, did not evince congressional intent to diminish

reservations.").

 Every Supreme Court diminishment ruling involved a statute that at a minimum included

explicit language of cession,[5] or allotment of tribal land and return of surplus land to the public

domain.  DeCoteau, 420 U.S. at 439 n. 22, 441 ("cede, sell, relinquish, and convey to the United

States all [the Tribe's] claim, right, title and interest" plus payment by the U.S. of a specific fixed

sum for the lands ceded ); Rosebud Sioux Tribe, 430 U.S. 584, 591 n. 8 ("cede, surrender, grant,

and convey to the United States all [the Tribe's] claim, right, title, and interest" plus the

"continuity in purpose," id. at 599, between an unenacted 1901 Agreement – which would have

diminished the reservation – and the 1904 Act ); Hagen, 510 U.S. at 404 (land allotted to tribal

members and "all the unallotted land within said reservation . . . restored to the public domain"

for homesteading at a specified per-acre amount); Yankton, 522 U.S. 329, 344-45 (1998) ("cede,

---

[4] The language in the 1882 Act authorizing the Secretary of the Interior to sell unallotted reservation lands
does not restore such lands to the public domain.  Hagen, 510 U.S. at 413 (authorizing the Secretary of
the Interior to sell and dispose of unallotted reservation lands does not restore such lands to the public
domain – it "merely open[s] the reservation to non-Indian settlement and d[oes] not diminish it") (citing
Solem, 465 U.S. at 472-74).

[5] The Supreme Court has never held that language of cession in itself is a sufficient predicate for
diminishment.

sell, relinquish, and convey to the United States all [the Tribe's] claim, right, title, and interest" plus payment of a fixed sum by the U.S. for the lands ceded).

No similar language appears in the 1882 Act.  Nor does the 1882 Act contain the unconditional, "sum certain" payment language utilized by statutes construed to result in diminishment.  <u>Compare</u> 1882 Act (ECF No. 100 at 32) (land cannot be sold for less than the appraised value, and "proceeds . . . shall be placed to the credit of said Indians in the Treasury of the United States") <u>with</u> <u>Yankton</u>, 522 U.S. at 337 n.1 ("[i]n consideration for the lands ceded, sold, relinquished, and conveyed . . . the United States stipulates and agrees to pay [the tribe] the sum of six hundred thousand dollars"); <u>DeCoteau</u> at 448 (finding intent to diminish where statute vests a known, sum certain per acre payment, but not where a statute establishes a fund for the tribe "dependent on uncertain future sales of its land to settlers").

Rather, the 1882 Act is "[a]t the other extreme," mirroring the statutory language that the Supreme Court has consistently held does not constitute diminishment.  <u>Seymour v. Superintendent of Wash. State Penitentiary</u>, 368 U.S. 351, 355 (1962) (reservation not diminished by statute, 34 Stat. 80 (1906), authorizing "the Secretary of the Interior . . . to sell or dispose of unallotted lands" with proceeds from such sales "deposited in the Treasury of the United States to the credit" of the tribe); <u>Mattz v. Arnett</u>, 412 U.S. 481, 495 (1973) (reservation not diminished by statute declaring reservation "subject to settlement, entry, and purchase under the laws of the United States" with the "proceeds arising from the sale of said lands" going to a fund for the tribe's benefit); <u>Solem</u>, 465 U.S. at 472-73 (reservation not diminished by statute authorizing the "Secretary of the Interior . . . to sell and dispose [a specific] portion of the . . . reservations" with "the proceeds arising from the sale . . . deposited in the Treasury of the United States, to the credit of the Indians").

- 12 -

The language of the 1882 Act clearly fits this latter category of cases.  ECF No. 100 at 32 (Secretary of the Interior "authorized to cause to be surveyed, if necessary, and sold, all that portion of [the Omaha] reservation in the State of Nebraska lying west of the right of way" with the "proceeds of such sale . . . placed to the credit of said Indians in the Treasury of the United States").

The difference between the 1882 Act and the Omaha Treaties of 1854 and 1865 is "particularly illuminating."  Duncan Energy, 27 F.3d at 1297 (comparing treaty language with subsequent allotment statute to conclude that the allotment statute did not result in diminishment).  The Supreme Court, applying a similar comparison, noted in Mattz that Congress, from 1871 to 1892, had considered numerous other bills expressly diminishing a reservation "in unequivocal terms."  412 U.S. at 504.  In light of this, the Court found that "Congress was fully aware of the means by which termination could be effected," id., and thus would not infer intent to diminish when the statutory language chosen by Congress differed clearly from cases where the Court had found an intent to diminish.

In the Omaha Treaties of 1854 and 1865, the Tribe agreed to cede land to the United States and in return the United States agreed to pay fixed sums of money, demonstrating that both Congress and the Tribe knew how to alter the Reservation boundaries when they chose to do so.  1854 Treaty, ECF No. 115-2 ("The Omaha Indians cede to the United States" and "relinquish to the United States all claims" in exchange for specific sums of money); 1865 Treaty, ECF No. 115-3 ("The Omaha tribe of Indians do hereby cede, sell, and convey to the United States a tract of land" and "the United States agree to pay to the said Omaha tribe of Indians the sum of fifty thousand dollars").  This treaty language is substantially different from that employed in the 1882 Act, as the Tribal Court found.  Tribal Court Mem. Op. and Order

(ECF No. 82-1) at 17 ("the 1882 Act differs substantially from language of cession and sum certain in the 1854 Treaty and 1865 land sale").

The Eighth Circuit addressed an almost identical scenario in Duncan Energy, holding that the Fort Berthold reservation was originally diminished by an 1891 treaty with language of cession and sum certain, but not by a subsequent surplus land act authorizing the Secretary of the Interior to "surve[y] and to sell and dispose of . . . all the surplus unallotted and unreserved lands within [a] portion of said reservation." 27 F.3d at 1297; 26 Stat. 1032, 1033. The relevant provisions of the Omaha and Fort Berthold treaties are nearly identical, as are the statutes opening the two reservations to non-Indian settlement. Thus, the reasoning from Duncan Energy applies equally here: "It would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents [the treaty and the allotment statute] affecting the Tribe." Duncan Energy, 27 F.3d at 1297.

What is clearly stated in the 1882 Act, however, is that Congress intended tribal members to select allotments and settle in the Disputed Area, an action indicative of continued reservation status. 1882 Act, ECF No. 100 at 34 (providing for Omaha allotments "in any part of said reservation either east or west of said right of way"); Mattz, 412 U.S. at 497 (allotment "completely consistent with continued reservation status"). Again, Supreme Court precedent supports reading such language in favor of continued reservation existence. In Solem, the Supreme Court held that "permission to continue to obtain individual allotments of the affected portion of the reservation before the land was officially opened to non-Indian settlers" suggested

- 14 -

that the opened area was to remain a part of the reservation.  465 U.S. at 474.[6]  Here, the 1882

Act even refers to the land west of the right-of-way as "part of said reservation."  ECF No. 100 at

34.

Plaintiffs fail to address the statutory language of the 1882 Act in their Brief in Support

of Summary Judgment, even though it is the first and most important factor in the Solem test,

and the "most probative" evidence of congressional intent.  In doing so, they concede that the

1882 Act lacks a plain and unambiguous statement of congressional intent to diminish the

Reservation boundaries.[7]

In conclusion, the language and structure of the 1882 Act indicate that the boundaries

were meant to survive the sale of land in this portion of the Reservation: (1) like all other non-

diminishing land sale statutes construed by the Supreme Court, the 1882 Act merely authorized

the Secretary of the Interior to sell an unallotted portion of reservation lands to non-Indians; (2)

the 1882 Act did not specify a "fixed payment" or "sum certain," but rather provided that the

unknown amount of proceeds from future sales would be deposited in the Treasury for the

Tribe's benefit; (3) the language of the 1882 Act is vastly different from prior Omaha treaties

and other statutes used by Congress, and construed by the Supreme Court, to diminish

reservation boundaries; and (4) the 1882 Act expressly permitted tribal allotments "in any part of

---

[6] Not all statutes that provide for allotment as well as sale of surplus lands have been interpreted as
leaving existing reservation boundaries intact.  See, e.g., DeCoteau.  The statute in DeCoteau, however, is
different from the statutes in Seymour, Solem, Mattz, and here, because the DeCoteau statute provided for
a fixed sum payment for lands ceded.  420 U.S. at 439.  The operative language here contrasts sharply
with the statute at issue in DeCoteau.

[7] The Tribal Court found that "Plaintiffs concede that the 1882 Act lacks the determinative language of
diminishment applied by the Supreme Court."  ECF No. 82-1 at 16.  Plaintiffs admit again now that "the
express language of the 1882 Act does not incorporate terms which the Court has previously determined
to be clear evidence of Congressional intent to diminish."  ECF No. 118 at 41.

said reservation either east or west of said right of way."  ECF No. 100 at 32.  As the Tribal

Court determined, "Congress intended a continued tribal presence in the opened area."  ECF No.

82-1 at 20.

     **C.**       <u>**Solem Factor 2**</u>**:**
               **The Surrounding Circumstances Do Not Demonstrate Diminishment**

Where, as here, statutory language lacks "explicit language of cession and unconditional

compensation," legislative history and circumstances surrounding the passage of the relevant

statute may support a diminishment finding only "[w]hen events surrounding the passage of [the

statute] unequivocally reveal a widely-held, contemporaneous understanding" of Congress's

intent to diminish the reservation.  <u>Solem</u>, 465 U.S. at 471; <u>see also</u> <u>Yankton</u>, 522 U.S. at 351

(absent clear congressional purpose in the statutory text, "unequivocal evidence" from

surrounding circumstances may support diminishment).  But the Supreme Court has made clear

that when "both an act and its legislative history fail to provide substantial and compelling

evidence of a congressional intention to diminish Indian lands, we are bound to rule that

diminishment did not take place and that the old reservation boundaries survived the opening."

<u>Solem</u>, 465 U.S. at 472.

The surrounding circumstances in this case do not support diminishment.  Most of the

circumstances in fact strongly support the continuing viability of the Reservation boundaries.

Some of the surrounding circumstances in this case, however, as in most diminishment cases, are

subject to multiple interpretations.  But the Supreme Court has consistently recognized that being

subject to multiple interpretations is insufficient: a reservation remains intact unless Congress's

contrary intent is "clear and plain."  <u>Yankton</u>, 522 U.S. at 343; <u>Solem</u>, 465 U.S. at 470.  The

Court's requirement that, in order to effect a diminishment, the circumstances surrounding

- 16 -

passage of legislation must be "unequivocal" and that such evidence must be "substantial and compelling" amply justifies a conclusion that there was no "widely held, contemporaneous understanding," Solem, 465 at 471, that the boundaries of the Omaha Reservation would be diminished. As the Tribal Court here specifically found, "the facts and circumstances surrounding the enactments leading up to the 1882 Act do not reveal an unequivocal statement of Congressional purpose to diminish the Omaha Reservation." ECF No. 82-1 at 24.

*First*, Plaintiffs make much of the language of an 1872 Act that permitted the sale of 50,000 acres of reservation land – a sale that, for the most part, never occurred. Plaintiffs note that the 1872 Act provided that 50,000 acres were "to be separated from the remaining portion of said reservation" and offered for public sale. Act of June 10, 1872, 17 Stat. 391. But even if that separation and sale was consummated, there would still be strong doubt that the Reservation had been diminished because the 1872 Act, like the 1882 Act, contained neither sum certain language nor language of cession. It just defined the portion of land that was to be opened to settlement.

Plaintiffs contend that because the 50,000-acre area in the aborted 1872 land sale was to be "separated from the remaining portion of the reservation," Congress must have intended diminishment. But the Supreme Court has cautioned against this kind of leap in logic. Even congressional language such as "reduced reservation[s]" or "reservations as diminished" is ambiguous for present-day legal diminishment analysis. Solem, 465 U.S. at 478. In using such phrases, "it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate." Id.; see also Lower Brule Sioux Tribe v. South Dakota, 711 F.2d 809, 819 (8th Cir. 1983) (holding that the phrase "as diminished" had "nothing to do with the location of reservation boundaries" and fell short of

- 17 -

clear intent). Even the Plaintiffs' expert admits that the 1872 Act did not formally change the boundary of the Omaha Reservation. ECF No. 120-10 at 13:13-15. Furthermore, if the phrase "to be separated from the remaining portion of said reservation" has any legal relevance, then equally significant is Congress's decision to remove the phrase from the operative 1882 Act.

*Second*, the fact that the 50,000-acre "portion of [the Omaha] reservation" subject to sale and settlement under the 1872 Act was the same "portion of [the Omaha] reservation" opened for sale and settlement under the 1882 Act shows that the land retained its reservation status, and that neither statute resulted in legal diminishment of the reservation.

*Third*, the history of the Omaha Reservation leading up to the 1882 Act, including the Treaties of 1854 and 1865, demonstrates that both Congress and the Tribe knew how to diminish the Reservation's boundaries when they actually wanted to. But in crafting the 1882 Act, Congress chose not to use language of cession and sum certain. See Section II.B., supra.

*Fourth*, in 1882, Congress indicated that it wanted individual Omaha Indians to select allotments anywhere on the reservation, including west of the right-of-way. Whatever intent Congress may have had in 1872 to separate the western lands from the Reservation and sell them to non-Indians, by 1882 Congress was clear that the entire Reservation was available for Indians to select for allotments, including among the Disputed Lands. Had Congress sought to terminate this portion of the reservation entirely in 1882, it would not have sought to increase Indian settlement in the area by permitting Indian allotments. 1882 Act, ECF No. 100 at 34 (providing that Omaha tribal members could select allotments "in any part of said reservation either east or west of said right of way"); Solem, 465 U.S. at 474 (statute permitting allotments in a portion of the reservation opened to settlement suggested that the opened area remained part of the reservation); Mattz, 412 U.S. at 497 ("policy [of allotment and the sale of unallotted lands] was

- 18 -

to continue the reservation system and the trust status of Indian lands" and "allotment under the 1892 Act was completely consistent with continued reservation status").

*Fifth*, there is no evidence in the record that Congress understood the 1882 Act to dissolve the Reservation's boundaries (as opposed to merely selling land to non-Indian settlers). Tribal Court Mem. Op. and Order (ECF No. 82-1) at 26.  Plaintiffs' expert opinion relies primarily on Congress's discussion of acreage, and isolated references in prior legislation to lands "separated," without recognizing that <u>legal</u> diminishment of boundaries is different, and requires more.  <u>Solem</u>, 465 U.S. at 478; <u>Lower Brule Sioux Tribe</u>, 711 F.2d at 819.  At the turn of the century, "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest."  <u>Solem</u>, 465 U.S. at 468.  Thus, references to reservation acreage may just as likely have referred to the amount of Indian trust or allotment land, rather than the total number of acres within the boundaries of a reservation.  It was also expected that reservations would be a thing of the past, so Congress often did not meticulously clarify whether a particular piece of legislation formally changed reservation boundaries.  <u>Solem</u>, 465 U.S. at 468.  But as the Supreme Court has held, "we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land act."  <u>Id.</u> at 468-69.

Notably, Plaintiffs' expert questions whether Congressional intent even matters, and admits that she "<u>did not investigate whether Congress specifically understood the reservation to be diminished</u>."  ECF No. 120-10 at 13:7-14:6 (emphasis added).  Indeed, Plaintiffs' expert also admits that she did not specifically consider any other diminishment cases, nor evaluate the opening of the Omaha Reservation "within the legal framework of diminishment." ECF No. 120-10 at 16:20-17:1; 65:22-67:4.  But Congressional intent to change boundaries is the key

consideration in determining whether a statute diminishes a reservation.  Here, there is no

unequivocal, widely held, contemporaneous understanding of such intent.

Likewise, as observed by the Tribal Court, there is no evidence in the record that Omaha

Indians at the time understood that the 1882 Act would alter their boundaries (as opposed to

merely selling land to non-Indian settlers).  ECF No. 82-1 at 27; compare with Hagen, 510 U.S.

at 417 ("[C]ongress has provided legislation which will pull up the nails which hold down [the

reservation boundary] line and *after next year there will be no outside boundary line to this*

*reservation*.") (emphasis in opinion) (quoting U.S. Indian Inspector's comments to tribal

representatives during negotiations).

In sum, both the 1882 Act's statutory language and the circumstances surrounding the

passage of the Act demonstrate no Congressional intent to diminish the Reservation boundaries.

To the contrary, both enshrine the right of Omaha Indians to live anywhere on the Reservation.

While Plaintiffs point to isolated and ambiguous phrases, the legislative history and surrounding

circumstances fail to show, "unequivocally," any widely held, contemporaneous understanding

of diminished legal boundaries.

    **D.**    **Solem Factor 3: Subsequent Treatment of the Disputed Area**
                  **Does Not Demonstrate Diminishment**

In the third-part of the Solem test for diminishment, the Court looks, "[t]o a lesser

extent," at subsequent events that occurred after the passage of a surplus land act.  Solem, 465

U.S. at 471.  However, exclusive reliance on subsequent events to support a diminishment

finding is inappropriate.  Duncan, 27 F.3d at 1298.  Thus, because the 1882 Act and its

legislative history "fail to provide substantial and compelling evidence of congressional intention

to diminish Indian lands," the Court is "bound . . . to rule that diminishment did not take place and that the old reservation boundaries survived the opening." Solem, 465 U.S. at 472.

In evaluating subsequent events, the Court must also "resolve any ambiguities in favor of the Indians." Hagen, 510 U.S. at 411; DeCoteau, 420 U.S. at 447 (the general rule that "legal ambiguities are resolved to the benefit of the Indians" is given "the broadest possible scope" in diminishment cases). Similarly, inconsistencies in the subsequent treatment of an area do not tip the balance in favor of finding Congressional intent to diminish a reservation. Solem, 465 U.S. at 478; City of New Town, 454 F.2d at 125-26.

As shown below, and as presented by the parties throughout this case, there is substantial evidence that federal and state authorities have recognized the continued existence of the original boundaries of the Reservation, unchanged by the 1882 Act. While there are also numerous ambiguities and inconsistencies, those weigh in favor of finding that diminishment has not occurred.

### 1. The U.S. Department of the Interior Determined that the Reservation was Not Diminished.

Congress has entrusted Interior with responsibility for Indian affairs. See, e.g., 25 U.S.C. § 2 ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations"); 25 U.S.C. § 13 (Snyder Act, authorizing Interior appropriations and expenditures for the benefit, care, and assistance of Indian tribes); 25 U.S.C. § 465 ("The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . for the purpose of providing land for Indians."). See also U.S. v. Wheeler, 435 U.S. 313, 328

- 21 -

n.27 (1978); <u>Seymour</u>, 368 U.S. at 357 (citing Interior as the agency having primary

responsibility for Indian affairs, and agreeing with Interior's interpretation that a statute did not

diminish the reservation).

     Interior has determined, on multiple occasions, that the boundaries of the Omaha

Reservation have not been diminished:

- "**[T]wo statutory cessions to the use of the Winnebagoes are the only changes effected in the boundaries of the Omaha Reservation since its inception**" and "**later enactments authorizing sale of various lands included within these boundaries are not considered to have had the effect of terminating Federal jurisdiction over them.**" Winnebago Agency Historical Summary dated November 30, 1961 (ECF No. 120-11 at 6-7 and ECF No. 100 ¶¶ 123-24) (emphasis added).

- "**[T]he Omaha Reservation boundaries have not been changed or altered since its establishment by the survey of 1855** [with the exception of] the cession of March 6, 1865 . . . and the purchase for the Winnebago Tribe according to the Act of June 22, 1874." Interior Memorandum dated August 13, 1999 from Area Director, Aberdeen Area, to Superintendent, Winnebago Agency (ECF No. 120-39) (emphasis added).

- "**[A] plain reading of the treaties and statutory language involving the Omaha Indian Reservation does not evidence a diminishment of the reservation boundaries**" and "the documentation of legislative history and surrounding circumstances which is available in the record does not show a contemporaneous understanding that the reservation would be diminished." Interior Letter dated April 24, 2008 from Priscilla Wilfahrt, Field Solicitor, to Alice Harwood, Acting Regional Director (ECF No. 120-55) at 26 (emphasis added).

- "After reviewing the 1989 Opinion, the 2008 Opinion, the Tribe's and Plaintiffs' expert reports, and after conducting our own research, we conclude that the analysis in the 2008 Opinion is correct and is incorporated herein by reference. Below we supplement the 2008 Opinion by restating the Supreme Court jurisprudence concerning reservation diminishment; discussing the history of the Omaha Tribe and its Reservation; analyzing legislation enacted in 1872 and 1882; and determining that **neither act diminished the Tribe's reservation**." Memorandum dated September 5, 2012 from Michael Berrigan, Associate Solicitor, Division of Indian Affairs, to Priscilla Wilfahrt, Twin Cities Field Solicitor (ECF No. 106-3) at 1-2 (emphasis added).

     In a 27-page opinion dated April 24, 2008, Interior Field Solicitor Priscilla Wilfahrt

analyzed the history of the Reservation, the relevant treaties and statutes, the legislative history

and circumstances surrounding the passage of the 1882 Act, and the subsequent treatment of the

Reservation.  ECF No. 120-55.  The opinion then applied the appropriate legal principles to

conclude that the 1882 Act did not diminish the Reservation boundaries, and that the legislative

history and surrounding circumstances did not show a contemporaneous understanding that the

Reservation would be diminished.  The opinion recommended further expert review of the

surrounding circumstances and subsequent treatment of the Reservation.  Id. at 26.  The Deputy

Solicitor for Indian Affairs, Patrice Kunesh, stated that this 2008 opinion superseded a prior 1989

letter from Marcia Kimball in the Twin Cities Field Solicitor's Office (ECF No. 8-2 at 10), and

that the 1989 letter was not to be relied upon.  ECF No. 120-54; ECF No. 100 ¶¶ 134-35.

      In 2012, the Associate Solicitor for the Division of Indian Affairs, Michael Berrigan,

issued a 23-page memorandum, based on a detailed factual record, including the parties' expert

reports in this litigation as well as Interior's own research, which again analyzed the relevant

treaties and statutes, legislative history and circumstances surrounding the passage of the 1882

Act, and the subsequent treatment of the Reservation.  ECF No. 106-3.  The 2012 memorandum

concluded that the 2008 opinion was correct, incorporated it by reference, and offered additional

analysis as to why the 1882 Act did not diminish the Reservation.  Id.

      Plaintiffs instead rely on the 1989 letter from the Interior Twin Cities Field Solicitor's

Office, but fail to mention not only that the 1989 opinion conflicts with other Interior opinions,

but also that it has been rejected by Interior as legally and factually inaccurate.  In particular, the

1989 opinion relied on flawed and incomplete factual information, and failed to analyze the

question of reservation diminishment consistent with Supreme Court law, as Interior explained in

the 2012 memorandum disclaiming the 1989 letter.  ECF No. 106-3 at 21.

Even the 1989 letter did not find Congressional intent to diminish the Reservation, and was compelled by the statutory language of the 1882 Act to conclude that "diminishment was not the intent of Congress."  ECF No. 8-2 at 13.  Nevertheless, in an unwarranted departure from applicable law, the 1989 opinion went on to argue that "diminishment . . . may exist regardless of Congressional intent."  Id. at 14.  In addition to its legal shortcomings, this conclusion was also based in part on an inaccurate factual record, namely (1) that "no Indian trust allotments were made on lands lying west of . . . the right of way" and (2) that the land "lost its Indian character." Id.; see also ECF No. 100 ¶ 132 (parties' stipulation that the 1989 letter incorrectly stated that no allotments were taken west of the right-of-way).  The 1989 letter has been withdrawn by Interior and superseded, with instructions that it "is not to be relied upon or used."  ECF No. 120-54.

This is not the first time that a letter from an Interior field office has been superseded by subsequent analysis by the Solicitor's Office that contains a more thorough analysis.  For example, in City of New Town, the Deputy Commissioner for Indian Affairs opined in a 1962 letter that an allotment statute diminished the Fort Berthold Reservation's boundaries, but the Solicitor of the Interior issued a correcting opinion eight years later, concluding that the statute did not diminish the boundaries.  454 F.2d at 123.  Citing the "carefully considered" subsequent Interior opinion, the Eighth Circuit agreed, holding that the statute did not alter the reservation boundaries.  Id. at 123, 125, 127 (no diminishment where statute – like the 1882 Act – authorized the Secretary of the Interior to survey and "to sell and dispose of . . . all the surplus unallotted and unreserved lands within that portion of said reservation" with the proceeds derived from land sales "paid into the Treasury . . . to the credit of the Indians"); see also Iowa Power & Light Co. v. United States, 712 F.2d 1292, 1296-97 (8th Cir. 1983) (agency has inherent authority to reconsider and correct prior decisions).

- 24 -

Interior also referred to the width of the Omaha Reservation after the 1882 Act as 30 miles wide – the distance as measured along the south boundary of the original Reservation as surveyed in 1855, undiminished by the 1882 Act – in the following reports:

- 1897 Annual Report of the Commissioner of Indian Affairs: federal Indian agent describing the Reservation as "extend[ing] west 30 miles."  ECF No. 120-24 at 2.

- 1899 Annual Report of the Commissioner of Indian Affairs: another federal Indian agent describing the Reservation as "extending west 30 miles."  ECF No. 120-24 at 6.

The southern boundary of the Omaha Reservation, as established by the Treaty of 1854 and subsequently surveyed, was 30 miles wide.  ECF 82-1 at 37 (quoting Surveyor's Field Notes of the Boundary of the Omaha Indian Reservation, June 27, 1855) (measuring individual distances along the southern boundary which total 28 miles plus 660 rods, 330 rods being the equivalent of one mile, for a total of 30 miles from the Missouri River to the southwest corner of the Reservation); Neb. Revenue Ruling 99-92-1, RIA SLT NE 03/06/1992 (March 6, 1992) (Omaha Reservation's southern border is 30.5 miles, as established by the Treaty of 1854); Neb. Revenue Ruling 99-76-6, RIA SLT NE 10/13/1976 (Oct. 13, 1976) (same).

There are certainly some historical inconsistencies in various descriptions of the western boundary of the Reservation.  For example, in an 1885 Annual Report of the Commissioner of Indian Affairs, a federal Indian agent described the Reservation as extending 25 miles west of the Missouri River.  ECF No. 120-21 at 1.  This reference does not provide support for a diminishment finding because 25 miles to west of the Missouri River would be well to the west of the railroad right-of-way.  In fact, it is more likely that the federal agent used the 25-mile description to characterize the northern boundary of the original Reservation.  See 1885 Map,

attached hereto as Exhibit A.[8]  Also in 1885, missionary John Copley wrote that the "the west end of the reserve extends eight or nine miles west of Bancroft."  ECF 120-22 at 1.  Because Bancroft sits at or near the right-of-way, see Ex. A, this description would encompass lands west of the railroad right-of-way, but would not stretch to the actual western boundary.  And in 1901, an Interior field agent referred to the right-of-way itself forming the southwestern boundary.  ECF No. 100 at ¶ 107.  But if the western boundary of the Reservation had been the railroad right-of-way, as alleged by Plaintiffs, it would have been significantly less than 30-miles wide at the southern boundary and less than 25-miles wide near the northern boundary.  See Ex. A.  Ultimately, such isolated historical inconsistencies do not constitute clear evidence of Congress's intent to diminish the Reservation and, in fact, as explained above, provide evidence that Congress lacked the requisite clear intent to diminish the Reservation.

Plaintiffs also rely on isolated acreage comparisons in annual Interior reports.  This reliance is misplaced for the same reasons that Congressional references to "reduced reservation[s]" are ambiguous in diminishment determinations.  Solem, 465 U.S. at 478.  At the turn of the century, "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest."  Id. at 468.  Thus, isolated references to reservation

---

[8] The 1885 Map attached hereto as Exhibit A was previously authenticated by Plaintiffs' expert, ECF No. 117-30 at 3 ¶ 5, and is being offered here for illustrative purposes only.  Plaintiff's expert used the 1885 base map to create a new map.  The United States, in contrast, attaches the original base map for illustrative purposes.  The original boundaries of the Omaha Reservation included all of the land south of the red line.  Plaintiffs assert that the 1882 Act established the railroad right-of-way running through the western portion of the Reservation as its new western boundary.  The Village of Pender was established about two miles northwest of Athens, shown in the pink area just west of the railroad.  The Winnebago Reservation was extended into a block of approximately 20 sections, measuring two sections high and 10 sections wide, in the northeast corner of the Omaha Reservation in 1874, via 18 Stat. 170.  Counting the one-mile-wide section lines across the Omaha Reservation, the northern boundary is approximately 25-miles wide, and the southern boundary is 30-miles wide.  The Winnebago reservation is approximately 25 miles wide throughout, and in no place measures 30 miles wide.

acreage may have just as likely referred to the amount of tribal trust or allotment land, as opposed to the total number of acres within the <u>boundaries</u> of the reservation.

Furthermore, as determined by the Tribal Court, Interior's own acreage estimates were sometimes inconsistent.  ECF No. 81-1 at 36.  But those inconsistencies do not aid Plaintiffs. Plaintiffs assert that the 1882 Act reduced the number of acres on the Reservation to approximately 150,000, yet many statements from the Congressional Record and from Interior list the Reservation acreage as approximately 150,000 <u>prior</u> to the 1882 Act's allotment and sale. <u>See</u> ECF No. 120-4 at 56-57 (describing acreage amounts listed in Annual Reports for the Commissioner of Indian Affairs); ECF No. 120-24 at 12, 14 (1880 and 1881 Bureau of Indian Affairs acreage reports for the Omaha Reservation, listing the acreage as 143,225 acres prior to the 1882 Act); ECF No. 117-17 at 17, Letter from Commissioner, Department of the Interior, to Hon. A. Saunders, United States Senate, 13 Cong. Rec. 3079 (May 12, 1882) (listing 143,225 acres as "the amount of land contained in the Omaha reserve" prior to the 1882 Act); ECF No. 117-2 at 16, Statement of D. Haskell, 13 Cong. Rec. 6538 (July 26, 1882) ("The total reservation is about 150,000 acres.").  Taken as a whole, the surrounding circumstances do not "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation."  <u>Solem</u>, 465 U.S. at 471.

### 2.  Subsequent Federal Legislation Supports a Finding of Non-Diminishment

Congress postponed the 1882 Act's payments required from non-Indian settlers via subsequent legislation enacted in 1885, 1886, 1888, 1890, and 1894.  ECF No. 100 ¶ 97.  These extensions were passed several years after the 1882 Act, yet Congress continued to reference the Disputed Area as the "Omaha Indian Reservation" and "Omaha lands."  <u>See</u> Act of Aug. 2, 1886, 24 Stat. 214 ("all persons who have settled **or shall settle upon said Omaha lands**") (emphasis

added); Act of May 15, 1888, 25 Stat. 150 (Secretary of Interior authorized to extend the time for

payment due for "**land sold on [the] Omaha Indian Reservation**") (emphasis added); Act of

Aug. 19, 1890, 26 Stat. 329 (same); Act of Aug. 11, 1894, 28 Stat. 276 (same).  This would

suggest that the opened area remained a part of the Reservation.  Solem, 465 U.S. at 478-79 (two

years after the surplus land statute at issue, Congress passed another bill referring to "'lands *in*

*the Cheyenne River Indian Reservation*,' suggesting that the opened area was still a part of the

reservation.") (citation omitted) (emphasis in opinion).

The 1888 extension Act, 25 Stat. 150, also addressed what was to happen upon default by

a purchaser, a scenario about which the 1882 Act was silent.  The 1888 Act provided that upon

default by a purchaser, the Secretary of the Interior was to sell the land at public auction to the

highest bidder, over and above the original appraisal, with "the proceeds of all such sales . . .

covered into the Treasury, to be disposed of for the sole use of said Omaha tribe of Indians."  25

Stat. 150.  Plaintiffs rely on this as evidence of diminishment (ECF No. 118 at 45).  Not so.

Under the 1888 Act, the United States merely continues acting as trustee for the Tribe, where the

previous purchaser defaults, by reselling the lands previously identified for sale, so that the Tribe

gains the financial benefit of the sale.  If anything, Congress's reaffirmation in the 1888 Act that

the United States served as trustee for the Tribe's benefit, as opposed to the absolute owner of

unrestricted fee title its own benefit, shows that diminishment did not occur.  See Ash Sheep Co.

v. United States, 252 U.S. 159, 164-66 (1920) (distinguishing between the United States acting

as trustee for a tribe, and the United States acquiring unrestricted title to their lands by tribal

cession).

In addition, twelve years after the passage of the 1882 Act, Congress stated that the 1894

extension "shall be of no force and effect until the consent thereto of the Omaha Indians shall be

obtained." 1894 Act, 28 Stat. 276.  These subsequent acts of Congress indicate continued

reservation status of these lands.

### 3.   The U.S. EPA Has Rejected Prior Diminishment Arguments.

EPA has also taken the position that the Disputed Area remains within the Reservation's

boundaries.  On January 16, 2007, EPA Region 7 issued a final permit decision for a National

Pollution Discharge Elimination System ("NPDES") permit to the Village of Pender Waste

Water Treatment Facility ("Pender WWTF") pursuant to Section 402 of the Clean Water Act, 33

U.S.C. § 1342, and regulations thereunder, including 40 C.F.R. § 123.1(h), which authorize EPA

to administer the NPDES Program on Indian lands if a State (or Indian Tribe treated as a State)

does not seek or have authority to regulate Clean Water Act activities on Indian lands.  See ECF

No. 105 at 6 (citing EPA Region 7's Motion to Dismiss Petition for Review, In re Village of

Pender Waste Water Treatment Facility (EPA Env. App. Bd. Apr. 19, 2007), available at

http://yosemite.epa.gov/oa/eab_web_docket.nsf/Filings%20By%20Appeal%20Number/2ABEB

ADB35C14DED852573000060141A/$File/Dismiss...4.pdf).

The NPDES permit was part of a ten-year process, begun in 1997, when the State of

Nebraska proposed to issue its own NPDES permit to the Pender WWTF.  Region 7 objected,

arguing that the State of Nebraska lacked authority to implement the NPDES program on the

Omaha Reservation.  After a public comment period and a public hearing at the Omaha

Reservation in 1999, EPA Region 7, rather than the State, issued draft permits for the Pender

facility in 2002 and 2006, and accepted additional public comments.  Id.

Comments were filed challenging EPA's jurisdiction, arguing, among other things, that

"Pender was removed from the Omaha Indian Reservation by an Act of Congress, August 7,

1882."  Id. at Ex. C (Comments from Teri Lamplot on Draft Permit).  EPA Region 7 considered

- 29 -

the comments, but ultimately rejected them, responding that "these facilities are within the Omaha Indian Reservation." Id. at Ex. D (EPA's Response to Comments on Draft Permit). EPA then issued a final permit that was also challenged by three separate petitions for review, but the EPA Environmental Appeals Board dismissed all of the petitions on standing grounds. In re Village of Pender Waste Water Treatment Facility, 2007 WL 1221209 (EPA Env. App. Bd. April 19, 2007); see also In re Circle T Feedlot, Inc., 2010 WL 3295104 (EPA Env. App. Bd. June 7, 2010) (denying petitions for review for four NPDES permits issued east of the right-of-way, but relying upon Bureau of Indian Affairs correspondence "recogniz[ing] the current boundary of the Omaha Tribe to be that of the original 1854 reservation excepting the land ceded to the Winnebago Tribe").

Separately, in December 2007, EPA published a Fact Sheet indicating its intent to issue a final NPDES permit to Bruns Feedlot, LLC, located in Pender, Nebraska, situated and operating within the Disputed Area. ECF No. 100 at 27-28 ¶¶ 13-14. This NPDES permit can be issued by EPA only if the facility is determined to be located within a reservation or otherwise within Indian country. Id. at ¶ 15.[9]

---

[9] The U.S. Census Bureau has also rejected claims that the Omaha Reservation has been diminished. In 2007, the Chair of the Thurston County Board of Supervisors asked the U.S. Census Bureau to revise the boundaries of the Omaha Reservation to place Pender outside the Reservation's boundaries. ECF No. 100 ¶ 160. The Census Bureau rejected the request, stating that it would continue to rely upon the 1999 Bureau of Indian Affairs map indicating that Pender was within the boundaries of the Reservation, and further stating that "the reservation boundaries are clear and, as far as we are aware, no new legal opinion, federal court decision, Act of Congress, etc., has altered these boundaries." Id. at ¶ 161.

**4.   The State of Nebraska Has Statutorily Defined the Omaha Reservation as Including the Disputed Area and Pender.**

Seven years after the 1882 Act, the Nebraska Legislature enacted legislation establishing Thurston County and defining its geographical boundaries.  ECF No. 100 ¶ 122 (quoting Compiled Statutes of Nebraska 1889, Chap. 17, § 75b).  In doing so, the Legislature defined Thurston County's western boundary as running contiguously with the western boundary of the Omaha Reservation as established by the 1855 survey, from its northwest corner due south to the southeast corner of Section 34, Township 25, North, Range 5, East, thus including the area to the west of the railroad right-of-way.  Id.

In amending the Thurston County statute several times over the next 30 years, the Nebraska Legislature added specific references to, and explicitly recognized, the continued existence of the Omaha Reservation's western boundary, undiminished by the 1882 Act or any other statutes.  Id.  By 1922, the statute defined Thurston County as "[c]ommencing at a point where the **west boundary of the Omaha Indian reservation intersects the south line of section thirty-three (33), township twenty-five, north, range five, east"** and after outlining the southern, eastern, and northern borders of Thurston County (placing all of Thurston County within the original boundaries of the Omaha and Winnebago Reservations), "**then[] south along the Winnebago and Omaha Indian reservation line** to the place of beginning."  Id. (quoting Compiled Statutes of Nebraska 1922, Chap. 13, § 804) (emphasis added).  In other words, by 1922, the State of Nebraska amended its own statutes to more explicitly recognize the Omaha Reservation's undiminished boundary, which encompassed Pender and the Disputed Area within the Reservation.

- 31 -

The Nebraska Legislature again amended the Thurston County statute several times throughout the twentieth century, and continued to recognize the existence of the original, undiminished Reservation boundary.  Even today, the statute defines Thurston County as "[c]ommencing at a point where the **west boundary of the Omaha Indian reservation intersects the south line of section thirty-four, township twenty-five, north, range five, east**" and after again outlining the southern, eastern, and northern borders of Thurston county, it describes a western boundary "**south along the west line of the Winnebago and Omaha Indian reservations to the place of beginning**."  Neb. Rev. St. § 22-187 (emphasis added). That the western boundary of Thurston County coincides with the western boundary of the Omaha and Winnebago Reservations means that Thurston County, in its entirety, is encompassed by the reservations.

Thurston County's website also acknowledged, until very recently, the full extent of its overlapping boundary with the Omaha Reservation: "The two reservations [Omaha and Winnebago] are still in existence today and **cover the entire Thurston County area**."  ECF No. 120-33 (Thurston County webpage from May 28, 2012) (emphasis added).

> **5. In "Retroceding" Criminal Jurisdiction in 1969, the State of Nebraska and Interior Acknowledged that the Disputed Area, Including Pender, Remains Within the Omaha Reservation.**

The Nebraska Legislature again recognized the continued existence of the Omaha Reservation's western boundary, undiminished by the 1882 Act, when it "retroceded" criminal jurisdiction over Indian country in Thurston County to the federal government in 1969. Congress had transferred civil and criminal jurisdiction over Indian country within the State of Nebraska to the State in 1953, through what is commonly known as P.L. 280.  18 U.S.C. § 1162; 28 U.S.C § 1360; United States v. Brown, 334 F. Supp. 536, 537-38 (1971).  Several other states

received similar transfers of jurisdiction over the Indian country in their states.  Id.  But Congress reversed course in 1968 with legislation permitting any of the P.L. 280 states to "retrocede" back to the federal government "all or any measure of" jurisdiction previously transferred.  Brown, 334 F. Supp. at 538; 25 U.S.C. § 1323.

Thus, in 1969, the State of Nebraska "retroceded" to the United States "all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska," with the exception of offenses involving the operation of motor vehicles on public roads or highways.  Res. 37, 80th Legis., 1st Sess. (Neb. 1969), reprinted in Brown, 334 F. Supp. at 544-55; ECF No. 100 ¶ 125.  The state's retrocession was accepted by Interior as effective October 25, 1970, with a detailed description of "Indian country located within the boundaries of the Omaha Indian Reservation in Thurston County."  Dept. of Interior, Notice of Acceptance of Retrocession Jurisdiction, 35 Fed. Reg. 16598 (Oct. 24, 1970); ECF No. 100 ¶ 126.  And this Court subsequently upheld the validity of the state's retrocession.  Brown, 334 F. Supp at 540-41.

Significantly, "**Indian country located within the boundaries of the Omaha Indian Reservation in Thurston County**" was defined with precision (by specific corners of townships, ranges, and sections) as bounded on the west by "the west boundary line of the Omaha Indian Reservation as originally surveyed" – encompassing the Disputed Area, unaffected by the 1882 Act or any other alleged diminishment.  35 Fed. Reg. 16598.  The southern boundary was likewise defined, with reference to specific corners, as "the south line of the Omaha Indian Reservation as originally surveyed" – again matching the Tribe's original southern boundary.  Id.; see also ECF No. 100 ¶ 127 ("legal description of the land in the Notice

- 33 -

of Acceptance of Retrocession of Jurisdiction delineates the Omaha Indian Reservation as
originally surveyed").

The Nebraska Legislature has continued to consider bills that would expand the State's
retrocession to include traffic jurisdiction on the Reservation, see, e.g., Leg. Res. 234, 118th
Leg., 2d Sess., 2007 NE L.R. 234 (NS) (Neb. 2008), but without challenging the Reservation
boundaries identified in Interior's prior acceptance.

### 6. The Nebraska Department of Revenue Defines the Omaha Reservation as Including the Disputed Area, and Expressly Holds that Pender is Within the Boundaries of the Omaha Reservation.

In Revenue Rulings in 1976, 1989, 1990, and again in 1992, the Nebraska Department of
Revenue held that the Omaha Reservation's boundaries were those established by treaty, without
any alteration by the 1882 Act, and specifically identified the Village of Pender as within the
boundaries of the Reservation.  ECF No. 100 ¶ 100; Neb. Revenue Ruling 99-92-1, RIA SLT NE
03/06/1992 (March 6, 1992); Neb. Revenue Ruling 99-90-1, RIA SLT NE 04/03/1990 (Apr. 3,
1990); Neb. Revenue Ruling 99-89-2, RIA SLT NE 09/29/1989 (Sept. 29, 1989); Neb. Revenue
Ruling 99-76-6, RIA SLT NE 10/13/1976 (Oct. 13, 1976).

### 7. The State Treated the Disputed Area as "Within the Boundaries of the Reservation" when it Collected Tribal Motor Fuels Taxes in Pender and Remitted them to the Tribe.

The State does not specifically challenge the Tribe's liquor ordinance in this case;
instead, the State's sole cause of action is that the Omaha Tribe's collection of motor fuel tax
revenue in the Disputed Area is purportedly "in excess of Tribal Authority."  ECF No. 107 at 7.
But the State's argument is contrary to the written agreement it made with the Tribe, and the
State's performance thereunder.  See Agreement for the Collection and Dissemination of Motor
Fuel Taxes Between the State of Nebraska and the Omaha Tribe of Nebraska (the "Motor Fuels

- 34 -

Tax Agreement"), ECF No. 120-49.  In performing this agreement, the State (1) recognized the existence of the Tribe's Reservation, (2) treated the Disputed Area as "within the boundaries of the Reservation," and (3) agreed to collect tribal taxes from fuel retailers in the Disputed Area, including within Pender, and remit those taxes to the Tribe.  Id.; see also Lamplot v. Heineman, No. 4:06-cv-3075, Complaint (ECF No.1) (D. Neb. March 3, 2006) (suit against the Nebraska Governor, Attorney General, Tax Commissioner, and others for the State's collection of tribal motor fuels taxes in Pender, and the State's remitting those taxes to the Tribe).  The State in this case now challenges the same boundaries it recognized when it performed the contract.

The State signed the Motor Fuels Tax Agreement on September 20, 2005, pursuant its statutory authority to enter into agreements with "federally recognized Indian tribe[s]" for collecting and disseminating taxes on sales of motor fuels made "**on a federally recognized Indian reservation**."  Neb. Rev. Stat. § 66-741 (emphasis added).  In the Motor Fuels Tax Agreement, the State recognized that "the Tribe is situated on and occupies a federally established Indian Reservation situated in the northeastern part of the State of Nebraska known as the Omaha Indian Reservation (hereinafter sometimes referred to as the 'Reservation')."  ECF No. 120-49 at 1.  With respect to state motor fuels taxes, the State further agreed as follows:

- "Any motor fuel received **within the boundaries** of the Reservation shall be exempt from the imposition of the tax on these products as levied under the laws of the State of Nebraska"; and

- "This exemption shall only apply to receipt of motor fuel that occurs at retail outlets **located on the Reservation** in Nebraska and **within the boundaries of the Reservation** in Nebraska as are set forth in the Preamble of this Agreement."

Id. at 4 (emphasis added).

The Motor Fuels Tax Agreement also permitted the Omaha Tribe to "impos[e] a tax on motor fuel . . . **within the boundaries of [its] Reservation**."  Id. (emphasis added).  The State

- 35 -

agreed to collect tribal taxes and remit them to the Omaha Tribe.  Pursuant to that agreement, the

State collected tribal taxes from fuel retailers in Pender, and remitted those taxes to the Tribe.

See, e.g., Lamplot v. Heineman, No. 4:06-cv-3075, Complaint (ECF No. 1) (D. Neb. March 3,

2006).

The State's position in this case is inconsistent with the Motor Fuels Tax Agreement and

its performance of that contract, in which the state acquiesced in the challenged conduct and

accepted the benefits arising therefrom.  While the State may no longer wish to conclude such

agreements with the Tribe, the fact that it has done so in the recent past is evidence weighing

against a finding of diminishment.

### 8.    State Authorities That Improperly Found Diminishment.

As shown above, the State of Nebraska has overwhelmingly asserted, by legislative

action, revenue rulings, and contract performance, that the 1882 Act did not diminish the Omaha

Reservation's boundaries.  The State, however, has reached contradictory conclusions on other

occasions, for example in State v. Picotte, Case No. FE99-23, CR 00-6 (Thurston Co., Neb. D.

Ct. Aug. 22, 2000).  But the Picotte opinion is legally and factually inaccurate, did not involve

the Tribe, any of the tribal defendants in this case, or the United States, and did not provide them

any chance to participate in or appeal the decision.  Even the State of Nebraska rejected

Plaintiffs' Picotte argument in separate but related litigation in 2006, asserting that the Thurston

County District Court cannot issue a dispositive determination in a criminal proceeding as to

whether or not the Omaha Reservation was diminished.  Lamplot v. Heineman, No. 4:06-cv-

3075, Brief in Support of Defendants' Motion to Dismiss (ECF No. 14) at 9 (D. Neb. March 3,

2006); see also Lamplot v. Heineman, No. 4:06-cv-3075, Rebuttal Brief in Support of

Defendants' Motion to Dismiss (ECF No. 24) at 4-5 (D. Neb. July 20, 2006) (State of Nebraska

rejecting <u>Picotte</u> argument, and characterizing Plaintiffs' argument "that Pender is not part of the reservation" as "hav[ing] no factual basis").

The other state source primarily relied upon by Plaintiffs is a Nebraska Attorney General's Letter dated February 15, 2007 (ECF No. 8-3 at 1), which relied on <u>Picotte</u> – the case that the State had already discounted for diminishment purposes less than a year prior.  The Attorney General's 2007 letter also relied on the now-rejected 1989 letter from the Interior Twin Cities Field Solicitor's Office, yet neglected Interior's subsequent memorandum and letters concluding that the Omaha Reservation was not diminished and that Pender remained within the exterior boundaries of the Reservation.[10]  Notably, the 2007 letter concedes that "the determination of reservation boundaries is a federal matter" and recognizes that Interior "may disagree with our opinion regarding the diminishment of the Omaha Reservation." <u>Id.</u> at 5.

**9.   The Demographics in the Disputed Area Do Not Support Diminishment.**

The demographics of the Disputed Area are distinguishable from the facts found in cases concluding that diminishment has occurred.  Unlike other diminishment cases involving a surge in non-Indian settlement that displaced an existing Indian population, the Omaha Reservation had few, if any, tribal members living in the western portion of the reservation prior to the 1882 Act.  ECF No. 82-1 at 35.  Instead, the Omahas had located their settlements in the eastern portion of the Reservation near the Missouri River, using the western portion as a hunting

---

[10] In 2006, the State cited these subsequent letters from Interior in defending against litigation involving the Motor Fuels Tax Agreement.  <u>Lamplot v. Heineman</u>, No. 4:06-cv-3075, Exhibit Index in Support of Motion to Dismiss (ECF No.25) (D. Neb. July 20, 2006) at Exhibit 3 (letter from Interior stating "[t]he attached memorandum . . . issued on August 13, 1999 was developed to address the question of diminishment of the Omaha Reservation and its boundaries.  **As can be seen from the text, the Region and this Agency hold that no diminishment within the vicinity of the Village of Pender, Ne. has occurred**.") (emphasis added) and Exhibit 4 (letter from Interior stating "**the Village of Pender is within the exterior boundaries of the Omaha reservation**").

ground, as well as a buffer and security zone to protect against attacks from other tribes.  Id. at

23, 35; ECF No. 120-4 at 15, 20.  The 1882 Act ushered in not only non-Indian settlers, but also

Omaha tribal members that selected allotments in the western part of the reservation, including

west of the right-of-way (although most tribal members continued to take allotments near their

villages in the eastern portion of the Reservation).  See ECF No. 100 ¶ 91 (by the end of 1883,

10-15 allotments had been taken west of the right-of-way) and ¶ 88 ("most preferred the eastern

part of the reservation for its access to water and timber").

        Omaha Indians also played important and prominent roles in the early settlement of the

Village of Pender after the 1882 Act.  Between 1890 and 1895, Thomas Sloan, an attorney and

member of the Omaha Tribe, maintained both a residence and a law office in Pender, where he

employed an Omaha tribal member as a clerical assistant.  ECF No. 100 ¶ 117.  Mr. Sloan also

served as Mayor of Pender, Surveyor of Thurston County, and Justice of the Peace. Id. at ¶ 118.

        Hiram Chase, another attorney and enrolled member of the Omaha Tribe, resided and

practiced law in Pender, where his children attended public schools.  Mr. Chase also served as

Thurston County Attorney for eight years, before being elected as County Judge.  Id. at ¶ 119.

        It is undisputed that many other Omahas regularly visited Pender, resided in the Village,

and conducted business there.  Id. at ¶ 116.

        While Plaintiffs argue that the Disputed Area lost its "Indian character," the actual

statistics are more complicated and do not support Plaintiffs' contention.  As described above,

the 1882 Act actually increased the Indian population in the Disputed Area by encouraging

Indian settlement there.  And according to Census statistics cited by Plaintiffs' expert, the non-

Indian population in the Disputed Area decreased in the years 1900 to 1910, while the Indian

population in the Disputed Area more than quadrupled during the same time.  ECF No. 118 at

26.  Even the most recent Census figures cited by Plaintiffs' expert show nearly twice as many Indians in the Disputed Area as compared to 100 years earlier, yet the non-Indian population in the Disputed Area is approximately half of what it was 100 years earlier.  Id. at 26-27.

Comparing the demographics in the eastern portion of the Reservation, which is not alleged to have been diminished, with those in the Disputed Area, is also revealing.  From 1900 to 1910, when the non-Indian population in the Disputed Area decreased, the non-Indian population east of the right-of-way more than doubled.  In fact, between 1910 and 1930, the percentage of non-Indians east of the right-of-way (where reservation status is not challenged) fluctuated between 75% and 85%, undercutting the interpretive significance of the non-Indian population percentages west of the right-of-way.

While non-Indians have outnumbered Indians in the Disputed Area since the passage of the 1882 Act, the history and demographics in this case are unique and distinguishable from the facts in other cases, and they fail to shore up Plaintiffs' diminishment argument.

## II.    Confirming the Validity of the Omaha Reservation Boundaries Will Not Disrupt Settled Expectations or Cause Any Significant Changes in the Disputed Area

Contrary to Plaintiffs' current arguments, confirming the validity of the Omaha Reservation boundaries would not be a sudden or unexpected result.  As shown by the evidence, numerous federal and state agencies have, for many years, already treated the Disputed Area as within the Reservation.

Moreover, a finding of no diminishment would not have the kinds of drastic effects Plaintiffs allege as their last ditch argument against a ruling in favor of the Defendants.  That is because tribal jurisdiction over non-Indians on a reservation is strictly limited.  For example, tribes have no criminal jurisdiction over non-Indians within the boundaries of a reservation.  See

- 39 -

Oliphant v. Suquamish Indian Tribe, 435 U.S. 191 (1978) (tribe lacks criminal jurisdiction over non-Indian[11]).  Tribes also have limited civil jurisdiction over non-Indians on non-Indian fee land within reservations.  Montana v. United States, 450 U.S. 544 (1981) (tribe lacks civil regulatory jurisdiction over non-Indians on non-Indian fee land within reservation, absent certain exceptions[12]); South Dakota v. Bourland, 508 U.S. 679 (1993) (tribe lacks civil regulatory jurisdiction over non-Indian on reclamation land within reservation); Plains Commerce Bank v. Long Family Land & Cattle Co., Inc., 554 U.S. 316 (2008) (non-Indian business sale of land to non-Indian on reservation not subject to tribal law); Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408 (1989) (tribe has zoning jurisdiction over non-Indian in closed part of reservation but lacks zoning jurisdiction over non-Indian in open/heavily non-Indian area of reservation); Atkinson Trading Co. v. Shirley, 532 U.S. 645 (2001) (tribe lacks taxation authority over non-Indian conduct on reservation under Montana test).

This general principle of law extends to tribal court jurisdiction as well.  See Strate v. A-1 Contractors, 520 U.S. 438 (1997) (tribal court lacks jurisdiction to adjudicate civil case involving accident on state-owned road within boundaries of reservation); Nevada v. Hicks, 533 U.S. 353 (2001) (tribal court lacks jurisdiction to adjudicate claims involving state officer conduct on reservation concerning off reservation crime).

---

[11] One relatively small exception is if the Tribe is approved to exercise special jurisdiction over non-Indian defendants who commit enumerated domestic violence crimes against Indian victims within the Reservation pursuant to the new provisions of the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54.

[12] The exceptions, as set forth in Montana and its progeny, are: (1) if a statute states otherwise; (2) if the non-Indian enters into a consensual relationship with the tribe; or (3) if the conduct has a direct effect on the political integrity, economic security or health or welfare of the tribe.

The risk of disruption caused by a determination that the Disputed Area remains within the Reservation, as it has long been considered, would be far less than what is suggested by Plaintiffs' unsupported arguments to the contrary.  In any event, the question here is strictly a legal one concerning jurisdictional boundaries guaranteed by Congress and should not be driven by the State's policy considerations.  Also, once jurisdictional boundaries are clarified, State, local, and tribal/federal agencies can work cooperatively to allocate, and where appropriate, share jurisdiction.  See, e.g., ECF No. 100 ¶¶ 162, 163 (describing past efforts to cross-deputize police officers among the Tribe, Thurston County Sheriff, and the Nebraska State Patrol to facilitate law enforcement on the reservation by defining policing relationships, delineating powers, and encouraging cooperation).

## CONCLUSION

The Court should enter summary judgment in favor of Defendants and the United States, and against Plaintiffs and the State of Nebraska.  The United States further requests that this Court assess costs against Plaintiffs and the State, and grant such other relief as deemed just and proper.

Dated: July 29, 2013                    Respectfully submitted,


                                        ROBERT G. DREHER
                                        Acting Assistant Attorney General
                                        Environment and Natural Resources Division


                                         /s/  Daron T. Carreiro
                                        DARON T. CARREIRO, Trial Attorney
Of Counsel:                             Indian Resources Section
                                        Environment and Natural Resources Division
Rebecca Ross, Attorney-Advisor          United States Department of Justice
U.S. Department of the Interior         P.O. Box 7611
Office of the Solicitor                 Ben Franklin Station
1849 C Street N.W.                      Washington, D.C. 20044-7611
Washington, D.C. 20240                  Phone: (202) 305-1117
Phone: (202) 208-4218                   Fax: (202) 305-0275
rebecca.ross@sol.doi.gov                daron.carreiro@usdoj.gov

                                        Attorneys for the United States



## CERTIFICATE OF SERVICE

        I, Daron Carreiro, hereby certify that on July 29, 2013, I electronically filed the foregoing
Brief of the United States in Support of Summary Judgment with the Clerk of the Court using the
CM/ECF system, which will send notification of such filing (NEF) to all registered CM/ECF
users in this case.

                                         /s/  Daron T. Carreiro
                                        Daron T. Carreiro, Trial Attorney
                                        Indian Resources Section
                                        Environment and Natural Resources Division
                                        United States Department of Justice
                                        P.O. Box 7611
                                        Ben Franklin Station
                                        Washington, D.C. 20044-7611
                                        daron.carreiro@usdoj.gov
                                        Phone: (202) 305-1117
                                        Fax: (202) 305-0275
                                        daron.carreiro@usdoj.gov