## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| RICHARD M. SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEBRASKA, | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | |
| v. | ) | Case No. 4:07-cv-3101 |
| | ) | |
| MITCH PARKER, in his official capacity as | ) | |
| Chairman of the Omaha Tribal Council, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant-Intervenor | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO PLAINTIFF-INTERVENOR'S BRIEF
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division

Of Counsel:

Rebecca Ross, Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor
1849 C Street N.W.
Washington, D.C. 20240
Phone: (202) 208-4218
rebecca.ross@sol.doi.gov

DARON T. CARREIRO, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Phone: (202) 305-1117
Fax: (202) 305-0275
daron.carreiro@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

## <u>INTRODUCTION</u>

The Supreme Court, which has established "a fairly clean analytical structure for distinguishing those surplus land acts that diminished reservations from those acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries,"[1] has never construed a statute like the 1882 Act as diminishing a reservation.  The Plaintiffs and the State of Nebraska, in effect, request that this Court break with a long line of established Supreme Court precedent to find diminishment in the absence of any clear congressional intent to diminish in either the statutory language or the surrounding circumstances.  Notably, the State, like the Plaintiffs, can point to no statutory language that would suggest any Congressional intent to diminish the Omaha Reservation.  Moreover, the State's own legislation, revenue rulings, and contract performance, demonstrate that, until recently, the State unequivocally acknowledged the continuing existence of the Reservation boundaries as unaltered by the 1882 Act.  Finally, the State fails to identify any actual harm to it that would result if the Reservation boundaries remain intact.

Only Congress can diminish reservation boundaries.  <u>Solem</u>, 465 U.S. at 470 ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.").  But in order for it to do so, "Congress [must] clearly evince an 'intent to change boundaries' before diminishment will be found."  <u>Id.</u> (quoting <u>Rosebud v. Kneip</u>, 430 U.S. 584, 615 (1977)).  Not only does the 1882 Act lack any express language diminishing the Omaha Reservation's boundaries, its legislative history and surrounding circumstances also fail to evidence any such intent.  The inconsistencies and ambiguities

---

[1] <u>Solem v. Bartlett</u>, 465 U.S. 463, 470 (1984).

identified by the State from the legislative history and the Act's surrounding circumstances do not constitute the clear, unequivocal evidence of Congressional intent that is required to diminish the Reservation.  And in any event, the Court should resolve these particular ambiguities in favor of the Omaha Tribe by finding that diminishment did not occur.  DeCoteau v. District Court, 420 U.S. 425, 447 (1975) (the general rule that "legal ambiguities are resolved to the benefit of the Indians" is given "the broadest possible scope" in diminishment cases).  Moreover, the events subsequent to the enactment of the legislation relied upon by the State do not support a diminishment finding, even if one disregarded the fact that the Act and its legislative history fail to provide any substantial or compelling evidence of Congressional intent to diminish.  Solem, 465 U.S. at 472.  The Court, therefore, should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

## ARGUMENT

### I.      The Express Language of the 1882 Act Shows There Is No Diminishment

According to the three-part diminishment test summarized in Solem, the first and most important inquiry is whether the 1882 Act explicitly evidences a clear intent by Congress to diminish reservation boundaries.  Solem, 465 U.S. at 470; South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998).  The answer is simple: the 1882 Act lacks express language of diminishment, as well as any "clear and plain" expression of Congressional intent to diminish the boundaries of the Omaha Reservation.  Yankton, 522 U.S. at 343.  Notably, the Supreme Court has construed every statute like the 1882 Act ("the Secretary of the Interior [is] authorized to cause to be surveyed, if necessary, and sold, all that portion of [the Omaha] reservation in the State of Nebraska lying west of the right of way" with the "proceeds of such sale . . . placed to the credit of said Indians in the Treasury of the United States"), ECF No. 100 at 32, as merely

opening the lands at issue to non-Indian purchase and settlement while preserving reservation

boundaries:

- Solem v. Bartlett, 465 U.S. 463, 472-73 (1984) (reservation not diminished by statute authorizing the "Secretary of the Interior . . . to sell and dispose of all that portion of the . . . reservations" with "the proceeds arising from the sale . . . deposited in the Treasury of the United States, to the credit of the Indians").

- Mattz v. Arnett, 412 U.S. 481, 495 (1973) (reservation not diminished by statute declaring reservation "subject to settlement, entry, and purchase under the laws of the United States" with the "proceeds arising from the sale of said lands" going to a fund for the tribe's benefit).[2]

- Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 355 (1962) (reservation not diminished by statute, 34 Stat. 80 (1906), authorizing "the Secretary of the Interior . . . to sell or dispose of unallotted lands" with proceeds from such sales "deposited in the Treasury of the United States to the credit" of the tribe).

Even Supreme Court cases that found diminishment have distinguished statutes like the

1882 Act.  See Yankton, 522 U.S. at 345 (statute at issue was "readily distinguishable from

surplus land Acts that the Court has interpreted as maintaining reservation boundaries" and "Acts

declaring surplus land 'subject to settlement, entry, and purchase,' without more, did not evince

congressional intent to diminish reservations"); DeCoteau, 420 U.S. at 448 (distinguishing sum-

certain statute at issue from others like the 1882 Act which opened reservation land to settlement,

established funds for tribes' benefit based on future proceeds, and did not result in

diminishment).

---

[2] The State unsuccessfully attempts to distinguish Mattz based on the word "vacating."  ECF No. 126 at 7. The word "vacating" does not appear in Mattz, and the word "vacated" appears only once, in a parenthetical of a footnote quoting a statute not at issue in that case.  Neither the 1882 Act, nor the statute at issue in Mattz, refer to "vacating" or "vacated" reservation lands.  Instead, Mattz involved a statute that went further than the 1882 Act at issue here, declaring reservation land "subject to settlement, entry, and purchase" with the "proceeds arising from the sale of said lands" placed in a fund for the tribe's benefit, and with tribal members permitted to select allotments from the lands to be opened.  412 U.S. at 495.  If the Act under consideration in Mattz did not diminish the reservation, then the 1882 Act certainly did not do so here.

In an attempt to compensate for the lack of statutory language evidencing Congressional intent to diminish, the State, ignoring Supreme Court and Eighth Circuit precedent, argues that "Congressional intent is rarely found on the face of the statute."  ECF No. 126 at 4.  But this argument is wrong.  Duncan Energy Co. v. Three Affiliated Tribes of the Ft. Berthold Reservation, 27 F.3d 1294, 1297 (8th Cir.1994) ("In cases where courts have found diminishment of a reservation, the Surplus Land Act itself contained phrases unambiguously expressing congressional intent to diminish the reservation.").  In fact, all of the modern era Supreme Court cases that found diminishment relied in part on express statutory language to do so.  Yankton, 522 U.S. at 351 ("we perceive congressional intent to diminish the reservation in the plain statutory language"); Hagen v. Utah, 510 U.S. 399 (1994) (finding diminishment in the operative language of the statute at issue); Rosebud, 430 U.S. at 587 (cession language in conjunction with "the Acts of 1904, 1907, and 1910 did clearly evidence congressional intent to diminish the boundaries of the Rosebud Sioux Reservation"); DeCoteau at 420 U.S. at 445, 448 (finding diminishment based in part on "the face of the Act" – "a straightforward agreement ceding lands to the Government for a sum certain").  Thus, the fact that the language of the 1882 Act lacks any clear language demonstrating Congressional intent to diminish the Reservation boundaries is significant.

The State seeks to turn Supreme Court precedent on its head, circumventing the rules of statutory construction and the presumption against diminishment of reservation boundaries, Solem, 465 U.S. at 481 ("[t]he presumption that Congress did not intend to diminish the Reservation therefore stands"), by arguing that the 1882 Act lacks "language indicating reservation status."  ECF No. 126 at 6.  This argument is flawed for two reasons.  First, the Supreme Court has observed that "Congress has used clear language of express termination

- 4 -

when that result is desired." <u>Mattz</u>, 412 U.S. at 504 n.22.  Accordingly, no "magic words" need

be present in the statute for the presumption against diminishment to be operative.  Instead, the

Plaintiffs and the State must prove that Congress's intent to diminish is clearly expressed.

<u>Yankton</u>, 522 U.S. at 343.  Second, although not required for the Tribe to prevail, the 1882 Act

nevertheless contains language that the Supreme Court has found is indicative of continued

reservation status.  Specifically, Section 8 permits the Omahas to select allotments and settle "in

any part of said reservation either east or west of said right of way."  ECF No. 100 at 34; <u>see</u>

<u>Solem</u>, 465 U.S. at 474 ("individual allotments of the affected portion of the reservation before

the land was officially opened to non-Indian settlers" suggested that the opened area was to

remain a part of the reservation); <u>Mattz</u>, 412 U.S. at 497 (allotment "completely consistent with

continued reservation status").  Congress, therefore, provided for a continuing Indian presence in

the area at issue.

    A statute merely authorizing the Secretary of the Interior to sell unallotted reservation

land – even if some tribal members favored the sale – does not establish clear Congressional

intent to diminish reservation boundaries.  <u>Solem</u>, 465 U.S. at 477 (reservation not diminished

even though tribes were "satisfied to have the surplus unallotted lands disposed of under the

provisions of the bill").  Otherwise, every surplus land statute, and every sale of reservation land,

would result in a diminishment – a proposition long rejected by the Supreme Court.  <u>Id.</u> at 469

("some surplus land acts diminished reservations, and other surplus land acts did not") (internal

citations omitted); <u>Mattz</u>, 412 U.S. at 496 (rejecting an argument that reservation lands opened

for settlement and sale "militates against a continuation of such reservation status"); <u>Yankton</u>,

522 U.S. at 356 ("we have repeatedly stated that not every surplus land Act diminished the

affected reservation"); <u>Seymour</u>, 368 U.S. 351, 356 (1962) ("The Act did no more than open the

way for non-Indian settlers to own land on the reservation in a manner which the Federal
Government, acting as guardian and trustee for the Indians, regarded as beneficial to the
development of its wards.").[3]  Treating the purchase of land by non-Indians as constituting
diminishment would also create the "impractical pattern of checkerboard jurisdiction . . . avoided
by the plain language of [18 U.S.C. § 1151]" and "the result would be merely to recreate
confusion Congress specifically sought to avoid."  Seymour, 368 U.S. at 358.

## II.     The Legislative History and Other Surrounding Circumstances
##         Do Not Unequivocally Demonstrate Diminishment

Because the 1882 Act lacks "explicit language of cession and unconditional
compensation," the Court may premise diminishment on legislative history and circumstances
surrounding the passage of the 1882 Act only if "events surrounding the passage of [the statute]
unequivocally reveal a widely-held, contemporaneous understanding" of Congress's intent to
diminish the Reservation.  Solem, 465 U.S. at 471; see also Yankton, 522 U.S. at 351 (absent
clear congressional purpose in the statutory text, "unequivocal evidence" from surrounding
circumstances may support diminishment).  Because diminishment is not lightly inferred, Solem,
465 U.S. at 470, it must be "unequivocally" shown that Congress affirmatively intended to alter
reservation boundaries.  Id. at 470-71.  Here, the legislative history and surrounding
circumstances fail to show, "unequivocally," any widely-held, contemporaneous understanding
of diminished legal boundaries for the Omaha Reservation.  Thus, because "both [the] act and its

---

[3] The State relies on statements from the Commissioner of Indian Affairs and from Congressional floor
debates as part of its statutory language analysis.  Doing so ignores the "fairly clean analytical structure"
for analyzing diminishment claims, in which the Supreme Court has held that the statutory language alone
is "[t]he most probative evidence of congressional intent."  Solem, 465 U.S. at 470.  The Court should
consider the legislative history and other circumstances surrounding the passage of the 1882 Act, but does
so as part of the second prong of the Solem test, and in light of the absence of any express statutory
language showing Congressional intent to diminish the Reservation.

legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," the Court is "bound . . . to rule that diminishment did not take place and that the old reservation boundaries survived the opening."  Solem, 465 U.S. at 472.  The contemporaneous legislative record contains nothing remotely similar to the evidence found persuasive by the Supreme Court in the cases (Yankton, Hagen, Rosebud, DeCoteau) in which it found reservations to be diminished.

The State cites legislative history purporting to show that certain tribal members favored the proposed sale, ECF No. 126 at 10; but as explained above, the mere sale of land alone – even when favored by some tribal members – does not show clear Congressional intent to diminish reservation boundaries.  Solem, 465 U.S. at 477 (holding that reservation was not diminished even though tribes were "satisfied to have the surplus unallotted lands disposed of under the provisions of the bill").

The State also relies heavily on an earlier 1872 Act providing that 50,000 acres were "to be separated from the remaining portion of said reservation" and offered for public sale.  Act of June 10, 1872, 17 Stat. 391.  But even if that separation and sale pursuant to the 1872 Act had been consummated (very few acres were actually sold), there would still be significant doubt of Congressional intent to diminish.  This is because the 1872 Act, like the 1882 Act, did not contain sum certain language, language of cession, or any other indicia of an intent to diminish in 1872, let alone ten years later when Congress passed the 1882 Act.[4]

---

[4] This context of the failed 1872 Act and the subsequent 1882 Act does not bear any similarity to the situation at issue in Rosebud.  In Rosebud, the Court premised diminishment on a 1904 Act, 33 Stat. 256, that included language of cession in conjunction with the express intent of all parties to effectuate an earlier 1901 Agreement between the tribe and the United States, which included a payment of sum certain.  430 U.S. at 587, 590-91, 596-601.  The 1901 Agreement, if it had been ratified by Congress, would have diminished the Rosebud Reservation, eliminating the portion of the reservation in Gregory County, South Dakota.  Rosebud, therefore, found congressional intent to diminish based on both the

- 7 -

The prior statute's use of the phrase "to be separated" also carries little weight, as do the Commissioner of Indian Affairs' two isolated statements – 10 years prior to the 1882 Act – referring to "diminishing these reservations" and "diminished reserve."  ECF No. 126 at 9-10. The Supreme Court has held that even direct, contemporaneous Congressional language referring to "reduced reservation[s]" or "reservations as diminished" is ambiguous for present-day legal diminishment analysis.  Solem, 465 U.S. at 478.  In using such phrases, "it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate."  Id.; see also Lower Brule Sioux Tribe v. South Dakota, 711 F.2d 809, 819 (8th Cir. 1983) (holding that the phrase "as diminished" had "nothing to do with the location of reservation boundaries" and fell short of clear intent).[5]

Here, the phrase "to be separated," and the Commissioner of Indian Affairs' statement regarding a "diminished reserve," all in the context of the 1872 Act, more likely refer to the reduction in Indian-owned lands that would result once the area was opened to settlement. Indeed, the fact that the 50,000-acre "portion of [the Omaha] reservation" subject to sale and

---

statutory language of cession in the 1904 Act and the "continuity in purpose" between the 1901 Agreement and the subsequent 1904 Act.  430 U.S. at 599; see also Solem, 465 U.S. at 471.

[5] In Solem, both the Senate and House reports referred to a "reduced reservation" and to "reservations as diminished."  465 U.S at 478 (citations omitted).  Even the statute itself referred to the reservation as "thus diminished," and to certain parts of the opened lands as "part of the public domain."  Id. at 474-75. Yet the Supreme Court held that these statements did not constitute clear Congressional intent to diminish reservation boundaries.  Similarly, in Yankton, references to restoring the land at issue to the "public domain" appeared in the legislative history of the statute, as well as in the annual report of the Commissioner of Indian Affairs.  522 U.S. at 353-54.  But the Supreme Court ruled that the context of the statute was not by itself compelling enough to indicate diminishment, and found diminishment instead because of the "almost insurmountable presumption" that arose "from the statute's plain terms."  Id. at 351.

settlement under the 1872 Act, was the same "portion of [the Omaha] reservation" at issue in the 1882 Act, demonstrates that neither statute affected reservation status.  If the phrase "to be separated from the remaining portion of said reservation" has any relevance, then equally significant is Congress's decision to remove the phrase from the operative 1882 Act.

Far more illuminating than the 1872 Act are the Omaha Treaties of 1854 and 1865, pursuant to which the Tribe agreed to cede land to the United States and in return the United States agreed to pay fixed sums of money, demonstrating that both Congress and the Tribe knew how to alter the Reservation boundaries when they chose to do so.  1854 Treaty, ECF No. 115-2 ("The Omaha Indians cede to the United States" and "relinquish to the United States all claims" in exchange for specific sums of money); 1865 Treaty, ECF No. 115-3 ("The Omaha tribe of Indians do hereby cede, sell, and convey to the United States a tract of land" and "the United States agree to pay to the said Omaha tribe of Indians the sum of fifty thousand dollars").  This treaty language is substantially different from that employed in the 1882 Act.  As the Eighth Circuit held in an analogous case comparing similar treaty language with a similarly worded surplus land statute: "It would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents [the treaty and the allotment statute] affecting the Tribe."  Duncan Energy, 27 F.3d at 1297.

The State also fails to address a key segment of legislative history that contradicts a diminishment finding: in 1882, Congress indicated that it wanted individual Omaha Indians to select allotments anywhere on the Reservation, including west of the right-of-way.  Whatever intent Congress may have had in 1872 to separate the western lands from the Reservation and sell them to non-Indians, by 1882 Congress made the entire Reservation available for Indians to

select allotments, including among lands in the Disputed Area.  1882 Act, ECF No. 100 at 34

(providing that Omaha tribal members could select allotments "in any part of said reservation

either east or west of said right of way"); <u>Solem</u>, 465 U.S. at 474 (statute permitting individual

allotments in the affected portion of the reservation before the land was opened to settlement

suggested that the opened area remained part of the reservation); <u>Mattz</u>, 412 U.S. at 496 ("policy

[of allotment and the sale of unallotted lands] was to continue the reservation system and the

trust status of Indian lands" and "allotment under the 1892 Act was completely consistent with

continued reservation status").

Likewise, as observed by the Tribal Court, there is no evidence in the record that Omaha

Indians at the time understood that the 1882 Act would alter their boundaries (as opposed to

merely selling land to non-Indian settlers).  ECF No. 82-1 at 27; <u>compare with</u> <u>Hagen</u>, 510 U.S.

at 417 ("[C]ongress has provided legislation which will pull up the nails which hold down [the

reservation boundary] line and *after next year there will be no outside boundary line to this*

*reservation*.") (emphasis in opinion) (quoting U.S. Indian Inspector's comments to tribal

representatives during negotiations).

In sum, neither the 1882 Act's statutory language nor the circumstances surrounding the

passage of the Act demonstrate any clear Congressional intent to diminish the Reservation

boundaries.  To the contrary, both enshrine the right of Omaha Indians to live anywhere on the

Reservation.  While Plaintiffs point to isolated and ambiguous phrases – mostly in the context of

a different statute 10 years prior to the 1882 Act – the legislative history and surrounding

circumstances fail to show, "unequivocally," any widely held, contemporaneous understanding

of diminished legal boundaries.

III.     **Subsequent Treatment of the Disputed Area Does Not Demonstrate Diminishment**

In the third-part of the <u>Solem</u> test for diminishment, the Court looks, "[t]o a lesser

extent," at subsequent events that occurred after the passage of a surplus land act.  <u>Solem</u>, 465

U.S. at 471.  However, subsequent history has been described as "less illuminating," <u>Hagen</u>, 510

U.S. at 420, and exclusive reliance on subsequent events to support a diminishment finding is

inappropriate.  <u>Solem</u>, 465 U.S. at 472 ("When both an act and its legislative history fail to

provide substantial and compelling evidence of congressional intention to diminish Indian

lands," the Court is "bound . . . to rule that diminishment did not take place and that the old

reservation boundaries survived the opening"); <u>Duncan Energy</u>, 27 F.3d at 1298 ("We find this

exclusive reliance on the third *Solem* factor to create a quasi-diminishment totally

inappropriate.").

In its opening brief, the United States showed 131 years of substantial evidence of federal

and state authorities recognizing the original boundaries of the Omaha Reservation, unchanged

by the 1882 Act.  ECF No. 127 at 20-39.  That evidence, most of which is ignored by the State,

will be described here only briefly, in response to the limited number of subsequent events cited

by the State's brief.  At most, the contradictory events cited by the State prove only the existence

of some ambiguities and inconsistencies, none of which tip the scale in favor of finding that

Congress clearly intended to diminish the Reservation, particularly given the absence of express

statutory language or clear legislative history to that effect.

*First*, subsequent acts of Congress in 1886, 1888, 1890, and 1894, continued to refer to

the Disputed Area as the "Omaha Indian Reservation" and "Omaha lands."  ECF No. 100 ¶ 97;

Act of Aug. 2, 1886, 24 Stat. 214; Act of May 15, 1888, 25 Stat. 150; Act of Aug. 19, 1890, 26

Stat. 329; Act of Aug. 11, 1894, 28 Stat. 276.  This suggests that the opened area remained a part

of the Reservation.  Solem, 465 U.S. at 478-79 (two years after the surplus land statute at issue, Congress passed another bill referring to "'lands *in the Cheyenne River Indian Reservation*,' suggesting that the opened area was still a part of the reservation") (citation omitted) (emphasis in opinion).[6]  The State's argument to the contrary, ECF No. 126 at 13-14, is unclear, unsupported, and fails to examine the post-1882 Act legislative activity in any detail.

*Second*, Interior has also concluded through numerous opinions and memoranda that the western boundary of the Omaha Reservation has not been diminished.  ECF No. 100 at ¶¶ 123-124; ECF No. 120-11; ECF; ECF No. 120-39; ECF No. 120-55; ECF No. 106-3.[7]

*Third*, the Environmental Protection Agency has also taken the position that the Disputed Area remains within the Reservation's boundaries.  ECF No. 127 at 30-31 and authorities cited; In re Circle T Feedlot, Inc., 2010 WL 3295104 (EPA Env. App. Bd. June 7, 2010); ECF No. 100 at 27-28 ¶¶ 13-15.

*Fourth*, the State statutorily defines the Omaha Reservation as including the Disputed Area and Pender by defining the western boundary of the Thurston County conterminously with the western boundary of the Omaha Reservation.  ECF No. 100 ¶ 122; Neb. Rev. St. § 22-187.

---

[6] An Assistant Attorney General opinion from 1900, approved by the Secretary of the Interior, similarly stated that the 1882 Act opened land to settlement "in the Omaha Indian reservation" and that settlers under the 1882 Act settled "lands embraced in the Omaha reservation."  ECF No. 120-25 (Opinion, Assistant Attorney-General Vandevanter to Interior to the Secretary of the Interior (approved by E.A. Hitchcock, Secretary) June 23, 1900).

[7] Interior's opinion dated April 24, 2008, from Interior Field Solicitor Priscilla Wilfahrt, analyzed the history of the Reservation, the relevant treaties and statutes, the legislative history and circumstances surrounding the passage of the 1882 Act, and the subsequent treatment of the Reservation, and recommended further expert review of the surrounding circumstances and subsequent treatment of the Reservation.  ECF No. 120-55 at 26.  That additional expert review was performed by the Parties' experts, and was analyzed and incorporated into the Interior Memorandum dated September 5, 2012, from Michael Berrigan, Associate Solicitor, Division of Indian Affairs, to Ms. Wilfahrt.  ECF No. 106-3. The 2008 opinion and 2012 Memorandum contain Interior's well-researched analyses and further support the conclusion that the Omaha Reservation boundary was not diminished by the 1882 Act.

*Fifth*, the continued existence of the Omaha Reservation's western boundary, undiminished by the 1882 Act, was again confirmed when the Nebraska Legislature "retroceded" criminal jurisdiction over Indian country in Thurston County to the federal government in 1969. ECF No. 127 at 32-34; Dept. of Interior, Notice of Acceptance of Retrocession Jurisdiction, 35 Fed. Reg. 16598 (Oct. 24, 1970); ECF No. 100 ¶¶ 126 and 127.

*Sixth*, in State Revenue Rulings in 1976, 1989, 1990, and 1992, the Nebraska Department of Revenue held that the Omaha Reservation's boundaries were those established by treaty, without any alteration by the 1882 Act, and specifically identified the Village of Pender as within the boundaries of the Reservation. ECF No. 100 ¶ 100; ECF No. 127 at 35.

*Seventh*, the State treated the Disputed Area as "within the boundaries of the Reservation" when it collected tribal motor fuels taxes in Pender and remitted them to the Tribe. ECF No. 127 at 34-36. The State's motor fuels tax agreement with the Tribe applied only "within the boundaries of the Reservation." ECF No. 120-49 at 4. The State correctly points out that the agreement does not specify the location of Reservation boundaries; but the absence of a Reservation boundary description is all the more telling, considering the State proceeded to collect tribal taxes from fuel retailers in the Disputed Area, including within Pender, and remit those taxes to the Tribe. ECF No. 127 at 34-36; see also Lamplot v. Heineman, No. 4:06-cv-3075, Complaint (ECF No.1) (D. Neb. March 3, 2006) (suit against the Nebraska Governor, Attorney General, Tax Commissioner, and others over the State's collection, and remittance to the Tribe, of tribal motor fuels taxes in Pender).

For its evidence of subsequent treatment of the Reservation by local authorities, the State cites only a single situation in which an Omaha Indian was tried in state court, which resulted in two trial court opinions regarding diminishment. But the argument is overwhelmed by contrary

- 13 -

State legislative action, revenue rulings, and contract performance, all illustrating that the 1882 Act did not diminish the Omaha Reservation's boundaries.

Finally, maps of the Disputed Area have been contradictory and inconsistent, and therefore have "limited interpretive value." Yankton, 522 U.S. at 355. As for federal maps, the General Land Office ("GLO") surveyed the Omaha Reservation in 1866-1867, detailing the southwestern corner of the Reservation, and its western and southern boundaries. ECF No. 117-10 at 11-12. On January 31, 1884 – eighteen months after the passage of the 1882 Act – federal cartographers working for the Office of Indian Affairs drafted another map showing the "Boundary Lines of the Omaha and Winnebago Ind. Res. in Nebraska," indicating that the Reservation boundaries remained unchanged: lands in the Disputed Area west of the right-of-way remained part of the Reservation. ECF No. 100 at 28; ECF No. 120-34. This 1884 Office of Indian Affairs map also matches the 1885 map previously authenticated by Plaintiffs' expert. ECF No. 127-1; ECF No. 117-30 at 3 ¶ 5.

Without mentioning either of these post-1882 Omaha Reservation-specific maps, the State instead relies on three newly added, nationwide maps. ECF No. 126 at 11-12. But among other problems, these nationwide maps do not purport to show legal boundaries. See 25 U.S.C. § 176 (describing procedures for surveying Indian reservations, including direction and control by the Bureau of Land Management, formerly the GLO); French v. United States, 49 Ct. Cl. 337, 347-48 (1914) (in the absence of a survey duly accepted by GLO, general lines or projections of a Reservation boundary were "entitled to little, if any, evidential value" and "must yield to an actual survey when lawfully executed and accepted").

Furthermore, because of the State's eleventh-hour attempt to add these maps to the record in the middle of summary judgment briefing, after the Tribal Court's opinion and over six years

- 14 -

after this case was initially filed, neither this Court nor the Parties have the benefit of any expert

analysis regarding these additional maps.  In addition, it is not clear what data was used, how the

maps were prepared, or what attention was paid specifically to the Omaha Reservation, which

appears as a mere blip among over 150 other generally depicted reservations.  Nor is it clear why

these three general, nationwide maps should prevail over the Omaha Reservation-specific map

prepared at around the same time by federal cartographers working for the Office of Indian

Affairs, which shows the Reservation boundary unaffected by the 1882 Act.  ECF No. 100 at 28;

ECF No. 120-34.[8]

Several other federal maps contradicted each other throughout the twentieth century.

Compare ECF No. 120-38 and 120-4 at 79 (Map of Omaha Indian Reservation, BIA, Aberdeen

Office, Surface Ownership, August 3, 1994, showing all of Thurston County, including the

Village of Pender, within the boundaries of the Omaha Reservation, but excluding a portion of

Cuming County) with ECF No. 120-40 and 120-4 at 79 (Omaha Reservation maps showing land

ownership status as of 1995 and 1999, and including the Disputed Area within the boundaries of

the Omaha Reservation); see also ECF No. 100 at ¶ 161 (U.S. Census Bureau relying on 1999

BIA map indicating that Pender was within the boundaries of the Reservation); In re Circle T

Feedlot, Inc., 2010 WL 3295104 (EPA Env. App. Bd. June 7, 2010) (citing in part BIA Map of

Omaha and Winnebago Reservations for "BIA recogniz[ing] the current boundary of the Omaha

---

[8] In addition, if the State's additional maps were authoritative, Congress and Interior would not have
continued referring to lands west of the right-of-way as "within the Reservation" after the 1882 Act.
Moreover, Interior described the Reservation after the 1882 Act as 30-miles wide, the distance as
measured along the southern boundary of the original Reservation as surveyed in 1855, which would have
been impossible to do had the 1882 Act diminished the Reservation's boundaries.  ECF No. 127 at 25-26;
ECF No. 120-24 at 2; ECF No. 120-24 at 6.  As a result, along with the other conflicting federal, state,
and local maps, Plaintiffs' newly added maps should have "limited interpretive value."  Yankton, 522
U.S. at 355.

Tribe to be that of the original 1854 reservation excepting the land ceded to the Winnebago Tribe").

The State also ignores its own contemporaneous maps, and local maps, showing the Disputed Area as located within the Omaha Reservation.  The atlas and plat book for Cuming County, Nebraska, prepared in 1908, shows the southwestern corner of the Reservation, and its western and southern boundaries, as coinciding with the 1866-1867 GLO map and survey, undiminished by the 1882 Act or any other statute.  Compare ECF No. 117-10 at 11-12 (1867 plat of Township 24 North Range 5 East) with ECF No. 123-8 (1908 plat of the same Township 24 North Range 5 East), available at http://www.loc.gov/resource/g4193cm.gla00166/#seq-15; see also ECF No. 123-7 (1908 Outline Map of Cuming County, Nebraska, showing the Omaha Reservation's southwestern corner and western and southern Reservation boundaries), available at http://www.loc.gov/resource/g4193cm.gla00166/#seq-5.  The 1908 maps and plats of Cuming County actually show land ownership in the Disputed Area after the 1882 Act, including Indian allottees and non-Indian settlers by name, and all of their corresponding tracts of land in the Disputed Area, all bounded by the original Reservation boundary lines, unchanged by the 1882 Act.  ECF No. 123-8 (1908 plat of Township 24 North Range 5 East), available at http://www.loc.gov/resource/g4193cm.gla00166/#seq-15; ECF No. 123-9 (1908 plat of the Township 24 North Range 7 East), available at http://www.loc.gov/resource/g4193cm.gla00166/#seq-22.

As for State-specific maps, a railway map issued by the State Board of Transportation in 1889 also shows the Omaha Reservation extending beyond the railroad right-of-way, although without a precise southwestern corner.  ECF No. 123-6, available at http://www.loc.gov/resource/g4191p.rr002500.    For many years, Nebraska highway maps did

not depict any boundaries for the Omaha Reservation, but maps published in 1972 outlined the

boundaries of the Reservation as including the Disputed Area, matching the Reservation

boundary lines established by surveyors in 1867.  ECF No. 120-4 at 75.[9]  This depiction

continued in State maps until 1975, when the map altered the western boundary along a

seemingly arbitrary line, which nevertheless continued to include Pender and other parts of the

Disputed Area within the boundaries of the Reservation.  Id. at 75-76.  This map, which included

Pender within the Omaha Reservation, remained in effect for approximately the next 30 years,

until the State Highway Superintendent requested that the Reservation boundaries again be re-

drawn.  Id. at 76.  The Highway Superintendent acknowledged that the newly requested

boundaries were contrary to the BIA maps in his possession, which showed the 1854 Treaty

boundaries of the Reservation, but the State maps were nevertheless redrawn, again somewhat

arbitrarily, but this time to exclude Pender.  Id. at 76-77.

    In the face of substantial evidence that federal and state authorities have recognized the

continued existence of the original boundaries of the Reservation, unchanged by the 1882 Act,

the State's evidence to the contrary at best shows evidentiary ambiguity and inconsistencies

which provide no basis on which to rest a finding of diminishment.  Yankton, 522 U.S. at 344 (in

diminishment cases, the Court "resolve[s] any ambiguities in favor of the Indians and we will not

lightly find diminishment"); Hagen, 510 U.S. at 411 (Court must "resolve any ambiguities in

favor of the Indians"); DeCoteau, 420 U.S. at 447 (the general rule that "legal ambiguities are

resolved to the benefit of the Indians" is given "the broadest possible scope" in diminishment

---

[9] Following the 1882 Act, commercial cartographers such as the Encyclopedia Britannica and Rand
McNally also consistently included the Disputed Area as part of the Omaha Reservation.  ECF No. 120-4
at 75.

- 17 -

cases); see also Solem, 465 U.S. at 478 (holding that diminishment did not occur where "[t]he subsequent treatment of the [reservation] by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side"); New Town, 454 F.2d at 125-26 (inconsistent subsequent events do not impute congressional intent to diminish and "[w]e do not deem it necessary to examine these later acts in detail").

## IV.    The State's Alleged Harms Are Unidentified, Speculative, and Unsupported

The State makes a broad conclusory assertion that confirming the reservation status of the Disputed Area would "severely damage the State's legal interest in the village and its ability to enforce the laws and protect the health, security, and welfare of its residents."  ECF No. 126 at 2. But the State does not identify any interests that might be harmed, nor does it explain how anyone's health, security, or welfare might be threatened.  The State's alleged harms are speculative and unsupported.

As described at length in the United States' Brief in Support of Summary Judgment (ECF No. 127 at 39-42), tribal jurisdiction over non-Indians on a reservation is strictly limited. Confirming the validity of the Omaha Reservation boundaries would not be a sudden or unexpected result (as shown by the evidence, numerous federal and state agencies have, for many years, already treated the Disputed Area as within the Reservation), nor would it have any drastic jurisdictional effects in the Disputed Area.[10]

---

[10] The State cites a recent decision by the Bureau of Indian Affairs to acquire land in trust (less than one acre) for the Omaha Tribe in the Disputed Area.  According to the decision, notice of the Tribe's request to place the property in trust was provided to the State, the Thurston County Board of Supervisors, the Pender Township Board, and the Village of Pender in 2011.  The Bureau of Indian Affairs treated the question as an on-reservation decision pursuant to its regulations.  Nevertheless, the Bureau of Indian Affairs has now withdrawn and vacated its decision at the request of the Tribe.

V.    **DeCoteau, Upon Which the State Relies, Confirms No Diminishment Here**

Finally, we note that the State repeatedly quotes DeCoteau as if the quoted passage ("Congress and the tribe spoke clearly" and "we cannot remake history") is relevant to the facts here.  ECF No. 126 at 1, 10-11 (quoting DeCoteau, 420 U.S. at 449).  But the statute, facts, and quote from DeCoteau are all distinguishable, and help demonstrate why a finding of diminishment is inappropriate in this context.

In DeCoteau, the Supreme Court indeed found that Congress and the tribe "spoke clearly."  420 U.S. at 438 (United States and tribe agreed to "a simple and unqualified cession of all of the unallotted lands to the United States for a sum certain").  The Court found clear intent to diminish on "the face of the act" and its "legislative history."  420 U.S. at 445 (internal quotation marks omitted).  The Court also found mutual understanding among the parties in DeCoteau.  Id. at 445 ("The negotiations leading to the 1899 Agreement show plainly that the Indians were willing to convey to the Government, **for a sum certain**, **all their interest in all of their unallotted lands**.") (emphasis added).  By a "straightforward" negotiated agreement, the Tribe agreed to cede, sell, and convey unallotted surplus lands for a sum certain.  Id. at 448.

By contrast, Congress did not "speak clearly" on the issue of diminishment here.  The 1882 Act lacks language of cession and sum certain, and there is no evidence of any mutual understanding of the parties at the time, as the Tribal Court confirmed.  ECF No. 82-1 at 27.  In fact, DeCoteau distinguishes Mattz for similar reasons:  "In Mattz, the Court held that an 1892 Act of Congress did not terminate the Klamath River Indian Reservation" because the Act merely "declared the reservation lands 'subject to settlement, entry, and purchase.'"  DeCoteau, 420 U.S. at 447 (footnote omitted).  DeCoteau also distinguished the sum certain payment provision at issue from the one in Mattz which, "by contrast benefited the tribe only indirectly,

- 19 -

by establishing a fund dependent on uncertain future sales of its land to settlers." Id. at 448.
DeCoteau also distinguishes Seymour, where the statute "merely opened reservation land to
settlement and provided that uncertain future proceeds of settler purchases should be applied to
the Indians' benefit." Id. The present case falls within the category of cases that DeCoteau
distinguished, and DeCoteau is thus helpful only because its operative statute differs so
substantially from the 1882 Act, as DeCoteau itself recognized.

## CONCLUSION

"Once a block of land is set aside for an Indian Reservation and no matter what happens
to the title of individual plots within the area, the entire block retains its reservation status until
Congress explicitly indicates otherwise." Solem, 465 U.S. at 470. Congress did not explicitly
indicate otherwise here, and there is no clear, unequivocal evidence of diminishment among the
inconsistent and often contradictory surrounding circumstances, legislative history, and
subsequent events, most of which actually demonstrate that Congress did not intend to diminish
the Omaha Reservation boundaries. As a result, the Court should enter summary judgment in
favor of the Defendants and against the Plaintiffs.

Dated: August 29, 2013                    Respectfully submitted,


                                          ROBERT G. DREHER
                                          Acting Assistant Attorney General
                                          Environment and Natural Resources Division


                                          ___/s/ _Daron T. Carreiro_____
                                          DARON T. CARREIRO, Trial Attorney
Of Counsel:                               Indian Resources Section
                                          Environment and Natural Resources Division
Rebecca Ross, Attorney-Advisor            United States Department of Justice
U.S. Department of the Interior           P.O. Box 7611
Office of the Solicitor                   Ben Franklin Station
1849 C Street N.W.                        Washington, D.C. 20044-7611
Washington, D.C. 20240                    Phone: (202) 305-1117
Phone: (202) 208-4218                     Fax: (202) 305-0275
rebecca.ross@sol.doi.gov                  daron.carreiro@usdoj.gov

                                          ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I, Daron Carreiro, hereby certify that on August 29, 2013, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing (NEF) to all registered CM/ECF users in this case.

   /s/  *Daron T. Carreiro*
Daron T. Carreiro, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
daron.carreiro@usdoj.gov
Phone: (202) 305-1117
Fax: (202) 305-0275
daron.carreiro@usdoj.gov

- 22 -