IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RICHARD M. SMITH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | 4:07CV3101 |
| STATE OF NEBRASKA, | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| v. | ) | |
| | ) | |
| MITCH PARKER, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

The plaintiffs are owners or agents of businesses and clubs in Pender, Nebraska, that sell alcoholic beverages. They have sued Omaha Tribal Council members in their official capacities for prospective injunctive and declaratory relief from the Omaha Tribe's attempt to enforce its liquor-license and tax scheme on the plaintiffs. The plaintiffs claim that because they are not located on a federally recognized Indian reservation or in "Indian country,"[1] they are not subject to the Omaha Tribe's

---

[1]"Indian country" is defined in [18 U.S.C. § 1151](18 U.S.C. § 1151) to mean: "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired

jurisdiction, and the defendants have therefore exceeded their authority under 18 U.S.C. § 1161[2] and under federal common law by trying to exercise tribal jurisdiction over the plaintiffs.  The plaintiff-intervenor, the State of Nebraska, alleges that the Omaha Tribe has exceeded its tribal authority under federal common law by attempting to enforce its liquor-license and tax scheme against the retailers in Pender, but also requests a permanent injunction prohibiting the Omaha Indian Tribe from asserting any tribal jurisdiction whatsoever within all 50,157 acres of Thurston County, Nebraska, lying west of the now-abandoned right-of-way of the Sioux City and Nebraska Railroad—in other words, the State's challenge is not limited to Pender, Nebraska.  (Filing 107, Complaint-in-Intervention of Intervenor State of Nebraska.)[3]

This matter is before the court on cross-motions for summary judgment (Filings 113 & 116) after a lengthy stay[4] to allow the plaintiffs to exhaust their remedies in the Omaha Tribal Court.  The pivotal issue in this case is whether Congress intended to "diminish"[5] the boundaries of the Omaha Indian Reservation in Nebraska when it

_____

territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

[2]The plaintiff's complaint alleges that 18 U.S.C. § 1161 permits the Omaha Tribe to regulate liquor sales on its reservation land and in "Indian country."

[3]The defendant-intervenor, the United States, claims that Pender, Nebraska, is located within the boundaries of the Omaha Tribe's reservation and that such boundaries have not been reduced or diminished.  (Filing 109, Answer of Intervenor-Defendant United States to Plaintiffs' Second Amended Complaint.)

[4]This case was stayed on October 4, 2007 (Filing 53), and the judgment of the Omaha Tribal Court was filed in this court on March 4, 2013.  (Filing 86.)

[5]The term "diminishment" was discussed and clarified in *Lower Brule Sioux Tribe v. State of South Dakota*, 711 F.2d 809, 815 n.3 (8th Cir. 1983):

For the sake of clarity, we note that the question whether the boundaries

enacted an 1882 Act that ratified an agreement for the sale of Omaha tribal lands to non-Indian settlers. If Congress intended to diminish the Omaha Reservation, the area involved would no longer constitute Indian country, and the Omaha Tribe could not regulate and tax alcohol sales in Pender, Nebraska. *Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 653 (2001)* ("An Indian tribe's sovereign power to tax—whatever its derivation—reaches no further than tribal land.").

## I.  STANDARD OF REVIEW

After litigants have exhausted their remedies in tribal court, the federal district court "should review the Tribal Court's findings of fact under a deferential, clearly erroneous standard.  The Tribal Court's determinations of federal law should be reviewed *de novo* while determinations of Tribal law should be accorded more deference." *Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation, 27 F.3d 1294, 1300 (8th Cir. 1994)* (citations omitted) (discussing district court's review of tribal court's determination of its own jurisdiction).

The parties agree that the ultimate issue in this case—whether the Omaha Indian

---

of an Indian reservation, as drawn when the reservation was established, are redrawn after part of that reservation has been opened for settlement, has been expressed in several different ways by various courts. The process has been called disestablishment (referring to the disestablishment of the original reservation boundaries); diminishment (referring to a diminishing or shrinking of the original boundaries); termination of reservation status (if the original boundaries are redrawn, the reservation status of the land is no longer within the boundaries and thus is terminated); and a change of boundaries.

*See also* *Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1017 (8th Cir. 1999)* ("[D]iminishment commonly refers to the reduction in size of a reservation.  A finding of diminishment generally suggests that a discrete, easily identifiable parcel of land has been removed from reservation status." (internal citations omitted)).

Reservation was diminished by an 1882 act of Congress—is a question of federal law and, therefore, is subject to this court's *de novo* consideration. (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF pp. 31-37 (arguing that tribal court's decision has no legal effect, but "[e]ven if the Court engages in traditional judicial review, a *de novo* standard applies"); Filing 138, Defs.' Br. Opp'n Pls.' Mot. Summ. J. at CM/ECF pp. 15-17 ("the ultimate question of whether the Omaha Indian Reservation was diminished is subject to this Court's *de novo* review").)

## II.  UNDISPUTED MATERIAL FACTS[6]

## A.  Parties[7]

1.     The Village of Pender, Nebraska, ("Pender") is a village as defined by Neb. Rev. Stat. § 17-201 with a population of approximately 1,300 residents in northeastern Nebraska, and is a plaintiff in this litigation.  Pender is a political subdivision of the State of Nebraska, the county seat of Thurston County, and is governed by a Village Board of Trustees.

2.     The remaining plaintiffs are and were at all relevant times residents of

---

[6]I previously ordered (Filings 110 & 130) that this matter shall be resolved solely on the evidentiary record established before the tribal court, along with the parties' joint stipulation of facts (Filing 100), exhibits attached to the State of Nebraska's complaint (Filing 107), Exhibit B to the United States' index in support of its motion to intervene (Filing 106-3), and additional maps filed by the State of Nebraska (Filings 123-2, 123-3, 123-4) and by the defendants in rebuttal (Filings 123-5, 123-6, 123-7, 123-8, 123-9).  The parties have also agreed to additional facts in the course of briefing their motions for summary judgment.  (Filing 138 at CM/ECF pp. 5-15; Filing 118 at CM/ECF pp. 8-9, 11-17, 21-23, 25-28, 31.)

[7]Unless otherwise indicated, the following facts are undisputed and appear in the parties' joint stipulation of facts (Filing 100) or are characterized as admitted in the parties' briefing (Filing 138 at CM/ECF pp. 5-15).

4

Thurston County and owners of or agents for establishments engaged in the sale of alcoholic beverages in or near Pender, Nebraska. Each of the plaintiffs holds a valid liquor license from the State of Nebraska and has fully complied with all of Nebraska's requirements to engage in the retail sale of alcohol.

3.      The Omaha Tribe of Nebraska is a federally recognized Indian Tribe organized and chartered under the Indian Reorganization Act of 1934. Indian Entities Recognized and Eligible to Receive Services from U.S. Bureau of Indian Fairs Notice, 75 Fed. Reg. 60810 (Oct. 1, 2010). Defendants are or were at all relevant times members or officials of the Omaha Tribal Council.

4.      The plaintiffs' primary customers are not members of the Omaha Tribe, but rather nonmember residents of Pender and the surrounding areas. None of the plaintiffs are members of the Omaha Tribe, parties to any contracts with the Omaha Tribe, or involved in any other formal business relationship with the Tribe. Finally, none of the plaintiffs have applied for a license or remitted any taxes to the Omaha Tribe under the "Beverage Control Ordinance," discussed below.

## B.  The Beverage Control Ordinance License and Tax Structure

5.      On February 28, 2006, the Secretary of the Interior approved amendments to Title 8 of the Omaha Tribal Code. (Amendment (Title 8 of the Tribal Code) to Omaha Tribe's Beverage Control Ordinance, 71 Fed. Reg. 10056 (Feb. 28, 2006) (the ordinance, as amended, is hereinafter referred to as the "Beverage Control Ordinance").

6.      The purpose of the Beverage Control Ordinance "is to govern the sale, possession and distribution of alcohol within the Omaha Tribe's Indian Reservation." The Beverage Control Ordinance requires establishments that sell alcohol to obtain a license for a fee that varies by license class and imposes a 10-percent sales tax on the purchase of alcohol from any licensee.

7.     The licensing scheme contained within the Beverage Control Ordinance introduces three classes of liquor licenses—A, B, and C.  Class A licenses are issued to "Package Dealers" and require a $1,000.00 application fee; Class B licenses are issued to "On-Sale Dealers" and require a $1,500.00 application fee; and Class C licenses are issued to "Wholesalers" and require a $500.00 application fee.  Each license is valid for one year, but may be extended for an additional 30 days, provided that a new license application is pending at the time of expiration.  The Beverage Control Ordinance also institutes a 10-percent sales tax to be levied on the retail price of all sales of alcoholic beverages.  The 10-percent sales tax must be remitted to the Omaha Tribe.

8.     Any entity applying for a license under the Beverage Control Ordinance must also grant unlimited access to its books and premises to the Omaha Tribe.  The Beverage Control Ordinance states:  "[An applicant's] premises, for the purpose of search and seizure laws shall be considered public premises, and that such premises and all buildings, safes, cabinets, lockers, and store rooms thereon will at all times on demand of the Tribal Council or a duly appointed Tribal or Federal policeman, be open to inspection."

9.     Non-tribal members who fail to comply with the licensing and taxing scheme imposed by the Beverage Control Ordinance are subject to administrative fines in the amount of $10,000.00 per violation.

## C.  Enforcement of the Beverage Control Ordinance

10.     The Omaha Tribe has attempted to enforce the Beverage Control Ordinance against the individual plaintiffs.  In particular, on December 19, 2006, plaintiff Richard M. Smith, owner of a convenience store in Pender that has sold alcoholic beverages for the last 38 years, received a letter from the Omaha Tribe.  The letter included an application to obtain a liquor license from the Omaha Tribe for his convenience store, Smitty City West, and a request to remit the 10-percent alcohol tax

6

imposed by the Beverage Control Ordinance on a monthly basis. Smith did not take any action in response to the December 19, 2006, letter because he believed that his business was not located within the Omaha Indian Reservation, nor was he affiliated with the Omaha Tribe.

11.    On or about January 31, 2007, the plaintiffs received a Second Notice from the Omaha Tribe via registered mail. The Second Notice was addressed to "all manufacturers, importers, wholesalers, and retailers of alcoholic beverages within the Omaha Indian Reservation." This notice informed the plaintiffs that "the Omaha Tribe's Director of Liquor Control has determined that [they] are subject to the requirements of the Alcoholic Beverage Control Title." The Second Notice also stated that because the plaintiffs were not in compliance with the Beverage Control Ordinance, they were subject to fines of up to $10,000.00 per violation. The Second Notice threatened "enforcement actions in Omaha Tribal Court."

12.    On April 17, 2007, the United States District Court for the District of Nebraska granted the plaintiffs a temporary restraining order prohibiting the enforcement of the Beverage Control Ordinance in Pender, Nebraska, and that order was later extended by a stipulation of the parties. (Filings 16 & 29.)

13.    On October 4, 2007, the United States District Court for the District of Nebraska stayed the original proceeding in order for the plaintiffs to exhaust any potential remedies available in the Omaha Tribal Court. (Filing 53.)

14.    On January 7, 2008, the plaintiffs filed an action in the Omaha Tribal Court seeking a judgment declaring that Pender is not within the boundaries of the Omaha Reservation and an injunction prohibiting the enforcement of the Beverage Control Ordinance in Pender. In those proceedings, the plaintiffs retained Emily Greenwald, Ph.D., as their expert witness to prepare a historical report. Defendants retained R. David Edmunds, Ph.D., Watson Professor of American History for the University of Texas at Dallas, as their expert witness to prepare a historical report.

15.     On February 4, 2013, pursuant to cross-motions for summary judgment, the Omaha Tribal Court determined that Congress did not "intend[] to diminish the boundaries of the Omaha Indian Reservation" in the applicable 1882 Act, which is discussed in detail below.  (Filings 82-1 & 86.)  Stipulating that exhaustion was complete, the parties returned to this court for resolution of this matter.

**D.  The 1854 Treaty**

16.     In 1854, the Omaha Tribe entered into a treaty with the United States government in which the Tribe agreed to "cede to the United States all their lands west of the Missouri River, and south of a line drawn due west from a point in the centre of the main channel of said Missouri River due east of where the Ayoway river disembogues out of the bluffs, to the western boundary of the Omaha country, and forever relinquish all right and title to the country south of said line[.]"  (Filing 115-2, at CM/ECF p. 2.)

17.     In consideration of and payment for the land ceded by the Omaha Tribe, the United States agreed to pay the Omaha Tribe a sum certain paid over a certain number of years.

18.     In the Treaty of 1854, the Omaha Indians also made a commitment to allow railroads to construct a right-of-way across their reservation at some point in the future, and in 1880, they agreed to grant the Sioux City and Nebraska Railroad a right-of-way from the northern edge of their reservation generally southeastward until it crossed the southern boundary of the Omaha Indian Reservation.

19.     As a result of the 1854 Treaty, the actual boundaries of the Omaha Reservation were set in 1855, and the original size of the Omaha Reservation was approximately 300,000 acres.  Pender is within the original boundaries of the Omaha Reservation as established in 1855.

## E.  1865 Omaha Land Sale:  Winnebago Reservation

20.     On March 6, 1865, the Omaha Tribe entered into a treaty with the United States government under which the Tribe agreed to "cede, sell, and convey to the United States" a portion of the Omaha Reservation for the sum certain of $50,000.00 for the establishment of the Winnebago Reservation.  (Filing 115-3 at CM/ECF p. 2.)

21.     The size of the Winnebago Reservation created by the 1865 Treaty was approximately 98,000 acres, leaving the Omaha Reservation with approximately 202,000 acres.  The General Land Office ("GLO") conducted a survey of the remaining Omaha Reservation from 1866 to 1867 which was approved by the GLO Commissioner in 1867.

22.     The 1865 Treaty provided for the allotment of the remaining portion of the Omaha Reservation to individual Omaha Tribe members and also provided that the Omaha Tribe was to "vacate and give possession of the lands ceded by this treaty immediately after its ratification."

23.     In March 1871, the Omaha received certificates for their individual allotments, all of which were in the eastern half of the Omaha Reservation.  The Omaha Tribe members later learned that the certificates they were given for the allotments provided in the 1854 and 1865 Treaties did not provide fee-simple title to the land, causing the Omaha Tribe to request allotments that would guarantee fee-simple title to the reservation land so allotted.

## F.  The 1872 Act Regarding the Western Portion of the Omaha Reservation

24.     In August 1871, the Omaha chiefs appealed to Congress "to provide for the enactment of a law authorizing the sale of 50,000 acres of the most western portion of their reservation . . ." to raise funds for farming and housing.  Congress did not enact the requested legislation.

9

25.    In October 1871, the Omaha chiefs sent a letter to Congress and "earnestly renew[ed] the petition presented to Congress at its last session" calling for "the sale of near 50,000 acres from the most western portion of our reservation as can be separated from the remainder by a line running along the section-lines from north to south."

26.    On January 22, 1872, Commissioner of Indian Affairs F.A. Walker recommended the proposed legislation to Congress and stated, "I believe that the general idea of diminishing these reservations for the purpose of securing higher cultivation of the remaining lands, is consonant with sound policy."

27.    On June 10, 1872, Congress enacted legislation that authorized the Secretary of the Interior, with the consent and concurrence of the Omaha Tribe, to "cause to be surveyed, if necessary, a portion of their reservation in the State of Nebraska, not exceeding fifty thousand acres, to be taken from the western part thereof, and to be separated from the remaining portion of said reservation by a line running along the section lines from north to south.  The said lands so separated shall be appraised . . . . [and] the Secretary of the Interior shall be, and hereby is, authorized to offer the same for sale for cash in hand."  The 1872 Act also contained provisions allowing other Indian tribes to sell portions of their reservation lands.

28.    Only 300.72 acres of the Omaha Reservation were actually sold under the terms of the 1872 Act.  The Commissioner reported:  "By the provision of the act of June 10, 1872, 49,762 acres have been appraised for sale [and are held] in trust for said Indians, leaving 143,225 acres as their diminished reserve."

## G.  1873 Ponca Agreement Regarding the Western Portion of the Omaha Reservation

29.    On November 6, 1873, the Omaha and Ponca chiefs signed a resolution to sell a portion of the Omaha Reservation to the Ponca Tribe.  Both tribes wished to

10

settle the Ponca on the western part of the Omaha Reservation surveyed and appraised for sale in 1872.

30.     The sale of land from the Omahas to the Poncas was never completed.

## H.  1874 Omaha Land Sale: Wisconsin Winnebagoes

31.     In 1874, following the Omaha's unsuccessful attempt to sell land to the Poncas, Congress appropriated funds to purchase additional land from the Omaha Tribe for the Wisconsin Winnebagoes from the eastern part of the Omaha Reservation. The amount of land sold to the Wisconsin Winnebagos was reported as 12,374.53 acres.

## I.  1880 Proposal Regarding the Western Portion of the Omaha Reservation

32.     In 1880, Nebraska Senator Alvin Saunders again offered a bill to accomplish the sale of 50,000 acres from the western portion of the Omaha Reservation first proposed as part of the 1872 Act.  In support of this effort, Senator Saunders stated: "The bill provides for a survey and sale of fifty thousand acres. There was a bill passed some eight years ago [the 1872 Act] authorizing the sale of this land, and only about three hundred acres of land were sold under it.  The Secretary now recommends that we deduct that from this bill so that the survey may stand as it is, 49,461.71 acres instead of fifty thousand acres."

33.     Later in the debate, Senator Saunders explained why the 1872 Act was unsuccessful: "Let me state the reason for it.  A bill was passed some seven or eight years ago authorizing it to be sold in smaller tracts, but people would not go and settle around the Indians when they could get lands as cheap or cheaper off a distance from them.  The object now is that we may get, if possible, persons to emigrate in colonies and go and make their own settlements where they will not be isolated from society."

34.     Senator Saunders went on to state:  "The Indians want the land sold . . . [T]hey want this money put out at interest so that they can have the interest to use in improving their farms.  They are very desirous to have the land sold.  They even would have it sold at a lower figure than this bill names if it cannot be sold at that."

35.     Senator Saunders' 1880 proposal did not advance.

## J.  1882 Act Regarding the Western Portion of the Omaha Reservation

36.     On February 20, 1882, the Senate introduced Senate Bill 1255, which provided for the sale of up to 50,000 acres from the western portion of the Omaha Reservation.

37.     During the first floor debate on this bill, Senator Saunders stated:  "It happens to be one of those few cases where I believe everybody is satisfied to have a bill of this kind passed. The Indians want it passed so as to put the money derived from the sale on interest.  The white people are there ready to buy the land and put it in cultivation."   In support of the bill, Senator Saunders read a letter into the record stating: "[T]here are no Indians living on the western portion of the Omaha Reservation; that no land has been allotted to any of them so far as I can ascertain; and furthermore [] there are no improvements such as housing, fencing[] upon the 50,000 acres of land alluded to in your letter."  Senator Saunders also stated:  "Twice they have expressed themselves already in open council in favor of it, and the bill requires that it shall be done a third time, and that the land shall not be sold until they do decide in open council that they want it sold."

38.     Senator Saunders explained that the 1882 Act "practically breaks up that portion at least of the reservation which is to be sold, and provides that it shall be disposed of to private purchasers."  He went on to state that under the bill, "[t]he lands that [the tribe] occupy are segregated from the remainder of the reservation, and the allottees receive patents to the separate tracts, so that the interest and control and

jurisdiction of the United States is absolutely relinquished."

39.     Specific to the land west of the right-of-way, Senator Saunders explained that the Omahas did not want to live in the area to be sold.  "I do not think an acre of this land will be sold to the Indians. . . ," and "I did not think as a matter of fact a single acre of land [west of the right-of-way] would go into the hands of Indians." Senator Saunders' belief was consistent with the report submitted by the local agent which stated, "there are no Indians living on the western portion of the Omaha reservation."

40.     Senator Dawes reported, "Last summer I saw the representatives of this tribe, and I heard them myself state . . . they were very anxious to sell a portion of their real estate and obtain the money, so that the interest of the money they could use for the improvement of the residue of their property.  They had more land than they could occupy, as I heard them myself."

41.     Senator Dawes explained, "When this bill came in I was troubled lest the sale of 50,000 acres would leave the [Omaha] reservation too small.  I went personally to the Indian Bureau to satisfy myself upon that point, and by the Commissioner of Indian Affairs I was assured that it would leave an ample reservation, as much as, if all the Indians should take in severalty, would give each one a farm and have some left for such increase of numbers as might probably be expected in the next twenty-five years; that there was no apprehension on the part of the Department; they were satisfied."

42.     On April 20, 1882, the Senate passed the bill and referred it to the House Committee on Indian Affairs.  On July 1, 1882, the House committee offered a substitute bill that authorized both the sale of land and allotment in severalty to the Omaha Tribe.

43.     On July 26, 1882, Representative Dudley Haskell explained that before

13

the western portion of the Omaha Reservation would be sold,

> they are at liberty to make their individual selections of one hundred and
> sixty acres to every head of family, eighty acres to every widow, and
> forty to every child.  These severalty selections are to be held in trust by
> the Government for the sole use of the Indians for twenty-five years, at
> the end of which time patents are to be issued in fee-simple.  All the lands
> not allotted are to be patented under the broad seal of the United States
> to the tribe in common, so as to give them an absolute indefeasible title
> to about 100,000 [sic] acres.

44.     On July 26, 1882, Representative Edward Valentine of Nebraska stated:
"These Indians I know very well, and they are anxious to sell this portion of the
reserve and have allotments made to them in severalty of the remainder.  It is at their
request, as I have stated, that the bill was drawn . . .”

45.     On July 16, 1882, Representative Valentine also stated:

> I desire to say there is now a law [the 1872 Act] authorizing the Secretary
> of the Interior to sell 50,000 acres of that land.  It embraces all the land
> mentioned in this bill and some other land in addition; and that land may
> be sold indiscriminately to any persons.  It may be sold to persons not
> expecting to become actual settlers.  After this railroad was built through
> there[,] the Indians then asked that he sell no land under the law as it now
> exists, and made their petitions for a bill of this character, the one which
> is now pending before the House, and which was framed in accordance
> with their wishes.

46.     Representative Valentine further explained:

> You cannot find one of those Indians that does not want the western
> portion sold, not the eastern part.  A railroad has been built and is now
> being operated through that reservation.  The Indians say they want that
> portion west of the railroad sold.  This could be done under existing law,
> but if sold under the existing law[,] it would be sold to persons who

14

would not be required to occupy it.  Therefore, the Indians say, "Do not sell the land under the present law, but pass a new law and sell it only to persons who will reside upon it and cultivate it."  When it is sold upon these conditions, the white men will occupy up to the railroad on the west.  They will build stations and towns; and the Indians will come up to the railroad from the east and get the benefit of these improvements.

47.    Finally, while specifically discussing the provision to allow Indians to select allotments west of the railroad right-of-way prior to the lands opening, Senator Valentine stated, "They do not care about making selections over on that side of the road at all."

48.    On July 27, 1882, the House approved S. 1255, as amended, to provide for both the grant of allotments to Omaha Tribe members from either the east or west portions of the Omaha Reservation, as well as the sale of the remaining portion of the reservation west of the railroad right-of-way to white settlers.

49.    Although initially referred back to committee by the Senate, the Senate withdrew its opposition to the House amendment to S. 1255.

50.    On August 7, 1882, President Chester Arthur signed the bill into law.  The Act of August 7, 1882, 22 Stat. 341, distinguished between treatment of "that portion of their reservation . . . lying west of the right of way," *id.* §§ 1-4, and "lands lying east of the right of way," *id.* §§ 5-8.  As to land situated west of the right-of-way, the Act of 1882 provided:

That with the consent of the Omaha tribe of Indians, expressed in open council, the Secretary of the Interior be, and he hereby is, authorized to cause to be surveyed, if necessary, and sold, all that portion of their reservation in the State of Nebraska lying west of the right of way granted by said Indians to the Sioux City and Nebraska Railroad Company under the agreement of April nineteenth, eighteen hundred and eighty, approved by the Acting Secretary of the Interior, July

15

twenty-seventh eighteen hundred and eighty.  The said lands shall be appraised, in tracts of forty acres each, by three competent commissioners, one of whom shall be selected by the Omaha tribe of Indians, and the other two shall be appointed by the Secretary of the Interior.

(Act of August 7, 1882, 22 Stat. 341 § 1.)  After the survey and appraisal, the law authorized the Secretary of the Interior to issue a proclamation that "unallotted lands are open for settlement . . .":

That after the survey and appraisements of said lands the Secretary of the Interior shall be, and he hereby is, authorized to issue proclamation to the effect that unallotted lands are open for settlement under such rules and regulations as he may prescribe.  That at any time within one year after the date of such proclamation, each bona fide settler, occupying any portion of said lands, and having made valuable improvements thereon, or the heirs-at-law of such settler, who is a citizen of the United States, or who has declared his intention to become such, shall be entitled to purchase, for cash, through the United States public land office at Neligh, Nebraska, the land so occupied and improved by him, not to exceed one hundred and sixty acres in each case, according to the survey and appraised value of said lands as provided for in section one of this act . . .

(*Id*. at § 2.)

51.     The 1882 Act did not provide a sum certain to be paid to the Omaha Tribe for land sold, but stated:

That the proceeds of such sale, after paying all expenses incident to and necessary for carrying out the provisions of this act, including such clerk hire as the Secretary of the Interior may deem necessary, shall be placed to the credit of said Indians in the Treasury of the United States, and shall bear interest at the rate of five per centum per annum, which income shall be annually expended for the benefit of said Indians, under the direction

of the Secretary of the Interior.

(*Id*. at § 3.)

52.     As to land east of the right-of-way, the 1882 Act authorized the Secretary of the Interior to allot lands "in severalty to the Indians" in certain quantities, and to patent such land to the Omaha Tribe allottees in trust for 25 years.  After the 25-year trust period, fee patents would issue "to said Indian or his heirs."  Similarly, the "residue" of land lying east of the right-of-way not allotted were to be patented to the Omaha Tribe, with the United States holding such land in trust for the sole use and benefit of the Omaha Tribe for 25 years, after which fee patents would issue to the Omaha Tribe.  *Id*. §§ 5, 6, 8.

53.     The last sentence of section 8 of the 1882 Act refers to land both east *and* west of the right-of-way, providing "[t]hat said Indians . . . may . . . select the land which shall be allotted to them in severalty *in any part of said reservation either east or west of said right of way . . .*"  *Id*. § 8 (emphasis added).

## K.  Implementation of the 1882 Act

54.     In April 1883, the Secretary of the Interior appointed Alice Fletcher as a special agent to oversee the allotment process.  Fletcher urged the Omahas to select land near the railroad right-of-way because she considered this the best agricultural land, and it also afforded rail access to markets.  While some of the Omahas accepted Fletcher's advice, most preferred the eastern part of the reservation for its access to water and timber.

55.     In April 1883, Commissioner of Indian Affairs Hiram Price wrote to Fletcher, directing her to "please ascertain whether any of the Indians desire to make their selections <u>west</u> of the right-of-way of the Sioux City and Nebraska Railroad Company.  It is important that their wishes in that respect be made known at once in

order that the appraisement of the lands lying west of the railroad may be proceeded with, if deemed desirable, without waiting for the completion of the allotments. . . ."

56.     Section 8 of the 1882 Act allowed the Omaha Tribe members to take their allotments anywhere on the reservation, including west of the railroad right-of-way. Commissioner of Indian Affairs Hiram Price addressed this provision in his 1882 annual report:

> By section 8 of the act the Indians are permitted, if they shall so elect, to select allotments within the tract designated to be sold, and while it is not thought that there are any who desire to make selections there, it might be well to ascertain their intentions in that respect, so that if there be any such they may make their selections and have them approved before the appraisement is begun.

(Greenwald Report, p. 15, n.69 citing ARCIA 1882, LXVII.)  At the end of 1883, Commissioner Price reported that 10 to 15 allotments had been taken west of the railroad right-of-way, and 876 of the approximately 50,000 acres west of the railroad right-of-way had been allotted to Omaha Tribe members.  Indian allotments either wholly or partially west of the railroad right-of-way taken by members of the Omaha Indian Tribe represented less than two percent of the total acreage west of the right-of-way. (Decl. of Emily Greenwald ¶ 3.)

57.     Upon completion of the initial allotment process, and on April 30, 1884, 50,157 acres west of the railroad right-of-way were opened for settlement by non-Indians, and "the major portion thereof was quickly absorbed by settlers.  By September 1, 1884, 311 filings had been made, embracing about 43,000 acres." (Greenwald Report, p. 22, n.105 quoting Report of the Commissioner of the General Land Office, 28, in Report of the Secretary of the Interior, vol. I, H.exdoc. 1, part 5, 48th Cong., 2d sess., 1884, serial 2286.)

58.     In 1885, Omaha and Winnebago Agent George Wilson described the

results of the 1882 Act as follows: "The Omahas have reduced their reservation by selling 50,000 acres, west of the Sioux City and Omaha Railroad, to actual settlers, and have taken allotments on the remainder."

59.     In 1885, the Commissioner of Indian Affairs reported that "Omaha Reservation lands lying west of the Sioux City and Nebraska Railroad" had recently been sold to settlers, but that many of the latter had failed to pay for the acreages.

60.     In 1887, the Secretary of the Department of the Interior referred to land west of the railroad right-of-way as "within the limits of the former Omaha Indian Reservation."

61.     Congress authorized extensions of payment under the 1882 Act in 1885, 1886, 1888, 1890, and 1894.  The 1894 extension of payment provided that "this Act shall be of no force and effect until the consent thereto of the Omaha Indians shall be obtained[.]"  Further, non-Indian settlers on the reservation lands west of the railroad also requested the Omaha Tribe's acquiescence in the payment extensions. Federal officials agreed to the request, and on December 23, 1895, the Omaha met in council with Indian Agent William Beck and gave their permission for payment schedules for reservation lands west of the railroad to be extended.

62.     Under the terms of the 1888 extension, if a settler defaulted on payment for land west of the right-of-way, the land was to be sold at public auction rather than revert back to the Omaha Tribe.  The proceeds from any sale of the land continued to inure for the benefit of the Omaha Tribe.

63.     Congressional reports focusing upon this extension also refer to the land as being "on the Omaha Reservation" or individuals buying lands west of the railroad as "purchasers of land of the Omaha tribe."

64.     In 1900, Secretary of Interior Ethan Allen Hitchcock ruled that settlers

19

who purchased land west of the railroad right-of-way were not subject to homestead legislation because they were settled on lands "in the Omaha reservation."

65.     All of the land west of the railroad right-of-way, apart from the 10 to 15 Indian allotments, was conveyed from the United States to non-Indians, with the final remaining parcel selling in 1913.

66.     The land allotted to Indians west of the right-of-way was patented in fee simple by 1919, with no trust land remaining west of the railroad.

67.     The Office of Indian Affairs ("OIA") reports of 1884 and 1888 did not include the land west of the railroad right-of-way as part of the reservation, listing the size of the Omaha Reservation as 142,345 acres.

68. The OIA report of 1898 did not include the land west of the railroad right-of-way as part of the reservation, listing the size of the Omaha Reservation as 142,344.63 acres.

69.     The OIA report of 1900 did not include the land west of the railroad right-of-way as part of the reservation's total acreage, listing the size of the Omaha Reservation as 142,344.79 total allotted and unallotted acres.

70.     In 1901, Indian Agent Charles Mathewson reported, "The Chicago, St. Paul, Minneapolis and Omaha Railway passes through the Winnebago Reservation on the west and forms the southwestern boundary of the Omaha Reservation."

71.     In 1906 and 1909, the OIA's report did not include the land west of the railroad right-of-way as part of the reservation, listing 141,891 total allotted and unallotted acres.

72.     In 1911, OIA's report did not include the land west of the railroad

20

right-of-way as part of the reservation, listing 135,022 total allotted and unallotted acres.

73.    In 1924, two Omaha tribal delegates inquired into the 1882 land sales regarding the amount of land sold, its value, the amount of interest due, and whether the Tribe had been paid for the value of land and interest.

74.    In 1924, the Commissioner of the General Land Office reported: "Public sales have accordingly been held and all the moneys for which the lands were sold have been paid."

75.    The 1935 Annual Statistical Report for the Winnebago Agency listed three "reductions" to the original acreage of the Omaha Reservation, including the "[s]ale of land west of railroad, 50,157 acres."

**L.  Establishment and Population of the Village of Pender**

76.    Upon the opening of the area west of the right-of-way, W.E. Peebles purchased a tract of 160 acres, on which he platted the townsite for Pender, Nebraska. He conveyed a portion of the land to the railroad for a depot site.  Lots within the town went on sale in April 1885.

77.    Since the early twentieth century, Indians have comprised less than two percent of the population west of the right-of-way.

78.    Many Omahas regularly visited Pender, resided in the village, and conducted business there.  Excerpts from the correspondence and diary of Rosalie Farley, whose allotments were located west of the railroad, indicate that her family resided on her allotment, and that she and other Omahas regularly visited Pender, conducted business at that location, and attended concerts in the village.

79.     Between 1890 and 1895, Thomas Sloan, an attorney and member of the Omaha Tribe, maintained both a residence and a law office in the Village of Pender, where he employed an Omaha as a clerical assistant.  Sloan also served as Mayor of the Village of Pender, Thurston County Surveyor, and Justice of the Peace.

80.     Hiram Chase, another attorney and enrolled member of the Omaha Tribe, resided and practiced law in Pender, where his children attended public schools. Chase also served as Thurston County Attorney for eight years before being elected as a county judge.

81.     In *Hallowell v. United States*, 221 U.S. 317, 319-20 (1911), the United States Supreme Court restated the parties' stipulation of facts relied upon by the district court as follows:

> That the Omaha Indians exercise the rights of citizenship, and participate in the County and State Government extending over said Omaha Indian Reservation, and over and upon the allotments herein referred to.  That the defendant, Simeon Hallowell, has been on frequent occasions a Judge and Clerk of election, a Justice of the Peace, an Assessor, and a Director of the public school district in which he lives.  That Omaha Indians have taken part in the State and County government, extending over the reservation, and have held the following offices in said county of Thurston, State of Nebraska:  County Coroner, County Attorney, County Judge, Justice of the Peace, Constable, Road Overseer, Election Officers, and have also served as jurors in the county and district Courts. Defendant is self-supporting, as are most of said Indians.  Some of them are engaged in business and most of them engaged in farming.

## M.  Other Determinations Regarding the Disputed Territory

82.     In 1889, the Nebraska Legislature enacted legislation defining the geographical boundaries of Thurston County—now codified as Neb. Rev. Stat. § 22-187.  By 1922, the legislature had changed the boundaries of Thurston County, as reflected below.  New language as of 1922 is highlighted in bold font and excluded

22

1889 language is stricken through:

> **The territory bounded as follows shall constitute the county of Thurston:** Commencing at **a point where the west boundary of the Omaha Indian reservation intersects the south line of section thirty-three (33),** ~~the southeast corner of section thirty-four (34),~~ township twenty-five, (25), north, of range five, **(5)** east, ~~sixth P.M.~~ **6th principal meridian**; thence east to the northeast corner of township twenty-four, (24), north, of range seven (7)~~, east sixth P.M~~; thence south to the south line of the Omaha Indian reservation~~, as originally surveyed~~; thence east along said line to the **line between sections thirty-two and thirty-three,** ~~southwest corner of section twenty-eight (28),~~ township twenty-four (24)~~, north, of range ten (10), east sixth P.M.~~; thence north to the northwest corner of section twenty-one (21), township twenty-four, (24) north, of range ten (10) east ~~sixth P.M.~~; thence east to the eastern boundary of the State of Nebraska; thence in a north-westerly direction along said boundary line to its intersection with the section **north** line **of the Winnebago Indian reservation,** ~~dividing sections twenty-five (25) and thirty-six (36),~~ township twenty-seven (27)~~, north, of range nine,~~ (9)~~, east sixth P.M.~~; thence west **along the north line of said reservation to the intersection of the line between sections thirty-three and** ~~to the northwest corner section~~ thirty-four (34), township twenty-seven (27)~~, north, range six (6), east sixth P.M~~; thence south to the south-west corner of section thirty-four**,** (34)~~; township twenty-seven, (27), north, range six (6), east sixth P.M.~~; thence west to **an intersection with the west boundary of said Winnebago Indian reservation;** ~~the northwest corner of section two (2), township twenty-six (26), north, of range five (5), east sixth principal meridian;~~ thence south **along the Winnebago and Omaha Indian reservation line** to the place of beginning.

(Filing 100, Joint Stipulation of Facts (comparing Compiled Statutes of Nebraska 1889, chapter 17, § 75b with Compiled Statutes of Nebraska 1922, chapter 13, § 804).)

83.     In November 1961, the Winnebago Agency issued a "Historical Summary for Omaha Reservation," which stated that boundaries of the Omaha Reservation had been delineated in the original survey of 1855 and were only diminished by two sales

of land to the United States for the benefit of the Winnebagos.  According to the "Summary," these "two statutory cessions . . . are the only changes effected in the boundaries of the Omaha Reservation since its inception. The later enactments authorizing sale of various lands included within these boundaries are not considered to have had the effect of terminating Federal jurisdiction over them."

84.     On April 16, 1969, the legislature on behalf of the State of Nebraska voted to retrocede to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, except for offenses involving operation of motor vehicles on public roads or highways.

85.     The United States government, through the Secretary of the Interior, accepted the retrocession of jurisdiction on October 25, 1970.  *See* 35 Fed. Reg. 16598 (1970).  The legal description of the land in the Notice of Acceptance of Retrocession of Jurisdiction delineates the Omaha Indian Reservation as originally surveyed.

86.     From 2007 until sometime immediately prior to expert depositions in this case (August 7-8, 2012), the Thurston County website declared: "The two reservations [the Omaha Indian and Winnebago] are still in existence today and cover the entire Thurston County area."

87.     In 1989, the Office of the Solicitor of the United States Department of the Interior was asked by the Bureau of Indian Affairs to locate the western boundary of the Omaha Indian Reservation.  The Department of Interior reviewed "each of the treaties or legislative acts effecting [sic] the reservation" boundary and stated that the land west of the railroad right-of-way "appears to have lost its Indian character long ago with the arrival of non-Indian homesteaders."   The Department of Interior concluded "the most logical demarcation line for the western boundary of the Omaha Reservation is the centerline of the abandoned [Sioux City and Nebraska Railroad Company] right of way . . . [U]nder the 1882 Act the land to the west of the right of way went out of Indian control when it was opened for settlement."

88.    The 1989 Department of the Interior opinion incorrectly stated that no "Indian trust allotments were made on lands lying west of the Sioux City and Nebraska Railroad right-of-way."  The allotment map shows that there were at least 10 to 15 allotments taken by Omaha Tribe members which were either wholly or partially west of the railroad right-of-way following the passage of the 1882 Act.

89.    The 1989 Department of the Interior opinion was officially withdrawn on April 16, 2012, by Patrice H. Kunesh, Deputy Solicitor for Indian Affairs in the United States' Solicitor's Office in Washington, in a letter to Priscilla Wilfahrt, Twin Cities Field Solicitor.  Kunesh's letter to Wilfahrt stated:

> I have reviewed your letter of April 24, 2008, to the Great Plains Regional Director of the Bureau of Indian Affairs, which concludes that the boundaries of the Omaha Indian Reservation have not been diminished.  The April 24, 2008 letter supersedes your Office's letter of June 27, 1989, to the Great Plains Regional Director regarding 'Survey of Western Boundary of Omaha Reservation.'
>
> The June 27, 1989 letter is hereby withdrawn and not to be relied upon or used by your office.

(Filing 120-54.) The Department of the Interior, the Office of the Solicitor in Washington, D.C., the Field Solicitor's Office in Minnesota, and the Winnebago Agency in Nebraska have been instructed to rely upon the April 24, 2008, Wilfahrt letter.[8]

---

[8]The April 24, 2008, 27-page Wilfahrt letter concluded:

[S]ince diminishment is not to be lightly inferred and a reservation retains it[s] status no matter what happens to the title of individual[] plots of land within the area until Congress explicitly indicates otherwise, a plain reading of the treaties and statutory language involving the Omaha Indian Reservation does not evidence a diminishment of the reservation boundaries.  Our review of the documentation of legislative history and

25

90.     Deborah R. Gilg, United States Attorney for the District of Nebraska, sent a letter dated October 9, 2012, to Nebraska Governor David Heineman, informing him of the United States Department of Justice's position "that the [Omaha Indian] reservation has not been diminished" and the Department of Justice "intends to assert the same federal jurisdiction in Pender that we routinely exercise in other parts of 'Indian Country'." (Filing 107, Complaint in Intervention of State of Nebraska, Ex. 1.)

91.     On August 22, 2000, the Thurston County District Court determined that the land west of the railroad right-of-way is not a part of the Omaha Reservation. On February 15, 2007, the Nebraska Attorney General issued an opinion which also concluded that the land west of the railroad right-of-way was not a part of the Omaha Reservation.

## N.  Intervention of State of Nebraska and United States

92.     After issuance of the Tribal Court's opinion in the case now before this court concluding that Congress did not "intend[] to diminish the boundaries of the Omaha Indian Reservation" in the applicable 1882 Act, Rodney Morris, Chairman of the Omaha Tribe of Nebraska, sent a letter dated February 12, 2013, to Douglas A. Ewald, Tax Commissioner of the Nebraska Department of Revenue. The letter purported to respond to the Department of Revenue's prior letter stating that it "would

---

surrounding circumstances which is available in the record does not show a contemporaneous understanding that the reservation would be diminished and in accordance with *Yankton*, leads us to conclude that our 1989 opinion should be revisited.

Wilfahrt also recommended further factual development of the administrative record, without which she was unable to "make any broader conclusions." (Filing 120-55, at CM/ECF p. 26 (Letter from Field Solicitor Priscilla Wilfahrt to Acting Director of Bureau of Indian Affairs Alice Harwood (Apr. 24, 2008)).)

cease sharing fuel tax revenue from retailers in Pender as of March 1, 2007" based on the February 15, 2007, Nebraska Attorney General's opinion concluding that property west of the right-of-way described in the 1882 Act should *not* be considered part of the Omaha Indian Reservation.  Based on the Tribal Court's contrary decision that the 1882 Act did *not* diminish the boundary of the reservation, leaving the original boundary intact, the letter demanded "that the Nebraska Department of Revenue forward the tribal share of the fuel tax revenue attributable to retailers located west of the referenced right-of-way from March 1, 2007 to the present" and that such retailers should be included "in future fuel tax calculations."  (Filing 107, Complaint in Intervention of State of Nebraska, Ex. 2.)

93.    Because the "Tribe's request for money from the State obviously implicates a direct interest of the State which hinges on a resolution of the substantive issue in this case"—that is, whether the 1882 Act of Congress diminished the boundary of the Omaha Indian Reservation—I allowed the State of Nebraska, as Plaintiff-Intervenor, to file a Complaint in Intervention in this matter to challenge the Tribe's jurisdiction over approximately 50,157 acres of Thurston County, Nebraska, lying west of the now-abandoned right-of-way of the Sioux City and Nebraska Railroad, as that term is defined in the 1882 Act of Congress.  This area includes the Village of Pender, but also areas lying beyond Pender's municipal boundaries.  Like the plaintiffs, the State of Nebraska claims that the Omaha Tribe has exceeded its authority under federal common law.  (Filings 102 & 107.)

94.    I also allowed the United States to intervene in this matter as Defendant-Intervenor.  (Filing 108.)  The United States has filed an Answer to Plaintiffs' Second Amended Complaint, asserting as affirmative defenses that Plaintiffs' claims are barred because Pender and Plaintiffs' businesses are located within the boundaries of the Omaha Reservation, as established by the Treaties of 1854 and 1865, and because those boundaries have not been reduced or diminished by the Act of 1882 or otherwise. (Filing 109.)

## O.  Treatment of the Disputed Territory by the Tribe

95.     Tribal authorities enforce the following portions of the Omaha Tribal Code east of the right-of-way, but not west of the right-of-way:   Title 7 (fire protection); Title 9 (animal control); Title 14 (fireworks); Title 15 (wildlife and parks); Title 35 (business permits); and Title 36 (business licenses).

96.     The Omaha Tribe does not offer foster care or medical, welfare, or child protective services west of the right-of-way.  The Omaha Tribe does not have an office and does not operate a school, industry, or business west of the right-of-way.  No tribal celebrations or ceremonies take place west of the right-of-way.  The Omaha Tribe does not conduct governmental or ceremonial activities west of the right-of-way and has no mineral rights or other claims to land west of the right-of-way.

## P.  Other Activity Related to the Omaha Reservation Boundaries

97.     On March 6, 1992, the Nebraska State Tax Commissioner issued a Revenue Ruling stating that the Village of Pender, among others, is located within the boundaries of the Omaha Indian Reservation.

98.     In 2002 and 2003, the Omaha Tribe contacted the Nebraska Department of Roads requesting replacement of signs delineating the location of the boundaries of the Omaha Indian Reservation.  The signs had been removed at the direction of state officials due to a dispute over the location of the western boundary of the Omaha Indian Reservation.

99.     Beginning on October 1, 2005, the Omaha Tribe and the State of Nebraska entered into an Agreement for the Collection and Dissemination of Motor Fuel Taxes between those parties on sales of motor fuel made on the Omaha Reservation.

28

100.    Former Omaha Tribal attorney Maurice Johnson testified regarding various efforts made by the Omaha Tribe throughout his tenure as counsel relating to its presence in the western region of the Omaha Tribe of Nebraska Reservation and, in particular, near or within the Village of Pender.  Mr. Johnson testified that in his opinion, for the most part, the Tribe's efforts were met with anger and hostility and at least one instance of overt racism.  For example, in approximately 2003, the Tribe received a federal grant relating to roads.  A requirement of the grant was the exercise of traffic safety checks in order to determine whether people were wearing seatbelts. There was opposition from the Pender community and, specifically, the Pender police, who challenged the Tribe's authority to administer the safety checks.

101.    In 2003, Mark Casey, the Highway Superintendent of the Thurston County Road Department, contacted the Nebraska Department of Roads and requested that the state road map of Nebraska be redrawn.  Casey stated that "the latest BIA maps that are in my possession show the original boundary of the Reservation and include a notation 'Omaha Treaty Boundary of March 10, 1854.'"  Casey requested that the boundary be changed "particularly in the area around Pender" due to a "District Court decision [*State v. Picotte*] of August 22, 2000, Case No. CR 00-6 . . . ."

102.    Although all orders entered in *State v. Picotte* by the District Court of Thurston County, with no involvement by the Omaha Tribe, have no legal impact on the Omaha Reservation, state cartographers again redrew the western borders of the reservation, creating an altered map that moved the western boundary of the Omaha Reservation to a new location just east of Pender.  The state cartographers then extended the Omaha Reservation's western boundary to the junction of State Highways 94 and 9 (north of Pender), with State Highway 9 as the western border of the reservation until this highway passed into the Winnebago Reservation.  This new delineation of reservation boundaries placed the Village of Pender outside of the reservation's borders.

29

103.   In or around the summer of 2007, officials from the Environmental Protection Agency, Region 7 in Kansas City ("EPA"), visited Pender to publicly discuss the Omaha Tribe administering federal regulations on pesticide and fungicide control on the Omaha Tribe Reservation, including Pender.  The meeting, which was of a "town hall" variety, was very heated.   Two statements made by persons in opposition to the EPA's involvement were anti-Native American, such as "We're not going to have Indians telling us how to farm," and "How about if I change my name to 'Spotted Eagle,' can I then tell white people how to farm their land?"

104.   In 2007, Ms. Teri Lamplot, while she was Chair of the County Board of Supervisors for Thurston County, asked the U.S. Census Bureau to revise the boundaries of the Omaha Indian Reservation to place Pender outside of the Omaha Indian Reservation.  In response to Ms. Lamplot, Robert LaMacchia, the Chief of the Geography Division of the U.S. Census Bureau, informed Ms. Lamplot that the Census Bureau was "unable to make the changes to our database" and would continue to rely upon the 1999 BIA map which indicated that Pender fell within the western boundary of the Omaha Indian Reservation and stated, "While land ownership may change on reservation lands, the reservation boundaries are clear and, as far as we are aware, no new legal opinion, federal court decision, Act of Congress, etc., has altered these boundaries."

105.   Finally, efforts were made to cross-deputize police officers among the Tribe, the Thurston County Sheriff, and the Nebraska State Patrol to facilitate law enforcement on the reservation by defining policing relationships, delineating powers, and encouraging cooperation.  Thurston County refused to join any cross-deputization efforts despite the willingness of the Nebraska State Patrol to participate in such an agreement.  Although cross-deputization did occur with the State Highway Patrol and with the Walthill Police Department, Thurston County did not participate.

106.   In approximately October of 2011, tribal member Thomas Saunsoci was arrested and charged with a probation violation in the County Court of Thurston

30

County, Nebraska.  Mr. Saunsoci was held in custody in the Thurston County Jail in Pender with the condition that he could not be released until he paid a bond.  A close personal friend of Mr. Saunsoci came to the Thurston County Jail in Pender with a sufficient amount of money to bail him out.  The jailer said that Thurston County could not accept the money without Mr. Saunsoci's signature appearing on a document called a "Waiver of Extradition."

## III.  ANALYSIS

"Indian reservation lands are owned by the United States and held in trust for the benefit of specific tribes or bands." *United States v. Jackson*, 697 F.3d 670, 672 (8th Cir. 2012).  In this case, I must decide whether Congress's Act of August 7, 1882, 22 Stat. 341, (the "1882 Act") diminished the boundaries of the Omaha Indian Reservation, or whether the Act simply permitted non-Indians to settle within existing Omaha Reservation boundaries.

"Congressional action removing certain reservation land from Indian ownership does not necessarily disestablish reservation boundaries.  Disestablishment occurs only when Congress intends to create a smaller reservation with adjusted boundaries.  It does not occur if Congress only intended to remove from Indian control certain land within the reservation boundaries while retaining its original exterior boundaries." *Lower Brule Sioux Tribe*, 711 F.2d at 815 (internal citations omitted).  "The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation." *City of New Town v. United States*, 454 F.2d 121, 125 (8th Cir. 1972); *see also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586-587 (1977) ("The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status.").

"[O]nly Congress can divest a reservation of its land and diminish its boundaries." *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).  Diminishment "will not be lightly inferred" because Congress must "clearly evince an intent to change boundaries

before diminishment will be found." _Id._ (internal quotation and citation omitted). Without clear congressional intent to disestablish a reservation, the reservation remains because "'[o]nce a block of land is set aside for an Indian Reservation . . . [it] retains its reservation status until Congress explicitly indicates otherwise.'" _Yankton Sioux Tribe v. Podhradsky_, 606 F.3d 985, 991 (8th Cir. 2010) (quoting _Solem_, 465 U.S. at 470). "'[T]here is a presumption in favor of the continued existence of a reservation.'" _Yankton Sioux Tribe_, 606 F.3d at 991 (quoting _Osage Nation v. Irby_, 597 F.3d 1117, 1122 (10th Cir. 2010)).

The Supreme Court has "established a fairly clean analytical structure"[9] for determining whether an Indian reservation has been diminished. "To determine whether a reservation has been diminished, we examine three factors: the statutory language, the historical context, and the population that settled the land. Of the three factors, the statutory language is the most probative. Throughout the inquiry, ambiguities are to be resolved in favor of the Indians, and diminishment should not be found lightly." _Duncan Energy_, 27 F.3d at 1297 (citations omitted); _see also_ _South Dakota v. Yankton Sioux Tribe_, 522 U.S. 329, 344 (1998) (most probative evidence of diminishment is statutory language used to open Indian lands; however, court will also

---

[9]This analytical structure is derived from several Supreme Court cases. As summarized by the Eighth Circuit Court of Appeals in _United States v. Jackson_, 697 F.3d at 672 (parallel citations omitted):

In modern times, the Supreme Court has decided seven cases raising the question whether various surplus lands Acts diminished or entirely terminated particular reservations. In three cases, the answer was no. _Solem v. Bartlett_, 465 U.S. 463, 481 (1984); _Mattz [v. Arnett]_, 412 U.S. [481,] at 506 [(1973)]; _Seymour v. Supt. of Wash. State Pen._, 368 U.S. 351, 356 (1962). In the other four, including the most recent two, the answer was yes. _South Dakota v. Yankton Sioux Tribe_, 522 U.S. 329, 358 (1998); _Hagen [v. Utah]_, 510 U.S. 399, 421 [(1994)]; _Rosebud Sioux Tribe v. Kneip_, 430 U.S. 584, 614–15 (1977); _DeCoteau v. Dist. Cnty. Ct._, 420 U.S. 425, 445 (1975).

consider "the historical context surrounding the passage of the surplus land Acts, and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there") (internal quotation and citation omitted).

If an act and its legislative history fail to "provide substantial and compelling evidence of a congressional intention to diminish Indian lands," the court is "bound by [its] traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." _Solem_, 465 U.S. at 472.

## A.  Statutory Language

"Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unalloted opened lands," _Solem_, 465 U.S. at 470, and "cession," combined with "sum certain" language, is "'precisely suited' to terminating reservation status." _Yankton Sioux Tribe_, 522 U.S. at 344.  Specifically,

> when a surplus land Act contains both explicit language of cession, evidencing "the present and total surrender of all tribal interests," and a provision for a fixed-sum payment, representing "an unconditional commitment from Congress to compensate the Indian tribe for its opened land," a "nearly conclusive," or "almost insurmountable," presumption of diminishment arises.

_Id_. (quoting _Solem_, 465 U.S. at 470 and _Hagen v. Utah_, 510 U.S. 399, 411 (1994)); _see also United States v. Jackson_, 697 F.3d at 675 ("When a surplus lands Act provides that a Tribe cedes its entire interest in land to the United States for a sum certain, 'a nearly conclusive, or almost insurmountable, presumption of diminishment arises.'" (quoting _Yankton Sioux Tribe_, 522 U.S. at 344)).  However, while statutory language requiring a fixed-sum payment "can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion,"

33

*Hagen*, 510 U.S. at 412, and language of cession and unconditional compensation "are not prerequisites for a finding of diminishment." *Solem*, 465 U.S. at 471.

In analyzing statutory language for evidence of diminishment, a court should focus on terms and language contained in the *operative* portion of the act at issue because it "is the relevant point of reference for the diminishment inquiry." *Hagen*, 510 U.S. at 413 (statute's reference to "public domain" dispositive if act "restores" lands to "public domain" in the "operative language of the statute opening the reservation lands for settlement"). The Supreme Court has cautioned that "although the statutory language must 'establis[h] an express congressional purpose to diminish,' *Solem*, 465 U.S., at 475, 104 S. Ct., at 1168-1169, we have never required any particular form of words before finding diminishment." *Hagen*, 510 U.S. at 411.

The plaintiffs admit that the most probative factor to be examined in a diminishment inquiry—statutory language—does not work in their favor, acknowledging that "the express language of the 1882 Act does not incorporate terms which the [United States Supreme] Court has previously determined to be clear evidence of Congressional intent to diminish." (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF p. 41.)

I agree. The language of the 1882 Act does not provide for cession, relinquishment, conveyance, or surrender of all rights, title, or interest to the Omaha Tribe's land in exchange for a specific sum of money; does not restore lands to the public domain; and does not require the Tribe to vacate their reservation land. Rather, the Act states that land west of the right-of-way could "be surveyed, if necessary, and sold" and, after survey and "appraisement," could be proclaimed by the Secretary of the Interior as "open for settlement." Proceeds of the sales were to be "placed to the credit of said Indians in the Treasury of the United States," and income was to "be annually expended for the benefit of said Indians." Further, Article 8 of the 1882 Act allows "Indians . . . [to] select the land which shall be allotted to them in severalty *in any part of said reservation either east or west of said right of way*," suggesting that

34

Congress intended the land west of the right-of-way to remain part of the Omaha Reservation.  (Emphasis added.)

In the late 1800s, "Congress was fully aware of the means by which termination could be effected," as evidenced by numerous bills that were introduced during that time frame that expressly terminated Indian reservations in unequivocal terms. *Mattz v. Arnett*, 412 U.S. 481, 504-05 & n.22 (1973) (stating that Congress knew how to expressly terminate reservation land when desired by using language such as "reservation is hereby discontinued," "a portion of the . . . Indian Reservation . . . be, and is hereby, vacated and restored to the public domain," and "the reservation lines of the . . . Indian reservations be, and the same are hereby, abolished").  When such language is not employed, the court will not be "inclined to infer an intent to terminate the reservation." *Mattz*, 412 U.S. at 504 (finding no diminishment when act provided that reservation was "hereby declared to be subject to settlement, entry, and purchase under the laws . . .  granting homestead rights and authorizing the sale of . . . lands," with proceeds of land sales to "constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands"; finding reference in act and legislative history to reservation in past tense insufficient to infer clear intent to diminish reservation).

Further, the difference between the 1882 Act and the Omaha Treaties of 1854 and 1865 is "particularly illuminating." *Duncan Energy*, 27 F.3d at 1297.  In the Omaha Treaties of 1854 and 1865, the Tribe expressly agreed to "cede, sell, and convey" land to the United States and "relinquish . . . all claims" thereto in exchange for fixed sums of money, demonstrating that both Congress and the Tribe knew how to alter the reservation boundaries when they chose to do so.  (Filing 115-2, 1854 Treaty ("The Omaha Indians cede to the United States" and "relinquish to the United States all claims" in exchange for specific sums of money); Filing 115-3, 1865 Treaty ("The Omaha tribe of Indians do hereby cede, sell, and convey to the United States a tract of land" and "the United States agree to pay to the said Omaha tribe of Indians the sum of fifty thousand dollars").  This treaty language is substantially different from

35

that employed in the 1882 Act.

The Eighth Circuit Court of Appeals addressed a similar scenario in *Duncan Energy*, 27 F.3d at 1297, where the court compared an 1891 treaty in which an Indian tribe agreed to "cede, sell, and relinquish to the United States all their right, title, and interest in" a portion of its reservation and referred to the "diminished Reservation" with a 1910 allotment statute that merely authorized the Secretary of the Interior to "surve[y] and to sell and dispose of . . . all the surplus unallotted and unreserved lands within [a] portion of said reservation. . . ." Finding this contrast in language to be "particularly illuminating," the court concluded that the allotment statute did not result in diminishment, stating that "[i]t would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents [the treaty and the allotment statute] affecting the Tribe." *Id*.

When compared to the language used in the 1854 and 1865 Omaha treaties, as well as statutes enacted by Congress around the turn of the century that the Supreme Court has construed to diminish reservation boundaries, I conclude that the language of the 1882 Act does not "clearly evince" Congress' "intent to change boundaries" of the Omaha Reservation, *Solem*, 465 U.S. at 470. Rather, the 1882 Act indicates that the United States intended to act as the Omaha Tribe's sales agent for purposes of surveying and auctioning its reservation land west of the right-of-way, with the proceeds held in trust in the United States Treasury for the benefit of members of the Omaha Tribe. *See Yankton Sioux Tribe*, 522 U.S. 329 (finding diminishment when act provided that Tribe would "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" and the United States pledged a fixed payment of $600,000 in return); *Hagen*, 510 U.S. at 412-14 (finding diminishment when act's language provided for opened land to be "restored to the public domain" in the operative language of the statute opening reservation lands for settlement); *Solem*, 465 U.S. at 472-475 (finding that act "opened but did not diminish" reservation and that Secretary

36

of the Interior was "simply being authorized to act as the Tribe's sales agent" when act authorized Secretary to "sell and dispose" of portions of reservation land and provided that "proceeds arising from the sale . . . shall be deposited in the Treasury of the United States, to the credit of the Indians . . ."; noting no "specific reference to the cession of Indian interests in the opened lands or any change in existing reservation boundaries"; finding that act's "isolated" and "ambiguous" references to "reservations thus diminished" and "public domain" were "hardly dispositive" and were insufficient to infer intent to diminish reservation when balanced against act's purpose of opening reservation lands for sale to non-Indian settlers)*; Rosebud Sioux Tribe*, 430 U.S. at 597 (finding diminishment when act was ratification of negotiated agreement with tribe that opened lands to settlement and appropriated and vested in the tribe $2.50 per acre in payment for the express cession and relinquishment of "all" of the tribe's "claim, right, title and interest" in the unallotted lands); *DeCoteau v. District County Court*, 420 U.S. 425, 436 (1975) (finding diminishment when tribe agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest" in reservation land for payment of sum certain); *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962) (finding no diminishment when act did *not* provide that reservation land was "vacated and restored to the public domain" and stated that proceeds from disposition of lands were to be deposited in United States Treasury "to the credit of the Colville . . . Indians"; stating that the "Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards"); *Duncan Energy*, 27 F.3d at 1297 (finding no disminishment when act "merely authorized the Secretary of the Interior to 'surve[y] and to sell and dispose of . . . all the surplus unallotted and unreserved lands within [a] portion of said reservation . . .'"; authorized Secretary to reserve land in opened territory for schools and religious institutions for benefit of Indian tribe; prohibited intoxicants in Indian Country in the opened territory; reserved timber and coal rights in opened territory for tribe; and stated that United States would act as "trustee for said Indians").

**B.  Historical Context Surrounding Passage of Act**

While Plaintiffs admit that the 1882 Act does not contain language that the Supreme Court has characterized as evidence of Congress' clear intent to diminish the Omaha Indian Reservation, Plaintiffs argue that "the legislative history of the 1882 Act and Congress' subsequent treatment of the land do make it clear that Congress intended to diminish and alter the boundaries of the reservation." (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF p. 41.)

"Even in the absence of a clear expression of congressional purpose in the text of a surplus land Act, *unequivocal* evidence derived from the surrounding circumstances may support the conclusion that a reservation has been diminished." *Yankton Sioux Tribe*, 522 U.S. at 351 (emphasis added) (looking at manner in which legislation developed after negotiations with tribe and tenor of legislative reports presented to Congress and noting that while such "context" was not compelling enough to indicate diminishment standing alone, it did not rebut the statute's plain terms, which established Congress' intent to diminish reservation).

> When events surrounding the passage of a surplus land act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress—unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.

*Solem*, 465 U.S. at 471.

The legislative history and the circumstances surrounding the 1882 Act indicate that in 1882, the only thing that can be said with certainty is that Congress understood that the stated purpose of the legislation at issue was "to sell this land and get it into

38

cultivation, and the object of the Indians is to get the money and have it put in trust for them here in Washington where they can draw their interest." (Filing 117-17 at CM/ECF p. 17, 13 Cong. Rec. 3079 (1882) (statement of Sen. Saunders).) The congressional debate indicates both an intent to "sell off from this reservation . . . 50,000 acres *in a block* on the western side of it," but also an intent to honor an existing treaty which allowed "any Indian [to] go upon any part of the whole reservation and occupy" the land.[10] (Filing 117-17 at CM/ECF p. 15 (statement of Sen. Dawes) (emphasis added).) These dual goals resulted in confusion and debate among members of Congress regarding treatment of the "Indian lands" versus lands of the "white people" who would be settling "side by side with the Indians," especially with regard to taxation.[11] The legislative history further indicates that the primary concern of the Omaha Tribe was obtaining "clear and full title" to land on which they had worked, farmed, and built houses upon and which they wished to pass on to their children. (Filing 117-17 at CM/ECF pp. 19-30 (H.R. Rep. No. 1530, 47th Cong., 1st Sess. (July 1, 1882) (statements by 53 individual members of the Omaha Indian Tribe

---

[10]See Filing 117-17 at CM/ECF pp. 32-33 (statements of Rep. Haskell ("This is the protection of the Indians in the sale. Before any land is sold they are at liberty to make their individual selections . . . ."; Indians' "severalty selections" may be made "anywhere in the reservation"; "Any Indian, however, who wishes to take his piece of land to the west of the railroad can do so.")).

[11]See Filing 117-17 at CM/ECF p. 16 (statement of Sen. Jones ("If you undertake to sell the Indian lands, and to permit the white people to buy them and settle side by side with the Indians, and thus consolidate and unite these two populations together, you cannot apply one rule to one and another to another. If you want to give Indians land in severalty, separate them from the white masses; recognize their independent organization, but do not undertake to mix them up side by side with the white people under such a system as this.")); *Id.* (statement of Sen. Butler ("I understand . . . that it is proposed to sell about fifty thousand acres of this reservation to anybody who chooses to purchase, Indian, white man, or anybody else. Do I understand that the Senator proposes to protect an Indian who purchases part of that 50,000 acres and takes it in severalty—does he propose to exempt that Indian from taxation?")).

regarding their desire to have title to their land); Filing 117-17 at CM/ECF p. 30 (Big Elk stating, "We want titles to our lands.  We are thinking of little else.").)

None of this legislative history establishes that Congress clearly contemplated that the area west of the right-of-way—whether sold in a "block" or in parcels among Indian allotments—would no longer be within the Omaha Reservation boundaries after the 1882 Act.  Indeed, the parties do not cite, nor does the court find, specific discussion of how, if at all, the 1882 Act would impact Omaha Reservation boundaries or whether the Act would transfer the Omaha Indians' tribal sovereignty in a particular geographic area.  *See, e.g.,* *Yankton Sioux Tribe v. Gaffey*, 188 F.3d at 1025 (noting that because Yankton Indian Commission report to Congress did not describe reservation boundaries or mention transfer of tribal sovereignty, the report did not indicate "clear and plain congressional intent" to terminate reservation status of nonceded lands).

The legislative history leading up to the passage of the 1882 Act is insufficient to establish an "unequivocal," widely held, contemporaneous understanding that the 1882 Act would diminish or alter the boundaries of the Omaha Reservation, as opposed to merely authorize the sale of reservation land to non-Indian settlers for the Omaha Tribe's benefit—that is, to remove certain land within the Omaha Reservation from Indian control while retaining the reservation's original exterior boundaries. *Solem*, 465 U.S. at 477-78 (neither floor debates nor legislative reports contained clear statement that Indians agreed to "cede" opened areas—rather, Congress described Indians as being "satisfied to have the surplus and unallotted lands disposed of under the provisions of the bill as amended"; legislative debate centered on amount of money Indians would receive after sale and "no mention was made of the Act's effect on the reservation's boundaries or whether State or Federal officials would have jurisdiction over the opened areas"; while there was some legislative history supporting idea that reservation was diminished, Court could not find congressional purpose to diminish reservation "[w]ithout evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests

40

in unallotted opened lands" and without "some clear statement of congressional intent to alter reservation boundaries"); *City of New Town*, 454 F.2d at 125 (citing *Seymour, 368 U.S. 351*) ("The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation.").

The plaintiffs contend that an intent to diminish the Omaha Reservation is evident from the fact that from 1871 to 1882, the Omaha Tribe and various members of Congress consistently sought to "separate" and sell 50,000 acres from the western portion of the Omaha Reservation.  (*See* Undisputed Material Facts ¶¶ 24-28 of this Memorandum & Order.)  However, if use of the word "separate" in proposed and actual legislation prior to 1882, as well as the phrase "to be separated from the remaining portion of said reservation" in the 1872 Act, have any legal relevance, then equally significant is Congress's decision to remove the word and phrase from the 1882 Act at issue here.

Like the use of the phrase "separate" in prior legislation, the Commissioner of Indian Affairs' two isolated statements—10 years prior to the 1882 Act—referring to "diminishing these reservations" and "diminished reserve" also carry little weight. (See Undisputed Material Facts ¶¶ 26 & 28 of this Memorandum & Order.)  The Supreme Court has held that even direct, contemporaneous congressional language "scattered through the legislative history" referring to "reduced reservation[s]" or "reservations as diminished" is ambiguous for purposes of diminishment analysis. *Solem*, 465 U.S. at 478.  In using such phrases,"it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate." *Id*.; *see also* *Lower Brule Sioux Tribe, 711 F.2d at 819* (holding that the phrase "as diminished" had "nothing to do with the location of reservation boundaries" and fell short of establishing congressional intent

to disestablish).[12]

Because I have found that both the language in the 1882 Act and its legislative history "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," I am "bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Solem*, 465 U.S. at 472 (citing *Mattz*, 412 U.S. at 505; *Seymour*, 368 U.S. 351).   However, I shall address the third prong of the well-established diminishment "analytical structure," as courts are to consider all three factors in determining whether an Indian reservation has been diminished.

## C. Subsequent Treatment of Area & Pattern of Settlement

The plaintiffs assert that "jurisdictional history and population demographics" of the land at issue "'demonstrate[] a practical acknowledgment that the Reservation was diminished.'"   (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF p. 43 (quoting *Hagen*, 510 U.S. at 421).)

---

[12]In *Solem*, both the Senate and House reports referred to a "reduced reservation" and to "reservations as diminished." *Solem*, 465 U.S. at 478 (citations omitted).   The statute itself even referred to the reservation as "thus diminished" and to certain parts of the opened lands as "part of the public domain." *Id*. at 474-75.   Yet the Supreme Court held that these statements did not constitute clear congressional intent to diminish reservation boundaries.   Similarly, in *Yankton Sioux Tribe*, 522 U.S. at 353-54, references to restoring the land at issue to the "public domain" appeared in the legislative history of the statute, as well as in the annual report of the Commissioner on Indian Affairs.   The Supreme Court found that the "context of the Act is not so compelling that, standing alone, it would indicate diminishment," but the Court went on to find diminishment because of the "almost insurmountable presumption that arises from the statute's plain terms." *Id*. at 351 (internal quotation marks and citation omitted).   As explained above, the language of the 1882 Act does not raise such an "insurmountable presumption."

> To a lesser extent, we have also looked to events that occurred after the passage of a surplus land act to decipher Congress's intentions. Congress's own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unalloted open lands.

*Solem*, 465 U.S. at 471.  However, subsequent history is "less illuminating" than contemporaneous evidence.  *Hagen*, 510 U.S. at 420.  The court may also "look to the subsequent demographic history of opened lands as one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers."  *Solem*, 465 U.S. at 471-472.

## 1.  Subsequent Treatment of Area

As evidence of diminishment, the plaintiffs argue that "[s]ince the early twentieth century, Indians have comprised less than two percent of the population west of the right[-of-way] and State and local officials—not the Omaha Tribe—have exercised exclusive jurisdiction over the land."  (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF p. 43.)  The plaintiffs also cite as persuasive the facts that (1) Congress treated the disputed land as if it were no longer part of the Omaha Reservation by passing the 1888 extension, which directed that in the event a settler defaulted on payment for a homestead claim in the disputed territory, the land was to be sold at public auction, not revert back to tribal ownership; (2) the Bureau of Indian Affairs issued reports and statements indicating their belief that the land west of the right-of-way was no longer part of the reservation; and (3) a local court and the Nebraska Attorney General determined that the property west of the right-of-way was no longer part of the Omaha Reservation after the 1882 Act.  (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF pp. 45-49.)

It is true that Congress postponed the 1882 Act's payments required from non-Indian settlers via subsequent legislation enacted in 1885, 1886, 1888, 1890, and

1894. (See Undisputed Material Facts ¶ 61 of this Memorandum & Order.)   These extensions were passed several years after the 1882 Act, yet Congress continued to reference the disputed area as the "Omaha Indian Reservation" and "Omaha lands." *See* 49 Cong. Ch. 844, Act of Aug. 2, 1886, 24 Stat. 214 ("all persons who have settled or shall settle upon said Omaha lands"); 50 Cong. Ch. 255, Act of May 15, 1888, 25 Stat. 150 (Secretary of Interior authorized to extend the time for payment due for "land sold on [the] Omaha Indian Reservation . . . by virtue of an act to provide for the sale of a part of the reservation of the Omaha tribe of Indians in the State of Nebraska"); 51 Cong. Ch. 803, Act of Aug. 19, 1890, 26 Stat. 329 (same); 53 Cong. Ch. 254, Act of Aug. 11, 1894, 28 Stat. 276 (same).   This would suggest that the opened area remained a part of the reservation.  *Solem*, 465 U.S. at 478-79 (two years after the surplus land statute at issue, Congress passed another bill referring to "'lands *in the Cheyenne River Indian Reservation,*' suggesting that the opened area was still a part of the reservation") (citation omitted) (emphasis in original).

The 1888 extension Act, 25 Stat. 150, also addressed what was to happen upon default by a purchaser, a scenario about which the 1882 Act was silent.  The 1888 Act provided that upon default by a purchaser, the Secretary of the Interior was to sell the land at public auction to the highest bidder, over and above the original appraisal, with "the proceeds of all such sales . . . covered into the Treasury, to be disposed of for the sole use of said Omaha tribe of Indians."  25 Stat. 150 § 3.   Under the 1888 Act, the United States merely continued to act as trustee for the Tribe so the Tribe gained the financial benefit of the sale.  Congress's reaffirmation in the 1888 Act that the United States served as trustee for the Tribe's benefit, as opposed to the absolute owner of unrestricted fee title by virtue of the cession of Indian lands, hints that diminishment did not occur.  *See, e.g., Ash Sheep Co. v. United States*, 252 U.S. 159, 164-66 (1920) (distinguishing between the United States acting as trustee for a tribe and the United States acquiring unrestricted title to their lands by tribal cession).  In addition, 12 years after the passage of the 1882 Act, Congress stated that the 1894 extension "shall be of no force and effect until the consent thereto of the Omaha Indians shall be obtained," 53 Cong. Ch. 254, 1894 Act, 28 Stat. 276, again suggesting the continued reservation

44

status of the disputed lands.

As to treatment of the area west of the right-of-way following the 1882 Act, the Omaha Reservation has been described, treated, and mapped inconsistently by the State of Nebraska, its agencies, and the United States. (See Undisputed Material Facts of this Memorandum & Order ¶¶ 60, 63-64, 67-72, 75, 83, 85-87, 89-91, 97-99, 101-102, 104; Filing 107, Exs. 1 & 2; Filing 106-3; Filings 123-2, 123-3, 123-4, 123-5, 123-6, 123-7, 123-8, 123-9.)

A "mixed record" which fails to reveal a consistent or dominant approach to the territory at issue is of "limited interpretive value," carries "little force," and cannot be considered dispositive of the question whether Congress intended to diminish the Omaha Reservation in the 1882 Act. *Yankton Sioux Tribe*, 522 U.S. at 354-355 (citing conflicting descriptions of disputed land by Congress and Executive Branch and inconsistent "scores of administrative documents and maps" presented by parties; finding that such evidence carried "little force in light of the strong textual and contemporaneous evidence of diminishment" and that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one" (internal quotations and citations omitted)); *Solem*, 465 U.S. at 478-479 ("The subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side."); *Rosebud Sioux Tribe*, 430 U.S. at 604 n.27 (sporadic and contradictory history of congressional and administrative actions carried "little force" in light of state's longstanding and clear assumption of jurisdiction over disputed area, with acquiescence by the tribe and federal government); *Yankton Sioux Tribe v. Gaffey*, 188 F.3d at 1029 n.11 (conflicting representations of reservation boundaries in administrative materials and maps had limited interpretive value, as "use of the term 'Yankton Sioux Reservation' in such documents, without more, cannot be said to be a considered jurisdictional statement regarding the specific status of the remaining Indian lands").

45

## 2.  Pattern of Settlement

The plaintiffs argue that "[s]ince the early twentieth century, Indians have comprised less than two percent of the population west of the right[-of-way] and State and local officials—not the Omaha Tribe—have exercised exclusive jurisdiction over the land."  (Filing 118, Pls.' Br. Supp. Mot. Summ. J. at CM/ECF p. 43.)

> "Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred." [Solem, 465 U.S.] at 471, 104 S. Ct., at 1166. This final consideration is the least compelling for a simple reason:  Every surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the "Indian character" of the reservation, yet we have repeatedly stated that not every surplus land Act diminished the affected reservation.

Yankton Sioux Tribe, 522 U.S. at 356.  The Court has also noted that "[w]hen an area is predominately populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains Indian country seriously burdens the administration of State and local governments." Solem, 465 U.S. at 472 n.12.

The parties agree that very few Omaha Indians settled west of the right-of-way but, as stated above, this is the "least compelling" factor in diminishment analysis because every act of this kind necessarily resulted in "a surge of non-Indian settlement," yet the Supreme Court has found that diminishment did not occur. Yankton Sioux Tribe, 522 U.S. at 356.

The parties also agree that "many" members of the Omaha Tribe have regularly visited, resided in, and conducted business in Pender.  Community involvement by members of the Omaha Tribe suggests their understanding that Pender sits within reservation boundaries.  For example, as early as 1890, an attorney and member of the Omaha Tribe maintained an office and residence in Pender, as well as served as mayor

46

of the Village of Pender, Thurston County surveyor, and justice of the peace.  At a time not specified by the parties, another attorney and enrolled member of the Omaha Tribe resided and practiced law in Pender, where his children attended the public schools.  He also served as the Thurston County Attorney for eight years before being elected as a county judge.  Finally, there is some historical evidence that the Omaha Indians have held several additional public offices in Thurston County, including county coroner, constable, road overseer, election officer, and juror in the county and district courts.  (Undisputed Material Facts of this Memorandum & Order ¶¶ 76-81 (citing *Hallowell v. United States*, 221 U.S. 317, 319-20 (1911).)

In contrast, the parties have stipulated that Omaha Tribal authorities enforce various portions of the Omaha Tribal Code east, but not west, of the right-of-way; the Omaha Tribe does not offer foster care or medical, welfare, or child protective services west of the right-of-way; the Omaha Tribe does not have an office and does not operate a school, industry, or business west of the right-of-way; no tribal celebrations or ceremonies take place west of the right-of-way; the Omaha Tribe does not conduct governmental or ceremonial activities west of the right-of-way; and the Tribe has no mineral rights or other claims to land west of the right-of-way.  (Undisputed Material Facts of this Memorandum & Order ¶¶ 95-96.)

As was the case with state and federal agencies' inconsistent treatment of the disputed land following the 1882 Act, this "mixed" evidence regarding the demographics of the area west of the right-of-way is not dispositive. *Solem*, 465 U.S. at 478-79 (finding no diminishment where "[t]he subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side"); *Duncan Energy*, 27 F.3d at 1297 ("Throughout the [diminishment] inquiry, ambiguities are to be resolved in favor of the Indians, and diminishment should not be found lightly.").

Even if this demographic evidence did establish diminishment, it cannot overcome my conclusion that the language of the 1882 Act itself does not clearly

47

evince Congress' intent to diminish the Omaha Reservation. *Duncan Energy*, 27 F.3d at 1298 ("We find . . . exclusive reliance on the third *Solem* factor to create a quasi-diminishment totally inappropriate.").

## IV.  CONCLUSION

"Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470.  Congress did not explicitly indicate otherwise here, as neither the 1882 Act's statutory language, the legislative history and circumstances surrounding the passage of the Act, nor the demographic history of the land west of the right-of-way demonstrate clear congressional intent to diminish the boundaries of the Omaha Indian Reservation or a widely-held, contemporaneous understanding that Congress's action would diminish those boundaries.

Accordingly,

IT IS ORDERED:

1.    Because the 47th Congress's Act of August 7, 1882, 22 Stat. 341, did not diminish the boundaries of the Omaha Indian Reservation as they existed at that time, the motion for summary judgment (Filing 116) filed by Plaintiffs requesting declaratory and injunctive relief from the Omaha Indian Tribe's attempt to enforce the Omaha Tribe's Beverage Control Ordinance, as amended, 71 Fed. Reg. 10056 (Feb. 28, 2006), against Defendants is denied;

2.    The motion for summary judgment (Filing 113) filed by Defendants is granted;

3.    The  temporary  restraining  order  prohibiting  the  enforcement  of  the

48

Omaha Tribe's Beverage Control Ordinance in Pender, Nebraska, which was later extended by a stipulation of the parties (Filings 16 & 29), is dissolved;

4.      The State of Nebraska's claims as plaintiff-intervenor are mooted by my finding that the 1882 Act did not diminish the Omaha Indian Reservation; and

5.      Judgment in favor of Defendants and Defendant-Intervenor and against Plaintiffs and Plaintiff-Intervenor providing that Plaintiffs and Plaintiff-Intervenor shall take nothing shall be entered by separate document.

DATED this 13th day of February, 2014.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.